# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| BALSHE LLC and THE SIMON LAW FIRM, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 08 CV 3256 |
| | ) | |
| v. | ) | Judge James B. Zagel |
| | ) | |
| ALAN J. ROSS and SAVE ASSOCIATES, | ) | Magistrate Judge Susan E. Cox |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' MEMORANDUM OF LAW IN
## SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION

P. Andrew Fleming
Richard L. Miller II
Richard G. Douglass
NOVACK AND MACEY LLP
100 N. Riverside Plaza
Chicago, Illinois 60606
(312) 419-6900
222774

Plaintiffs Balshe LLC ("Balshe") and The Simon Law Firm (the "Simon Firm") (collectively, "Plaintiffs"), by their attorneys, Novack and Macey LLP, submit this Memorandum of Law in support of Plaintiffs' Motion For Preliminary Injunction (the "Motion") as to Alan J. Ross ("Ross") and SAVE Associates ("SAVE") (collectively, "Defendants").

## I.

## INTRODUCTION

Plaintiffs are in need of preliminary injunctive relief from the Court. Defendants have already engaged in a calculated effort to fraudulently obtain immensely valuable confidential information and trade secrets from Plaintiffs. Once Defendants obtained that information, they knowingly violated their contractual and fiduciary duties to Plaintiffs by wrongfully: (i) demanding a monetary ransom to keep Plaintiffs' information secret; (ii) withholding delivery of a patent that Plaintiffs purchased from Defendants; and (iii) attempting to sell Plaintiffs' secret information and patent to various third parties.

Plaintiffs entered into three agreements with Defendants. Those agreements provided for: (i) Defendants' transfer of an interest in a valuable patent (the "'390 Patent") from Defendants to Plaintiff Balshe (the "'390 Patent Purchase Agreement"); (ii) Plaintiffs' safe disclosure to Defendants of how the '390 Patent could be used in an extremely profitable manner (the "Non-Disclosure Agreement"); and (iii) Defendants' sharing in the profits resulting from Plaintiffs' development and use of the '390 Patent by serving as a consultant to Plaintiffs (the "Consulting Agreement"). Defendants have knowingly, intentionally and in bad faith violated all three agreements.

Plaintiffs learned that, during the week of May 27, 2008, Defendants were planning on wrongfully and illegally engaging in meetings and negotiations with various third parties to sell

Plaintiffs' interest in the '390 Patent as well as Plaintiffs' immensely valuable confidential information (the "New Business Plan") which the Non-Disclosure Agreement was designed to protect. The sale of the '390 Patent would violate Plaintiffs rights under the '390 Patent Purchase Agreement and the Consulting Agreement. Further, the disclosure of the New Business Plan to any additional parties would violate the Non-Disclosure Agreement.

Faced with Defendants' threats to sell the '390 Patent, along with Plaintiffs' New Business Plan, upon notice to Defendants, Plaintiffs sought and obtained a temporary restraining order (the "TRO") from the Honorable Kathleen M. Pantle of the Circuit Court of Cook County preventing Defendants from: (i) transferring the '390 Patent; and (ii) disseminating the New Business Plan. Plaintiffs also sought and were granted leave to conduct expedited discovery. Following the granting of the TRO, Judge Pantle scheduled the matter for a hearing on Plaintiffs' motion for a preliminary injunction on June 12 and 13, 2008.

On June 5, 2008, Defendants removed the case to Federal Court. Although the State Court TRO remains in effect, Plaintiffs are no longer entitled to proceed with the preliminary injunction hearing before Judge Pantle. Accordingly, Plaintiffs are requesting a preliminary injunction from this Court to protect their interest in the '390 Patent and the New Business Plan until a trial can be held on the merits of this case.[1]

Since the removal of this case, the parties have also agreed, with minor changes, to adhere to the expedited discovery schedule established by Judge Pantle. Thus, Defendants will produce documents responsive to Plaintiffs' requests by June 12, 2008, and Plaintiffs will produce documents

---

[1] A copy of the TRO entered by Judge Pantle on May 28, 2008, is attached hereto as Exhibit 1.

2

responsive to Defendants' requests by June 18, 2006.  The parties have also agreed to schedule depositions beginning in mid-June 2008.  Consistent therewith, Plaintiffs anticipate being prepared for a two-day evidentiary hearing that could take place in early July 2008, if the Court is available.

## II.

## STATEMENT OF FACTS[2]

Defendant Ross obtained the '390 Patent from the United States Patent and Trademark Office in 1999.  (Verified Compl. ¶12.)  The patent sets forth a system for pooling life insurance policies into a trust in order to create a predictable income stream for the trust owners.  (Verified Compl. ¶13.)  Specifically, it allows various corporations to join the trust and thereby pool their life insurance policies with policies owned by other companies.  (Verified Compl. ¶13.)  When a given company's insured dies, and the policy pays-out, the payouts are shared among the trust owners to create a smoother and more predictable cash flow.  (Verified Compl. ¶13.)  At the time he obtained the '390 Patent, Ross assigned a one-half interest in it to another entity.  (Verified Compl. ¶11.)  That interest (the "AXA '390 Patent Interest") is now held by an affiliate of the AXA Group ("AXA").  (Verified Compl. ¶11.)

Despite obtaining the '390 Patent, Ross was unable to generate a single dollar of revenue from the operation of any trust pursuant to the patent.  (Verified Compl. ¶¶14, 98.)   This was because he had a flawed business strategy and he believed that he could only generate a few hundred thousand dollars of revenue per year from the patent.  (Verified Compl. ¶15.)  In the second half of 2007, Defendants Ross and SAVE approached David Simon ("Simon") of the Simon Firm

---

[2]     The Plaintiffs' *Verified* Complaint For Injunctive And Other Relief (the "Verified Complaint") is attached hereto as Exhibit 2.  The facts set forth herein are taken from the Verified Complaint.

concerning a possible purchase of the '390 Patent by a company to be formed by a group of investors. (Verified Compl. ¶15.) That company, which was later formed, is Plaintiff Balshe. (Verified Compl. ¶18.)

Simon developed an improved business plan that would create over a <u>billion dollars</u> in revenue within ten years through the use of the '390 Patent (the "New Business Plan").[3] (Verified Compl. ¶¶15-16) This plan, which Simon and Balshe have kept secret, involved applying the pooling system to large institutions. (Verified Compl. ¶¶13, 15-17.) Because of the enormous commercial value of the New Business Plan, Simon required Defendants to agree to maintain it as confidential. (Verified Compl. ¶¶18-22.) Plaintiff the Simon Firm and Defendants entered into a written agreement in December 2007 addressing this concern (the "Non-Disclosure Agreement"). (Verified Compl. ¶21.) Acting in reliance on the Non-Disclosure Agreement, the Simon Firm disclosed the New Business Plan to Defendants. (Verified Compl. ¶¶18-22.)

In April 2008, Plaintiffs and Defendants reached an agreement regarding Plaintiffs' purchase of Defendants' interest in the '390 Patent. (Verified Compl. ¶¶23- 37.) They agreed that Balshe, which was referred to as "Newco" at that time, would purchase the '390 Patent from Defendants for $75,000. (Verified Compl. ¶30.) The terms to which the parties agreed were set forth in a written contract (the "'390 Patent Purchase Agreement"). (Verified Compl. ¶¶35-37.) The parties also agreed that Ross would act as a consultant in a manner that would allow him to share in the financial rewards expected from the New Business Plan (the "Consulting Agreement"). (<u>See</u> Verified Compl. ¶¶2, 24-29, 31-37.)

---

[3]     Until such time as an appropriate Protective Order is entered in this case, Plaintiffs obviously cannot provide greater detail of the terms of the New Business Plan because disclosing those details may make them public and may, thereby, destroy the plan's value.

During the parties' negotiations, Ross told Simon he needed $25,000 of the $75,000 patent purchase price immediately because he was broke and he had to make a payment to the Internal Revenue Service that could not be delayed. (Verified Compl. ¶29.) On April 14, 2008, in reliance on Ross's confirmation that the parties had reached an agreement, Simon wire transferred the $25,000 to Ross. (Verified Compl. ¶36.) On that same day, Simon forwarded the '390 Patent Purchase Agreement to Ross for his execution on behalf of Ross and SAVE. (Verified Compl. ¶¶35-36.) Although Defendant Ross did not sign that document, he acknowledged that the parties had reached an agreement and even later requested "amendments" to the agreement. (Verified Compl. ¶¶38-42.)

In early 2008, Plaintiffs directed Defendants to negotiate on their behalf for the purchase of an option for AXA's one-half interest in the '390 Pate nt at a reasonable price. (Verified Compl.¶¶24-25.) After agreeing to do this, Defendants were informed that this was a critical aspect of the New Business Plan. (Verified Compl.¶¶24-25.) On or about February 28, 2008, Defendant Ross told Plaintiffs that AXA seemed unwilling to sell an option for its half-interest in the '390 Patent. (Verified Compl. ¶26.) In mid-May, Ross revealed that this statement was false and that he had secretly, and in violation of his fiduciary duties to Plaintiffs, obtained an option on such an interest for himself. (Verified Compl. ¶¶45-47.)

During that same telephone call, Ross repeated that he had secretly "tied up" the '390 Patent for himself and that he would not honor the parties' agreement. (Verified Compl. ¶¶45-46, 48.) Ross made it clear that he had obtained an option on the AXA '390 Patent Interest. (Verified Compl. ¶¶44, 47-48.) Later that day, Plaintiffs learned that Defendant Ross was actively marketing the New Business Plan to other investors in an attempt to sell them the '390 Patent along with the New

Business Plan -- in blatant violation of his duties and obligations under the '390 Patent Purchase Agreement, the Consulting Agreement and the Non-Disclosure Agreement. (Verified Compl. ¶49.) In fact, on that same day, Ross sent an e-mail in which he demanded that Balshe pay him the extortionate amount of $7,000,000, plus ongoing royalties and commissions, in order to obtain the '390 Patent. (Verified Compl. ¶50.)

Defendant Ross also admitted to Simon that he had just "changed his mind" about honoring his agreements. (Verified Compl. ¶45.) Ross said that, given the value of the '390 Patent when combined with the New Business Plan, he intended to sell them to a third-party. (Verified Compl. ¶51.) Recently, Plaintiffs learned that, during the week of May 27th, Defendants were planning on engaging in meetings and negotiations with various third parties regarding the sale of Plaintiffs' interest in the '390 Patent as well as Plaintiffs' immensely valuable confidential information. (Verified Compl. ¶¶51-54.) Indeed, Ross told Plaintiffs that unless Plaintiffs conceded to Ross's extortionate demand for payment, Ross would disclose to third-parties Plaintiffs' highly confidential New Business Plan and, if possible, illegally sell the '390 Patent. (Verified Compl. ¶¶51-54.) Consequently, Plaintiffs sought and obtained a temporary restraining order from the Circuit Court of Cook County and are now seeking a preliminary injunction to prevent these things from happening until such time as a trial can be held.

## III.

## ARGUMENT

To obtain a preliminary injunction, Plaintiffs must demonstrate that: (i) their case has some likelihood of success on the merits; (ii) no adequate remedy at law exists; and (iii) they will suffer irreparable harm if the injunction is not granted. Ty, Inc. v. The Jones Group, Inc., 237 F. 3d 891,

6

895 (7th Cir. 2001) (standards for preliminary injunction). If these three conditions have been met, then the Court must consider the irreparable harm Defendants would suffer if preliminary relief is granted, balancing such harm against the irreparable harm Plaintiffs would suffer if the relief is denied. Ty, Inc., 237 F. 3d at 895. Finally, the Court should consider the public interest in denying or granting the injunction. Id.

## A.    Plaintiffs Are Likely To Succeed On The Merits

To demonstrate a reasonable likelihood of success on the merits, Plaintiffs must show that their chance of prevailing is "better than negligible." Nano-Proprietary, Inc. v. Keesmann, 2007 WL 433100, at *4 (N.D. Ill. Jan. 30, 2007).[4] Plaintiffs have, by far, exceeded this standard. Plaintiffs have undeniable proof in support of their claims in the form of their verified allegations, the parties' three written agreements, and the $25,000 transfer. Indeed, their verified allegations demonstrate that they can establish the elements of twelve causes of action which include fraud, breach of contract, breach of fiduciary duty and violation of Illinois' Trade Secret Act. Under these circumstances, Plaintiffs have certainly, at the very least, shown they have a "better than negligible" chance of prevailing and that, thus, they are entitled to the limited protections they are seeking.[5]

## B.    Plaintiffs Will Suffer Irreparable Harm If A Preliminary Injunction Does Not Issue

If an injunction is not issued, Plaintiffs will suffer irreparable harm because: (i) Defendants will most likely transfer Plaintiffs' interest in the '390 Patent to a bona fide purchaser (from whom it may be impossible to obtain its return); and (ii) Defendants will share Plaintiffs' secret New

---

[4]    Copies of the unpublished cases cited herein, in alphabetical order, are attached as Exhibit 3.

[5]    In addition, at the evidentiary hearing on this matter, Plaintiffs will present the sworn testimony of various witnesses in support of their claims.

7

Business Plan with others -- to whom Defendants intend to wrongfully market it.

With respect to Plaintiffs' interest in the '390 Patent, the case of Nano-Proprietary, Inc. v. Keesmann, 2007 WL 433100 (N.D. Ill. Jan. 30, 2007), is directly on point. There, a plaintiff sought a preliminary injunction to prevent a defendant from terminating, or acting in violation of, a license agreement relating to certain patents. Id. at *4. Like here, the patents were potentially worth hundreds of millions, if not billions, of dollars and plaintiff was concerned that they would be transferred. Id. At *5-6. The court held:

> We conclude the sale of the patents, before the end of the litigation, would constitute _irreparable_ _harm_ to [Plaintiff] because [its] rights under the License Agreement would be irretrievably damaged. . . . Therefore, the Court believes that [Plaintiff] has also met its burden to demonstrate irreparable harm[.]

Id. at *7 (emphasis added). As in that case, this Court should find that Plaintiffs will suffer irreparable harm if their interest in the '390 Patent is not protected.

This Court should also protect Plaintiffs' New Business Plan. In Noddings Inv. Group, Inc. v. Kelley, 1994 WL 91932, at *1 (N.D. Ill. Mar. 18, 1994), the plaintiff sought a preliminary injunction to prevent a former employee from using and disclosing a confidential investment strategy. The court ruled:

> [I]f we refused to issue a preliminary injunction and [Defendant] were to use the [Plaintiff's confidential investment strategy], the harm to [Plaintiff] from the loss of clients to [Defendant] and the loss of reputation would be difficult to quantify. . . .   On balance, we find that entry of a preliminary injunction barring [Defendants] from using or disclosing the [confidential investment strategy] is appropriate.

Id. at *4; see also IDS Fin. Servs., Inc. v Smithson, 843 F. Supp. 415, 418 (N.D. Ill. 1994) (indicating the threat of irreparable harm is significant for the misappropriation or misuse of trade secrets).

8

Likewise, if Defendants are allowed to misuse and disclose Plaintiffs' New Business Plan, the loss of clients, business and profits Plaintiffs would suffer would be difficult to quantify. Accordingly, Plaintiffs would be irreparably harmed.

In addition, Ross knew that obtaining the AXA '390 Patent Interest option was critical to Plaintiffs and that he had a duty to negotiate to acquire this option on Plaintiffs' behalf. Despite this fact, Ross breached that duty and secured the option for himself. Plaintiffs would suffer irreparable harm if that option, which rightfully belongs to them, were allowed to lapse. Accordingly, Plaintiffs are seeking as part of the requested relief herein, an Order requiring Defendants to take all steps necessary to preserve Plaintiffs' right to ultimately obtain the AXA '390 Patent Interest. Entry of a preliminary injunction to protect the New Business Plan, Plaintiffs' interest in the '390 Patent, and any option Defendants have on the AXA '390 Patent Interest is therefore appropriate.

C.    **Plaintiffs Have No Adequate Remedy at Law**

The third element of the preliminary injunction analysis is also satisfied because it is not possible to fully or adequately compensate Plaintiffs with a remedy at law, i.e., money damages. Here, Plaintiffs are seeking to protect their interest in a patent, an item that is unique and therefore inherently difficult to value, and their highly confidential New Business Plan relating thereto. See Techtronic Indus. Co. v Chevron Holdings, Ltd., 395 F. Supp. 2d 720, 736 (N.D. Ill. 2005) ("It is well-settled that, because the principal value of a patent is its statutory right to exclude, the nature of the patent grant weighs against holding that monetary damages will always suffice to make the patentee whole"). Indeed, given that this is a brand new business venture, there is no way for Plaintiffs to prove what the worth of the patent and their information would have been if Defendants are allowed to wrongfully and illegally destroy its value by disseminating the information and

transferring the patent.  Nano-Proprietary, Inc. v. Keesmann again provides guidance:

> We conclude that the sale of the patents, before the end of the litigation, would constitute irreparable harm to [Plaintiff] because [its] rights under the License Agreement would be irretrievably damaged.  Moreover, because of the nature of the unique patents and their undeveloped market, evaluating the amount of damages due to [Plaintiff] is speculative, leaving equity as a more just remedy than money damages.  Therefore, the Court believes that [Plaintiff] has also met its burden to demonstrate irreparable harm and an *inadequate remedy at law*.

2007 WL 433100, at *7 (N.D. Ill. Jan. 30, 2007) (emphasis added).  Consequently, the only way to protect Plaintiffs' interests is to grant Plaintiffs' preliminary injunction preventing the sale of the '390 Patent and the transfer of any information protected by the Non-Disclosure Agreement.

To make matters worse, even if a dollar value could be assigned to Plaintiffs' rights after-the-fact, they probably could not obtain a recovery.  This is because Defendants are virtually insolvent, as demonstrated by the facts that Ross has admitted he is "broke" and he effectively stole $25,000 from Plaintiffs to make tax payments that he owed to the IRS.  Thus, even if an exact amount could be established, money damages are likely not an option for making Plaintiffs whole.  Toyoda Mach. USA Corp v. Gorski, No. 03 C 7020, 2003 WL 22956016 (N.D. Ill. December 12, 2003) (inadequate remedy at law where defendant does not have financial resources); Bowlman v. Dixon Theatre Renovation, Inc., 221 Ill. App. 3d 35, 42-43 (2nd Dist. 1991) ("judgment for money damages would be worthless due to the insolvency of the judgment debtor").  Accordingly, this element of the preliminary injunction analysis is met twice-over.

**D.    A Balancing Of The Harms Favors Granting The Preliminary Injunction**

A balancing of the hardships also favors Plaintiffs.  Plaintiffs seek protection of the '390 Patent and the New Business Plan only until such time as the Court finally rules upon Plaintiffs'

requested relief. Not allowing Defendants to immediately sell the '390 Patent will cause them little harm, if any. Indeed, Defendants had this right for <u>eight years</u> prior to their entering into the '390 Patent Purchase Agreement and never sold their interest or generated income from it. Similarly, not allowing Defendants to violate the Non-Disclosure Agreement by disseminating the New Business Plan will not harm Defendants since it is only Plaintiffs' plan that Defendants cannot use. Consequently, a temporary delay while this case is being litigated will not <u>unduly</u> burden Defendants.

In stark contrast, a decision by the Court <u>not</u> to protect Plaintiffs until a trial on the merits would be devastating for Plaintiffs. They will lose all of the benefits for which they contracted under the '390 Patent Purchase Agreement, the Non-Disclosure Agreement and the Consulting Agreement. By the time a trial arrives, the '390 Patent interest to which Plaintiffs are entitled may be impossible to recover. Further, their unique and priceless New Business Plan will be worthless -- since Defendants will have shared it with numerous third parties. Therefore, it is clear that a balancing of the hardships clearly favors preserving the *status quo* by entering a preliminary injunction. <u>See</u> <u>Nano-Proprietary, Inc. v. Keesmann</u>, 2007 WL 433100, at *7 (N.D. Ill. Jan. 30, 2007) (finding that the balancing test favors plaintiff, the licensee of the defendant with regard to certain patents, where denying entry of the requested injunction would allow the patent rights to revert to the defendant but the granting of the injunction would merely delay the defendants ability to use the patents).

**E.    Granting The Preliminary Injunction Will Cause No Harm To The Public**

The last element of the preliminary injunction analysis is whether the public interest will be harmed by the granting of the injunction. Here, because this is a private contract dispute, the Court should give little or no weight to this element. <u>See</u> <u>Nano-Proprietary, Inc. v. Keesmann</u>, 2007 WL

433100, at *7 (N.D. Ill. Jan. 30, 2007) ("Because this is essentially a private contract dispute, the Court is not inclined to weigh the public interest here"). The impact <u>on</u> <u>the</u> <u>public</u> of the entry of a preliminary injunction in this case is either non-existent or purely speculative. <u>Id.</u> Therefore, the preliminary injunction should be granted.

**F.    <u>Only A Nominal Bond Should Be Required</u>**

Rule 65(c) indicates that a party seeking a preliminary injunction should provide such security as "the court considers proper." Here, the Court should order Plaintiffs to provide a nominal bond. In the eight years that have passed since Plaintiffs obtained the '390 Patent, Ross has not sold it and he has been unable to generate a single dollar of revenue from the operation of any trust pursuant to it. Thus, little or no injury to Defendants will occur if they are delayed in their attempts to sell the patent pending the determination of Plaintiffs' rights.

**IV.**

**CONCLUSION**

WHEREFORE, for all of the foregoing reasons, Plaintiffs respectfully request that the Court:

(a)     Enjoin Ross and SAVE from disseminating any information disclosed by Balshe and/or the Simon Firm pursuant to the Non-Disclosure Agreement described within, and attached to, Plaintiffs' Verified Complaint;

(b)     Enjoin Ross and SAVE from transferring any interest in United States Patent No. 5,974,390;

(c)     Enjoin Ross and SAVE from allowing any interest either of them possesses in United States Patent No. 5,974,390, including an interest they hold in the AXA '390 Patent Interest, to lapse; and

(d)     Grant Plaintiffs such other and further relief as the Court deems appropriate.

BALSHE LLC and THE SIMON LAW FIRM

By:_____ /s/ Richard L. Miller II_____
          One of Their Attorneys

13

## CERTIFICATE OF SERVICE

I, Richard L. Miller II, hereby certify that I caused a copy of the foregoing Plaintiffs' Memorandum Of Law In Support Of Their Motion For Preliminary Injunction to be served upon the following individual via electronic means pursuant to Electronic Case Filing (ECF) procedures:

> Alan R. Lipton
> Hinshaw & Culbertson LLP
> 222 N. LaSalle St., Suite 300
> Chicago, IL 60601-1081
> alipton@hinshawlaw.com

and upon the following individuals via electronic mail and U.S. mail:

> David L. Braverman
> Richard S. Julie
> Braverman & Kaskey, P.C.
> One Liberty Place, 56th Floor
> Philadelphia, PA 19103-7334
> braverman@braverlaw.com
> julie@braverlaw.com

on this 9th day of June 2008.


> _____/s/ Richard L. Miller II_____
> Richard L. Miller II

# EXHIBIT 1

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

| | | |
|---|---|---|
| BALSHE LLC and THE SIMON LAW FIRM, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 08 CH 19160 |
| | ) | |
| ALAN J. ROSS and SAVE ASSOCIATES, | ) | Honorable Kathleen M. Pantle |
| | ) | |
| Defendants. | ) | |

## TEMPORARY RESTRAINING ORDER

This matter coming to be heard on the Emergency Motion For Temporary Restraining Order And Preliminary Injunction (the "Motion") filed by Plaintiffs Balshe LLC ("Balshe") and The Simon Law Firm (the "Simon Firm") (collectively, the "Plaintiffs") to enjoin Defendants Alan J. Ross ("Ross") and SAVE Associates ("SAVE") (collectively, the "Defendants") from: (i) disseminating any information disclosed by Balshe and/or the Simon Firm pursuant to the Non-Disclosure Agreement; and (ii) transferring any interest in United States Patent No. 5,974,390 (the "'390 Patent"); due notice having been given, ~~counsel for _____ having appeared,~~ the Court having reviewed Plaintiffs': (a) Verified Complaint For Injunctive And Other Relief; (b) Emergency Motion For Temporary Restraining Order And Preliminary Injunction (the "Emergency Motion"); and (c) Memorandum In Support Of Emergency Motion For Temporary Restraining Order And Preliminary Injunction; and the Court having heard argument and being otherwise fully advised in the premises,

THE COURT FINDS THAT:

1. Plaintiffs possess clearly ascertainable rights in need of protection in the form of: (a) their contractual rights to the '390 Patent, as set forth and described in the '390 Patent Purchase Agreement; (b) their contractual rights to not have the confidential and secret business plan they disclosed to Defendants (the "New Business Plan")

disseminated to any third parties, as set forth and described in the Non-Disclosure Agreement; and (c) their statutory rights under the Illinois Trade Secrets Act (the "Act") not to have their trade secrets, including, without limitation, the New Business Plan, misappropriated by Defendants.

2.     Defendants' threatened disclosure of the New Business Plan, which constitutes a trade secret pursuant to the Act, would constitute misappropriation under the Act;

3.     Plaintiffs' rights are in need of protection from Defendants as Defendants have the means, ability and motive to transfer the '390 Patent and disclose Plaintiffs New Business Plan;

4.     Plaintiffs will suffer irreparable harm if a Temporary Restraining Order ("TRO") is not issued to protect their interests because, if the '390 Patent is transferred, it may be difficult or impossible to obtain its return and, if the New Business Plan is disclosed, it will seriously impair its value and there may be no way to prevent third parties from using the information and/or disseminating it to others;

5.     Plaintiffs have no adequate remedy at law because: (i) the value of the '390 Patent and the New Business Plan cannot be determined; and (ii) Defendants do not have sufficient assets to satisfy a damage award;

6.     Plaintiffs are likely to succeed on the merits as they have written agreements and sworn allegations demonstrating the validity of their claims;

7.     The harm to Plaintiffs if a TRO is not granted outweighs any harm to the Defendants from the granting of such an order as, in the absence of a TRO, it may not be possible to make Plaintiffs whole if the '390 Patent is transferred and/or the New Business Plan is disseminated prior to the holding of a preliminary injunction hearing; but the harm to Defendants will be minimal if they are prevented from transferring the '390 Patent and disseminating the New Business Plan for a minimal amount of time until a preliminary injunction hearing is promptly held;

8.     Pursuant to Section 3 of the Act, Plaintiffs are entitled to the injunctive relief requested in the Emergency Motion to prevent Defendants' actual or threatened misappropriation of Plaintiffs' trade secrets; and

9.     The requested TRO will maintain the *status quo ante* as it will prevent the transfer of the '390 Patent to one or more other parties and prevent the dissemination of Plaintiffs' confidential and secret New Business Plan until the Court has an opportunity to hold a preliminary injunction hearing on this matter.

THE COURT HEREBY ORDERS THAT:

A.     Ross and SAVE are temporarily restrained and enjoined from in any manner transferring, pledging, disposing of or otherwise encumbering any interest in United States Patent No. 5,974,390;

B.     Ross and SAVE are temporarily restrained and enjoined from disseminating in any manner any information disclosed by Balshe and/or the Simon Firm pursuant to the Non-Disclosure Agreement including, without limitation, the New Business Plan; and

C.     This matter is set for hearing with respect to the portion of Plaintiffs' Motion requesting a preliminary injunction on ___June 12th + June 13th___, 2008 at ___1:30___ a.m./p.m.

ENTERED:

By:_____

Dated:_____

ENTERED
JUDGE KATHLEEN M. PANTLE - 1775
MAY 28 2008
DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL
DEPUTY CLERK

_Prepared by:_
P. Andrew Fleming
Richard L. Miller II
Richard G. Douglass
NOVACK AND MACEY LLP
100 N. Riverside Plaza
Chicago, Illinois 60606
(312) 419-6900
Firm ID. 91731
#221127

# EXHIBIT 2

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

BALSHE LLC and THE SIMON LAW FIRM,    )
    )
        Plaintiffs,    )
    )    Case No.
    v.    )
    )    08CH 19180
ALAN J. ROSS and SAVE ASSOCIATES,    )
    )
        Defendants.    )

## VERIFIED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiffs Balshe LLC ("Balshe") and The Simon Law Firm (the "Simon Firm") for their

Verified Complaint for Injunctive and Other Relief against Defendants Alan J. Ross ("Ross") and

SAVE Associates ("SAVE"), allege as follows:

## NATURE OF THE ACTION

1.    This action arises out of Defendants' scheme to fraudulently obtain extremely

valuable confidential information and trade secrets belonging to Plaintiffs and to extort and steal

millions of dollars from them. Indeed, once Defendants received the trade secrets and confidential

information from Plaintiffs and $25,000 of Plaintiffs' money, they knowingly violated their

contractual and fiduciary duties to Plaintiffs by wrongfully: (a) demanding a monetary ransom to

keep Plaintiffs' information secret; (b) withholding delivery of a patent that Plaintiffs purchased

from Defendants; and (b) attempting to sell Plaintiffs' patent, trade secrets and confidential

information to third parties.

2.    The parties' relationships are governed by three written contracts -- all of which

Defendants have violated. Among other things, the three agreements were designed to: (a) transfer

all right, title and interest in Patent No. 5,974,390 (the "'390 Patent") from Defendants to Balshe (the

"'390 Patent Purchase Agreement"); (ii) allow Plaintiffs to safely disclose to Defendants how the '390 Patent could be used in an extremely profitable manner (the "Non-Disclosure Agreement"); and (iii) provide for Defendants to share in the profits from Plaintiffs' development and use of the '390 Patent by serving as a consultant to Plaintiffs (the "Consulting Agreement").

3.      Defendants have now threatened that unless Plaintiffs agree to pay them $7,000,000, Defendants will sell the '390 Patent along, with Plaintiffs' confidential business plans, to an undisclosed third party.

4.      Plaintiffs seek to: (a) preliminarily and permanently restrain and enjoin Defendants from further wrongful dissemination of Plaintiffs' confidential information; (b) preliminarily and permanently restrain and enjoin Defendants from transferring to any party other than Plaintiffs any right, title or interest in, or corporate opportunities related to, the '390 Patent; (c) specifically enforce the '390 Patent Purchase Agreement; (d) recover damages and disgorgement of all profits and other compensation received or to be received by Defendants resulting from breaches of their contractual and fiduciary obligations; and (e) recover damages, including punitive damages, arising from Defendants' misappropriation of trade secrets and fraud.

## PARTIES, JURISDICTION AND VENUE

5.      Plaintiff Balshe LLC is a Delaware limited liability corporation with its principal place of business located within Cook County, Illinois. Balshe was formed to develop and pursue the economic opportunities relating to the '390 Patent.

6.      Plaintiff The Simon Firm is a sole proprietorship operated by David Simon ("Simon"), with its principal place of business located in Cook County, Illinois.

7.      Defendant Ross is a citizen of the Commonwealth of Massachusetts.

8.    Defendant SAVE is an unincorporated business entity operated by Ross, with its principal place of business located at 687 Highland Avenue, Needham, MA 02494.

9.    This Court has personal jurisdiction over Defendants because they expressly consented to jurisdiction in the State of Illinois in the contracts at issue in this suit. Additionally, this Court has personal jurisdiction over Defendants pursuant to, among other thing, 735 ILCS 5/2-209(a)(1), because this action arises out of Defendants' transaction of business within the State of Illinois and, pursuant to 735 ILCS 5/2-209(a)(7), because this action arises out of the making and performance of contracts and promises by Defendants in this State.

10.    Venue is proper in the Circuit Court of Cook County, pursuant to 735 ILCS 5/2-101, because, among other things:  (a) Defendants in this action are all non-residents of the State of Illinois and, thus, venue is proper in any county; and (b) the transactions or some part thereof out of which the causes of action arose occurred in Cook County, Illinois.

## GENERAL ALLEGATIONS

### The '390 Patent

11.    On or about July 21, 1997, Ross filed an application for the '390 Patent with the United States Patent and Trademark Office. On or about the same date, Ross assigned (the "AXA Assignment") a one half-interest in the '390 Patent to the Mutual Life Insurance Company of New York, which interest is presently held through succession by an affiliate of the AXA Group ("AXA"). Ross received no up-front compensation for the AXA Assignment.

12.    The '390 Patent was issued by the United States Patent and Trademark Office on or about October 26, 1999. Ross' one half interest in the '390 Patent shall be referred to herein as the "Ross '390 Patent Interest," and AXA's one half interest in the '390 Patent shall be referred to herein as the "AXA '390 Patent Interest."

3

13.     The '390 Patent sets forth a system of pooling life insurance policies into a trust to create predictable income streams for the trust owners.   For example, if a company held life insurance policies on five of its key executives, the income derived from those policies would be received at irregular times and in large lump sums at the time of each insured's death.  The '390 Patent provides for a system that allows that company to pool its life insurance policies with policies owned by other companies.  In this way, payouts occur more frequently due to the increased number of policies, and the payouts are divided according to a formula among the trust owners.  The result is a smoother and more predictable cash flow for all of the participant companies (the "Cash Flow Benefit").

**The New Business Plan**

14.     In the second half of 2007, Defendants approached Simon concerning a possible sale of the Ross '390 Patent Interest.  When Simon and Ross first met, Defendants had failed over the past eight years to recruit a single participant to join any '390 Patent trust arrangement.  Defendants had not even formed any trust pursuant thereto.  Indeed, Defendants had not generated even a single dollar of revenue from the operation of a trust pursuant to the '390 Patent.

15.     Simon realized that the reason why Ross was unable to profit from the '390 Patent was because of his flawed and myopic business strategy -- Ross believed at that time that the '390 Patent could only be expected to generate a few hundred thousand dollars of revenue per year.  But, Simon recognized that that was not the case.  He saw that the value of the '390 Patent could be greatly enhanced if it was integrated into a business plan that leveraged the infrastructure of major institutions and captured revenue from major trends transforming the insurance and financial products markets (the "New Business Plan").

4

16.     Simon and his business associates had tremendous expertise, contacts and experience in these other markets. And Simon recognized that any implementation of the New Business Plan to the '390 Patent would generate over a billion dollars in revenue within ten years. Ross had no experience, knowledge or expertise in these markets and did not realize how opportunities presented by transformative shifts in other industries could be used to significantly enhance the value of the '390 Patent.

17.     Due to its enormous value, Simon and the investors took great precautions against disclosure of the New Business Plan. Among other things, at the time that Simon began discussion with Ross, the elements of the New Business Plan were known only to Simon and a few of the key members of his investor group and third-parties who had entered into appropriate confidentiality agreements.

18.     In late 2007, the Simon Firm entered into negotiations regarding the purchase of the '390 Patent. To facilitate due diligence with respect to the purchase of the '390 Patent, Simon agreed to provide information to Defendants concerning the New Business Plan through the Simon Firm, as attorneys for, and agents of, the group of investors who would form Balshe.

19.     Because of the enormous commercial value of the New Business Plan, Simon required that Defendants agree to maintain the New Business Plan and all information related thereto as confidential, and not to disclose it to any other parties except through the Simon Firm. Although Defendants had provided Simon with Defendants' boilerplate Confidentiality and Non-Disclosure Agreement, Simon was concerned that Defendants' form agreement was insufficient to protect the confidentiality of the New Business Plan. Accordingly, Simon specifically negotiated the inclusion of Paragraph 3(D) in the agreement to protect the New Business Plan from any disclosure except

through the Simon Firm, and to require that SAVE would not attempt to circumvent the Simon Firm should it wish to implement the New Business Plan.

20.    Specifically, Paragraph 3(D) of the final Non-Disclosure Agreement provides as follows:

> SAVE acknowledges that [Simon Law] is an active member of the life insurance space and has developed expertise in marketing, administration and has developed proprietary contacts and relationships. SAVE may be exposed to [Simon Law's] ideas and/or contacts and will not circumvent [Simon Law] should SAVE be desirous of utilizing [Simon Law's] strategies and/or contacts.

21.    The Non-Disclosure Agreement was executed by the Simon Firm and SAVE on or about December 10, 2007 and December 18, 2007, respectively. A copy of the Non-Disclosure Agreement is attached hereto as Exhibit A.

22.    In reliance upon the Non-Disclosure Agreement, the Simon Firm disclosed to Defendants the New Business Plan and certain refinements and developments thereto.

**Defendants Agree to Sell the '390 Patent to Plaintiffs**

23.    On or about December 30, 2007, Simon sent Ross an e-mail setting forth the preliminary terms for the purchase of the '390 Patent by Plaintiffs. On the same date, Ross responded by acknowledging that the email represented an accurate summary of the parties' discussions, and confirming Defendants' intention to continue negotiations with Simon. Among other things, the parties agreed that Ross would act as a consultant for Plaintiffs in the use of the '390 Patent, for which Ross would receive a monthly salary and a share of Plaintiffs' profits.

24.    In reliance on the Non-Disclosure Agreement, Simon, Nicomedes Sy Herrera ("Herrera") and other members of the investor group met with Ross on or about January 9, 2008. During that meeting, they described the New Business Plan to Ross and informed him that a critical

aspect of that plan required Plaintiffs to acquire an option to repurchase the AXA '390 Patent Interest. Ross agreed (in his role as Plaintiffs' consultant) to negotiate a purchase option with AXA on Plaintiffs' behalf.

25.    In reliance on Ross' representation that he would negotiate on Plaintiffs' behalf to acquire for them an option on the AXA '390 Patent Interest, Plaintiffs hired experts and other third-party consultants to conduct further evaluation and refinement of the New Business Plan.

26.    Thereafter, Ross attended two meetings in Chicago, on or about February 27 and 28, 2008. During those meetings, Ross told Simon and Herrera that AXA seemed unwilling to sell an option on the AXA '390 Patent Interest. At Plaintiffs' request, Ross agreed to continue negotiating with AXA on Plaintiffs' behalf.

27.    During the February 27 and 28 meetings, Ross also told Simon and Herrera that he was attempting to persuade Wells Fargo Bank, N.A. ("Wells Fargo") to participate in a trust established pursuant to the '390 Patent. Ross further told Simon and Herrera that Wells Fargo was already conducting its own due diligence regarding the '390 Patent.

28.    Also during the February 27 meeting, Ross met with one of Plaintiffs' consultants who had been retained to further refine and develop the New Business Plan. Based on Ross' representation and promise that he would negotiate to acquire on Plaintiffs' behalf the AXA 390 Patent Interest, Plaintiffs, with Ross's input, directed the consultant to perform additional work to refine the New Business Plan.

29.    Thereafter, the parties began discussing the written documents that would effectuate their agreements regarding the transfer of the '390 Patent and Ross' consulting arrangement. In March 2008, while these discussions were ongoing, Ross told Simon that he needed at least $25,000

of the purchase price of the '390 Patent immediately because he was broke and needed to make a payment to the Internal Revenue Service for unpaid taxes.

30.     In April 2008, the parties agreed that Balshe would purchase the '390 Patent from Defendants for $75,000.00, pursuant to an Agreement for Purchase of Pooled Benefits Trust Patent No. 5,974,390 (the "'390 Patent Purchase Agreement"). Because Balshe had not been officially formed at that time, it was referred to in the agreement as Newco.

31.     Additionally, the parties agreed that Ross would enter into a consulting agreement with STP Enterprises, Inc. pursuant to an Agreement Regarding Pooled Benefits Trusts (the "Consulting Agreement"), which agreement would be assigned to Balshe or an affiliate to be formed.

32.     In connection therewith, on or about April 9, 2008, Simon sent a draft of the '390 Patent Purchase Agreement and the Consulting Agreement to Defendants *via* email.

33.     Over the next few days, Ross (on behalf of himself and SAVE) and Simon (on behalf of Balshe and its predecessors) had numerous conversations regarding the final language of the '390 Patent Purchase Agreement and the Consulting Agreement.

34.     On or about April 13, 2008, Ross and Simon reached agreement on the final terms of the '390 Patent Purchase Agreement and the Consulting Agreement. Specifically, during a telephone conference held that day, after discussing the final terms of the agreements, Ross agreed to the terms and told Simon "We have a deal."

35.     Simon updated the drafts with the final terms agreed to between Plaintiffs and Defendants. On or about April 14, 2008, Simon emailed for Ross's signature the final versions of the '390 Patent Purchase Agreement and Consulting Agreement that had been agreed to by the parties during the April 13 telephone conference. Copies of the '390 Patent Purchase Agreement and Consulting Agreement are attached hereto, respectively, as Exhibits B and C.

36.     On April 14, 2008, at Ross' request and in reliance on Ross's acknowledgement and confirmation that the parties had entered into the '390 Patent Purchase Agreement and the Consulting Agreement, Simon sent to Ross by wire transfer $25,000 of the purchase price for the '390 Patent.  Ross received and accepted these funds.

37.     Pursuant to an Assignment, Balshe has now acquired all of STP's rights under the Consulting Agreement.  A copy of the Assignment is attached hereto as Exhibit D.

**Ross Reaffirms The Parties' Agreements**

38.     Shortly after receiving the $25,000 installment of the purchase price under the '390 Patent Purchase Agreement, Ross requested that the parties make some additional changes to the written agreements before signing them because -- as Ross put it -- he wanted to provide a stream of income to his children and receive an additional portion of his consulting fees up-front.  Ross also wanted certain protections in case the New Business Plan failed to generate sufficient revenue to pay him a minimum consulting fee.  Even though the parties had already agreed on the final terms of the '390 Patent Purchase Agreement and the Consulting Agreement, Simon agreed to meet with Ross to consider amending the agreements as a gesture of goodwill and to preserve an amicable working relationship.

39.     To that end, Ross, Simon and Herrera had a series of personal meetings during the week of April 21-25, 2008, concerning Ross's requested amendments.  During those meetings, Ross acknowledged that the parties had already finalized the terms of their agreement and that he was requesting only minor amendments to those terms.

40.     More specifically, on or about April 22, 2008, Ross met with Simon and Herrera at 1230 Avenue of the Americas, New York, New York.  At that meeting, Ross told Simon and Herrera

9

that he acknowledged the fact that the parties had already reached an agreement, but that he was looking for only a few minor accommodations.

41.     On April 23, 2008, Ross and Herrera met in Manhattan to discuss Ross's consulting efforts on behalf of Plaintiffs.  Ross told Herrera that he would introduce Plaintiffs to Wells Fargo so that Balshe could ensure that the terms of any agreement with Wells Fargo would be consistent with the New Business Plan.

42.     On April 24, 2008, Herrera and Ross met at the Boat Basin Café in Manhattan.  At this meeting, Herrera expressed his concern that Ross had failed to return the signature pages to the '390 Patent Purchase Agreement and the Consulting Agreement and had not yet introduced Plaintiffs to Wells Fargo.  In response, Ross reassured Herrera that the parties had a deal and that he only wanted to iron out a few minor points with Simon before sending the signed signature pages back.

**Defendants Secretly Steal The AXA '390 Patent Interest**

43.     By reason of the foregoing, Ross was required to negotiate for the repurchase of the AXA '390 Patent Interest on behalf of Plaintiffs, and Plaintiffs relied upon Defendants to negotiate for the repurchase of the AXA '390 Patent Interest on Plaintiffs' behalf.

44.     In fact, Ross was secretly negotiating to acquire an option on the AXA '390 Patent Interest for himself.  Moreover, as detailed below, Ross was eventually successful in obtaining that option for Defendants, thus misappropriating and usurping the opportunity from Plaintiffs.

**Defendants Attempt To Extort Plaintiffs**

45.     On or about May 16, 2008, Ross contacted Simon by telephone and revealed his secret self-dealing.  Ross admitted to Simon that he had "changed his mind" about honoring the parties agreements and that, given the value of the '390 Patent when combined with the New Business Plan as described to him by Plaintiffs, he wanted a better deal.

46.     Indeed, contrary to his prior statements and the parties agreements, during the call Ross suddenly -- and for the first time -- claimed that there was never any agreement between the parties with respect to the '390 Patent.

47.     Ross also revealed that he had obtained an option to purchase the AXA '390 Patent Interest even though he previously represented to Simon and Herrera that AXA was unwilling to grant such an option.

48.     Ross then announced that he had secretly "tied up" the '390 Patent for himself and would not honor any of the parties' agreements.

49.     Then, on or about May 19, 2008, Simon and Herrera learned that Ross was actively "shopping" the New Business Plan to other investors in an attempt to sell them the '390 Patent along with the New Business Plan, in blatant violation of his duties under the Non-Disclosure Agreement, the '390 Patent Purchase Agreement, the Consulting Agreement and in violation of his fiduciary duties.

50.     On the same day, Ross sent Simon an email demanding that Balshe pay Ross -- not the remainder of the agreed-upon price of $75,000 -- but, instead, the extortionate amount of $7,000,000, plus ongoing royalties and commissions.

51.     Finally, on or about May 23, 2008, Ross admitted that he intends to negotiate with various third-parties to consummate a sale of the '390 Patent and the New Business Plan.  Ross intends to finalize such a sale sometime between May 27, 2008 and May 30, 2008.

52.     In addition to the violation of numerous contractual, statutory and common law obligations, Ross has threatened, and continues to threaten, Plaintiffs that, if Balshe does not give in to his outrageous and unlawful demand for payment, he will disclose to yet more third-parties the highly confidential New Business Plan and will immediately attempt to sell it and the '390 Patent.

53.     In fact, on or about May 23, 2008, Ross told another investor in Balshe that Ross was "not concerned with litigation costs," suggesting that he has already obtained an indemnification agreement from the undisclosed third-party against the costs of this suit, essentially acknowledging that his actions have been and are unlawful and recognizing the inevitability of this lawsuit.

54.     Unless Ross is immediately restrained and enjoined from carrying out his threats, Balshe will lose its entire business, including the value of the New Business Plan.

## COUNT I

### INJUNCTIVE RELIEF TO PREVENT
### DISCLOSURE OF THE NEW BUSINESS PLAN

55.     Plaintiffs incorporate by reference paragraphs 1 through 54 above as though fully set forth herein.

56.     The New Business Plan constitutes a "Trade Secret," as that term is defined in 765 ILCS § 1065/2(d).

57.     Defendants obtained the New Business Plan from Simon and the Simon Firm through improper means, including, without limitation, false statements, material misrepresentations and breaches of a confidential relationship.

58.     Defendants have misappropriated the New Business Plan by disclosing it to an unknown number of third parties, in an attempt to sell it for their own benefit.

59.     Defendants have threatened to further misappropriate the New Business Plan by selling it and the '390 Patent to a third-party.

60.     Defendants' misappropriation of the New Business Plan was willful and malicious, and was done in an attempt to extort money from Balshe.

61.    Based on the foregoing, Defendants should be immediately restrained and enjoined from any further misappropriation of the New Business Plan and from any further use or disclosure thereof.

62.    Pursuant to 735 ILCS § 1065/3(c), which authorizes affirmative injunctive relief where necessary to protect a trade secret, in order to protect the New Business Plan from further use and disclosure, Defendants should be ordered to: (a) identify to Balshe the third-parties to whom they disclosed the New Business Plan; (b) inform those third-parties that further disclosure or use of the New Business Plan is prohibited; and (c) destroy all information concerning or reflecting the New Business Plan in their possession.

63.    Plaintiffs have no adequate remedy at law with respect to Defendants' actual and threatened misappropriation of the New Business Plan.

64.    Plaintiffs will be irreparably harmed if the relief requested herein is not granted.

65.    There is a strong likelihood that Plaintiffs will succeed on the merits of its claims against Defendants.

WHEREFORE, Plaintiffs respectfully request the entry of judgment in their favor and against Defendants as follows:

A.    Preliminarily and permanently restraining and enjoining Defendants from using or disclosing the New Business Plan;

B.    Commanding Defendants to identify the third-parties to whom they have already disclosed the New Business Plan;

C.    Commanding Defendants to inform the third-parties to whom they have already disclosed the New Business Plan that further use or disclosure thereof is prohibited;

13

D.    Commanding Defendants to destroy all information concerning the New Business Plan in their possession;

E.    Awarding Balshe its attorney's fees pursuant to 765 ILCS § 1065/5.

F.    Awarding Balshe its costs of suit; and

G.    Awarding Balshe such other and further relief as is appropriate.

## COUNT II

### INJUNCTIVE RELIEF TO PREVENT DISCLOSURE OF THE NEW BUSINESS PLAN

66.    The Simon Firm incorporates by reference paragraphs 1 through 54 above as though fully set forth herein.

67.    Pursuant to the Non-Disclosure Agreement, among other things, Defendants are prohibited from disclosing the strategies of the Simon Firm, including the New Business Plan, in any manner except through the Simon Firm.

68.    Defendants' disclosure of the New Business Plan, and their threatened continued disclosure thereof, are in direct violation of the Non-Disclosure Agreement.

69.    The Simon Firm has no adequate remedy at law with respect to Defendants' breaches of the Non-Disclosure Agreement.

70.    The Simon Firm will be irreparably harmed if the relief requested herein is not granted.

71.    There is a strong likelihood that the Simon Firm will succeed on the merits of its claims against Defendants.

WHEREFORE, the Simon Firm respectfully requests the entry of judgment in its favor and against Defendants as follows:

14

A. Preliminarily and permanently restraining and enjoining Defendants from using or disclosing the New Business Plan;

B. Awarding the Simon Firm its costs of suit; and

C. Awarding the Simon Firm such other and further relief as is appropriate.

## COUNT III

### INJUNCTIVE RELIEF TO
### PREVENT TRANSFER OF THE '390 PATENT

72. Balshe incorporates by reference paragraphs 1 through 54 above as though fully set forth herein.

73. The '390 Patent represents a unique asset which, particularly when coupled with the New Business Plan, is of great value.

74. Defendants are required to transfer all of their right, title and interests in the '390 Patent to Balshe.

75. Defendants have threatened to transfer the '390 Patent to one or more third-parties, in violation of Balshe's rights.

76. Balshe has no adequate remedy at law with respect to Defendants' threatened breach of their obligations to transfer the '390 Patent to Balshe.

77. Balshe will be irreparably harmed if the relief requested herein is not granted.

78. There is a strong likelihood that Balshe will succeed on the merits of its claims against Defendants.

WHEREFORE, Balshe respectfully requests the entry of judgment in its favor and against Defendants as follows:

A.    Preliminarily and permanently restraining and enjoining Defendants from transferring any of their right, title and interest in the '390 Patent to any person or entity other than Balshe;

B.    Awarding Balshe its costs of suit; and

C.    Awarding Balshe such other and further relief as is appropriate.

**COUNT IV**

**SPECIFIC PERFORMANCE**

79.    Balshe incorporates by reference paragraphs 1 through 54 above as though fully set forth herein.

80.    The '390 Patent Purchase Agreement is valid, biding and enforceable.

81.    Balshe (and its assignors) have fully complied with all material terms of the '390 Patent Purchase Agreement and/or Balshe stands ready willing and able to fully perform any remaining obligations due thereunder.

82.    Defendants have materially breached the '390 Patent Purchase Agreement and presently refuse to perform thereunder.

83.    Balshe has no adequate remedy at law.

84.    By reason of the foregoing, the Court should order Defendants to specifically perform all of their obligations under the '390 Patent Purchase Agreement, including, without limitation, tendering to Balshe all of Defendants' right, title and interest to the '390 Patent.

WHEREFORE, Balshe respectfully requests the entry of judgment in its favor and against Defendants as follows:

A.    Ordering Defendants to specifically perform under the '390 Patent Purchase Agreement;

B.      Ordering Defendants to tender to Balshe all of Defendants' right, title and interest to the '390 Patent;

C.      Awarding Balshe its costs of suit; and

D.      Awarding Balshe such other and further relief as is appropriate.

## COUNT V

## VIOLATION OF ILLINOIS TRADE SECRETS ACT

85.     Plaintiffs incorporate by reference paragraphs 1 through 54 above as though fully set forth herein.

86.     The New Business Plan constitutes a "Trade Secret," as that term is defined in 765 ILCS § 1065/2(d).

87.     Defendants obtained the New Business Plan from Simon and the Simon Firm through improper means, including, without limitation, misrepresentations and breach of a confidential relationship.

88.     Defendants have misappropriated the New Business Plan by disclosing it to an unknown number of third parties, in an attempt to sell it for their own benefit.

89.     Defendants' misappropriation of the New Business Plan was willful and malicious, and was done in an attempt to extort money from Balshe.

90.     As a proximate cause of Defendants' misappropriation of the New Business Plan, Plaintiffs have suffered, and are continuing to suffer, actual losses and Defendants have been, and are continuing to be, unjustly enriched.

WHEREFORE, Plaintiffs respectfully request the entry of judgment in their favor and against Defendants as follows:

A.    Awarding damages in their favor and against Defendants in an amount to be determined at trial;

B.    Awarding pre- and post-judgment interest on such damages;

C.    Awarding exemplary damages pursuant to 765 ILCS § 1065/4(b)

D.    Awarding Plaintiffs their attorney's fees pursuant to 765 ILCS § 1065/5.

E.    Awarding Plaintiffs their costs of suit; and

F.    Awarding Plaintiffs such other and further relief as is appropriate.

## COUNT VI

## BREACH OF FIDUCIARY DUTY

91.    Plaintiffs incorporate by reference paragraphs 1 through 54 above as though fully set forth herein.

92.    At all relevant times, Ross was a consultant to STP pursuant to the Consulting Agreement.  As a consultant of STP, Ross owed fiduciary duties to STP, including, without limitation, the duties of undivided loyalty, good faith, honesty and fair dealing.

93.    Despite Ross's fiduciary duties to STP, as described herein, Ross breached his duties by, among other things, misappropriating the New Business Plan, secretly dealing with AXA for his own benefit to the detriment of STP, misrepresenting material facts to STP in furtherance of his own interest and otherwise acting in flagrant disregard of his obligations to STP.

94.    The foregoing conduct was willful, wanton and malicious, and was undertaken with callous disregard for STP's rights and business interests.

95.    As a direct and proximate result of the foregoing wrongful conduct, STP suffered, and Balshe (as assignee of STP's rights under the Consulting Agreement) has suffered and continues to suffer, substantial damages.

96.    To the extent SAVE has a separate existence from Ross, it intentionally and knowingly colluded and participated in Ross's breaches of his fiduciary duties as alleged herein.

WHEREFORE, Plaintiffs respectfully request the entry of judgment in their favor and against Defendants as follows:

A.    Directing Defendants to disgorge to Plaintiffs all benefits they received or will receive, directly or indirectly, from any corporate opportunity usurped by Defendants;

B.    Imposing a constructive trust on, and ordering that the Defendants convey to Plaintiffs, all property, and any proceeds of such property, acquired by them or to be acquired by them from the date that they first breached their fiduciary duties to Plaintiffs, including all right, title and interest in and to the AXA '390 Patent Interest;

C.    Directing that Defendants forfeit all compensation, consideration or other profits they have received or will receive from the date they first breached their fiduciary duties to Plaintiffs;

D.    Awarding Plaintiffs punitive damages, in an amount to be determined at trial, against Defendants to punish them and to deter such conduct in the future;

E.    Awarding Plaintiffs their costs of suit; and

F.    Awarding Plaintiffs such other and further relief as is appropriate.

## COUNT VII

## **PROMISSORY FRAUD**

97.    Plaintiffs incorporate by reference paragraphs 1 through 54 above as though fully set forth herein.

98.    As set forth herein, when Ross approached the Simon Firm regarding the sale of the '390 Patent, Ross had been unable to utilize the '390 Patent to generate any revenue, despite that it had been issued for more than eight years.

99.    Simon told Ross that the Simon Firm believed that it could generate pursuant to the New Business Plan over a billion dollars in revenue within ten years.  However, Simon would not disclose the New Business Plan to Ross except in connection with a sale of the '390 Patent.

100.    Ross therefore represented to Simon that he was willing to sell the '390 Patent to the Simon Firm or one of its business affiliates when, in fact, Ross knew that he never intended to sell the '390 Patent to Simon or any entity affiliated with Simon.  Instead, Ross lied to Simon to induce the Simon Firm to reveal the New Business Plan to Ross.

101.    Although Ross entered into the Non-Disclosure Agreement described herein and agreed not to disclose the New Business Plan to any other person, Ross never intended to honor the Non-Disclosure Agreement.  Rather, he lied to Simon in order to obtain the New Business Plan so that he could use it and disclose it to third parties for his own benefit.

102.    In reasonable reliance on Ross's representations, particularly in light of the Non-Disclosure Agreement, the Plaintiffs disclosed the New Business Plan to Ross.

103.    Additionally, on or about April 14, 2008, after negotiations for the sale of the '390 Patent, Ross agreed that he and Balshe "had a deal."  Ross then requested that, in light of that deal, Simon wire him $25,000 as an advance payment.

104.    In fact, Ross knew at the time that he made this statement that he never intended to honor the '390 Patent Purchase Agreement.  Instead, it was a ploy by Ross to obtain $25,000 from Simon to pay his debts to the Internal Revenue Service.

105.    In reasonable reliance on Ross's representation, Plaintiffs wired Ross $25,000 as an initial payment for the '390 Patent.

106.    Plaintiffs reliance on Ross's misrepresentations proximately caused substantial damages to Plaintiffs, including the $25,000 wire transfer, the misappropriation of the New Business Plan, the loss of value to the New Business Plan, and the professional expenses incurred in evaluating the '390 Patent, developing the New Business Plan and negotiating the '390 Patent Purchase Agreement.

107.    Ross's untrue statements alleged herein were part of scheme or device to defraud the Plaintiffs into paying Ross $25,000 and disclosing the New Business Plan.

WHEREFORE, Plaintiffs respectfully request the entry of judgment in their favor and against Defendants as follows:

A.    Awarding damages in their favor and against Defendants in an amount to be determined at trial;

B.    Awarding pre- and post-judgment interest on such damages;

C.    Awarding Plaintiffs punitive damages, in an amount to be determined at trial, against Defendants to punish them and to deter such conduct in the future;

D.    Awarding Plaintiffs their costs of suit; and

E.    Awarding Plaintiffs such other and further relief as is appropriate.

## ALTERNATIVE COUNT VIII

### BREACH OF CONTRACT

108.    Plaintiffs incorporate by reference paragraphs 1 through 54 above as though fully set forth herein.

109.    This Count is pleaded in the alternative.

110.    The Non-Disclosure Agreement is valid, binding and enforceable.

111.    Plaintiffs have fully complied with all material terms of the Non-Disclosure Agreement, or their performance has been excused or waived due to Defendants' actions and/or by operation of law.

112.    Defendants have materially breached the Non-Disclosure Agreement, which has caused damages to Plaintiffs.

WHEREFORE, Plaintiffs respectfully request the entry of judgment in their favor and against Defendants as follows:

A.    Awarding damages in their favor and against Defendants in an amount to be determined at trial;

B.    Awarding pre- and post-judgment interest on such damages;

C.    Awarding Plaintiffs their costs of suit; and

D.    Awarding Plaintiffs such other and further relief as is appropriate.

## ALTERNATIVE COUNT IX

### BREACH OF CONTRACT

113.    Plaintiffs incorporate by reference paragraphs 1 through 54 above as though fully set forth herein.

114.    This Count is pleaded in the alternative.

115.    The '390 Patent Purchase Agreement is valid, binding and enforceable.

116.    Plaintiffs have fully complied with all material terms of the '390 Patent Purchase Agreement, or their performance has been excused or waived due to Defendants' actions and/or by operation of law.

117.    Defendants have materially breached the '390 Patent Purchase Agreement, which has caused damages to Plaintiffs.

WHEREFORE, Plaintiffs respectfully request the entry of judgment in their favor and against Defendants as follows:

A.    Awarding damages in their favor and against Defendants in an amount to be determined at trial;

B.    Awarding pre- and post-judgment interest on such damages;

C.    Awarding Plaintiffs their costs of suit; and

D.    Awarding Plaintiffs such other and further relief as is appropriate.

## ALTERNATIVE COUNT X

## BREACH OF CONTRACT

118.    Plaintiffs incorporate by reference paragraphs 1 through 54 above as though fully set forth herein.

119.    This Count is pleaded in the alternative.

120.    The Consulting Agreement is valid, binding and enforceable.

121.    Plaintiffs have fully complied with all material terms of the Consulting Agreement, or their performance has been excused or waived due to Defendants' actions and/or by operation of law.

122.    Defendants have materially breached the Consulting Agreement, which has caused damages to Plaintiffs.

WHEREFORE, Plaintiffs respectfully request the entry of judgment in their favor and against Defendants as follows:

A.    Awarding damages in their favor and against Defendants in an amount to be determined at trial;

B.    Awarding pre- and post-judgment interest on such damages;

C.    Awarding Plaintiffs their costs of suit; and

D.    Awarding Plaintiffs such other and further relief as is appropriate.

## ALTERNATIVE COUNT XI

### UNJUST ENRICHMENT

123.    Plaintiffs incorporate by reference paragraphs 1 through 54 above as though fully set forth herein.

124.    This Count is pleaded in the alternative to one or more of Counts III through VII, in the event that the Court finds that the '390 Patent Purchase Agreement and/or the Consulting Agreement are not valid and enforceable.

125.    Defendants have received the benefit of the disclosure of the extremely valuable New Business Plan, all profits reaped or to be obtained by Defendants through their use and disclosure thereof, and the $25,000 wire transfer to Ross.

126.    Plaintiffs have suffered a detriment on account of the benefits Defendants have received, including, without limitation, the lost revenues and profits to be gained through the New Business Plan, the value of the New Business Plan and the loss of the $25,000 wire transfer.

127.    Defendants' retention of the benefits herein described would violate the principles of justice, equity, and good conscience.

WHEREFORE, Plaintiffs respectfully request the entry of judgment in their favor and against Defendants as follows:

A.    Awarding damages in their favor and against Defendants in an amount to be determined at trial;

B    Imposing a constructive trust upon the New Business Plan and all profits or other benefits derived or to be derived therefrom, and naming Plaintiffs the beneficiaries thereof;

C.    Awarding pre- and post-judgment interest;

D.    Awarding Plaintiffs their costs of suit; and

E.    Awarding Plaintiffs such other and further relief as is appropriate.

## ALTERNATIVE COUNT XII

## PROMISSORY ESTOPPEL

128.    Plaintiffs incorporate by reference paragraphs 1 through 54 above as though fully set forth herein.

129.    This Count is pleaded in the alternative to one or more of Counts III through VII and IX in the event that the Court finds that the '390 Patent Purchase Agreement and/or the Consulting Agreement are not valid and enforceable.

130.    Defendants promised to negotiate to acquire on Plaintiffs' behalf the AXA '390 Patent Interest.    Defendants also promised Plaintiffs that they would not disclose Plaintiffs' confidential information and trade secrets to others.

131.    Defendants expected and intended that Plaintiffs would rely on these promises to induce Plaintiffs to: (a) disclose the New Business Plan and educate Ross as to how to implement it;

(b) engage consultants and experts to further analyze and develop the New Business Plan; and (c) wire the $25,000 to Ross.

132.    In reliance on Defendants' promise, Plaintiffs:  (a) disclosed the New Business Plan and educated Ross as to how to implement it; (b) engaged consultants and experts to further analyze and develop the New Business Plan; and (c) wired the $25,000 to Ross.

133.    Ross has now obtained a right to purchase the AXA '390 Patent Interest.

134.    Injustice can only be avoided in these circumstances by requiring Defendants to assign and transfer to Plaintiffs all of their right, title and interest to the '390 Patent.

WHEREFORE, Plaintiffs respectfully request the entry of judgment in their favor and against Defendants as follows:

A.    Ordering Defendants to tender to assign and transfer to Plaintiffs all of Defendants' right, title and interest to the '390 Patent;

B.    Awarding Balshe its costs of suit; and

C.    Awarding Balshe such other and further relief as is appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues triable to a jury.

BALSHE LLC and THE SIMON LAW FIRM

By: _____
One Of Their Attorneys

P. Andrew Fleming
Richard L. Miller II
Richard G. Douglass
NOVACK AND MACEY LLP
100 North Riverside Plaza
Chicago, Illinois 60606
(312) 419-6900
Firm I.D. 91731
Doc# 220875

26

**VERIFICATION**

Under penalties as provided by law pursuant to Section 1-109 of the Illinois Code of Civil

Procedure, the undersigned certifies that the statements set forth in the foregoing Verified Complaint

For Injunctive And Other Relief are true and correct, to the best of his information and belief.

Dated: May 27, 2008

David Simon

Exhibit A

RECYCLED PAPER
RECYCLABLE

# CONFIDENTIALITY AND NON-DISCLOSURE AGREEMENT

This agreement ("Agreement") is effective this 12th day of September, 2007, by and between Alan J. Ross/SAVE Associates, 687 Highland Avenue, Needham, MA. 02494 (hereinafter "SAVE") and The Simon Law Firm, 303 E. Wacker Drive, Suite 210, Chicago, Illinois 60601 (hereinafter "recipient").

WHEREAS, SAVE desires to make available certain information to recipient and its employees, subcontractors and/or other agents (which shall collectively be referred to hereinafter as "Recipient") in connection with discussions and /or transfer of proprietary programs and/or software, concerning certain administrative, marketing, accounting, legal or actuarial strategies, proprietary administrative programs and/or software in regard to the recruitment of life insurance policy owners and the retention of such policyowners as participants in the "Pooled Benefits Trust" or any similar arrangement governed under U.S. Patent #5,974,390; and in conjunction with the administration other potential related business transactions between the parties (hereinafter the above to be referred to as the "Business Discussions").

WHEREAS, Recipient understands and acknowledges that such information disclosed by SAVE is confidential and proprietary information of SAVE.

NOW, THEREFORE, in consideration of the promises and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, SAVE and Recipient acknowledge and agree as follows:

1. **Recitals**

   The above recitals are true and correct and are made a part of this Agreement.

2. **Limited Purpose**

   The parties hereto agree that this Agreement is for the purpose of protecting SAVE's confidential information only. No other rights or obligations between the parties arising out of the performance of this Agreement are to be implied by this Agreement.

3. **Confidentiality**

   (A)     Recipient agrees and covenants that all information, knowledge, data, or record(s), whether written or otherwise, of whatsoever kind or nature not generally available to the public, including but not limited to information relating to SAVE's operations, policies, practices or procedures; business

2

strategies and methods of doing business; personnel matters; financial information; product information, software programs and applications, business and operational plans; company contracts; client and/or customer names and related personal information; or other information or documents of a confidential nature relating to the ownership or operation of or concerning any officer(s), director(s), owner(s), shareholder(s), employee(s), agent(s), servant(s), representative(s), consultant(s) and/or agent(s) of SAVE which is acquired or is made available to Recipient (hereinafter referred to as "Confidential Information"), shall be regarded as strictly confidential and/or trade secrets of SAVE. Confidential Information will not include information that falls within one of the following exceptions:

1.  was known to Recipient prior to receipt from SAVE (such knowledge to be conveyed to SAVE within 3 business days);

2.  is, or has been, independently developed by Recipient without aid of information provided by SAVE hereunder;

3.  was received by Recipient without restriction from a third party which, to the best of Recipient's knowledge, had the right to make such disclosure; or

4.  is permitted to be disclosed to third parties or to be used by Recipient or third parties pursuant to prior written authorization given by SAVE.

(B)     Recipient agrees that it will not at any time reveal, communicate, or divulge any Confidential Information to any person(s), or corporation(s), or other entity(ies) without the prior written consent of SAVE, except as may be required by law or legal process or requested by a regulatory agency to whose jurisdiction Recipient is subject (in which cases Recipient will, to the extent permitted by law, promptly notify SAVE of such requirement or request so that SAVE may seek appropriate relief).

(C)     Recipient further agrees to limit the use of and access to Confidential Information to its employees, agents, representatives and consultants (collectively hereinafter referred to as "Representatives") whose use or access is necessary in the opinion of recipient, and shall notify each such Representative to whom disclosure is made that such disclosure is made in confidence and shall be kept in confidence. Further, Recipient will direct such Representatives to observe the terms of this Agreement.

(D)     SAVE acknowledges that Recipient is an active member of the life insurance space and has developed expertise in marketing, administration and has developed proprietary contacts and relationships. SAVE may be exposed to Recipient's ideas and/or contacts and will not circumvent Recipient should SAVE be desirous of utilizing Recipients strategies and/or contacts.

3

**4.    Return of Confidential Information**

Recipient agrees that it will deliver all Confidential Information, and all copy(ies), duplicate(s) or reproduction(s) of whatsoever kind relating to Confidential Information which are in Recipient's possession or under its control to SAVE at any time upon SAVE's request, or, in the case of copies, notes, summaries and other material prepared by Recipient or its Representatives, destroy such material and confirm its destruction to SAVE in writing.

**5.    Use of Confidential Information**

Recipient shall use Confidential Information solely in connection with the Business Discussions. Recipient shall not use Confidential Information for any purpose other than the Business Discussions, including without limitation for Recipient's own advantage or benefit or for the advantage or benefit of any other individual, corporation or entity, and shall not sell, assign, lease, disseminate or otherwise dispose of Confidential Information or any part thereof to any other person except as permitted by this Agreement, nor shall Recipient assert any property interest in or any lien or other right against or to Confidential Information and hereby waives and releases any rights or future rights to do so.

**6.    Indemnity, Injunctive Relief and Attorney's Fees**

Recipient agrees that it will be fully responsible for the actions of its employees with respect to the Confidential Information of SAVE.  Recipient agrees to indemnify SAVE for any direct damages (including court costs, expenses and reasonable attorney's fees) suffered by SAVE as a result of a breach of this Agreement.

Recipient recognizes that irreparable injury may result to SAVE in the event of a breach of the restrictive covenants contained in this Agreement on the part of Recipient and agrees that in the event of a breach or threat of breach by Recipient of any of the provisions of this Agreement, SAVE shall be entitled, in addition to other remedies and damages available (including attorneys' fees and court costs), to an injunction to restrain the violations thereof by Recipient and all persons acting for and/or with Recipient.  This Agreement shall terminate three years from the date hereof.

**7.    Miscellaneous**

This agreement is personal to the parties and cannot be assigned or transferred by either party. The obligations of each party under agreement shall not be terminated upon any attempted assignment. This Agreement shall be binding upon and inure to the benefit of the undersigned parties and their respective legal representatives, directors, officers, shareholders, agents, servants and employees.  The parties hereto are not, nor shall they become by virtue of this Agreement or any actions taken pursuant

4

thereto, joint venturers, partners, employed by one and the other, or agents of one and the other. This agreement contains the entire understanding of the parties in respect to the subject matter hereof and with respect to the matter contained herein and supersedes all prior agreements or understandings.

IN WITNESS WHEREOF, SAVE and Recipient have each caused its respective corporate name to be signed by its duly authorized officer effective on the date first written above.

| SAVE | The Simon Law Firm |
|---|---|
| By: | By: |
| Name: ALAN J. ROSS | Name: David B. Simon |
| Title: President | Title: Owner |
| Date: 12/18/07 | Date: 12/18/07 |

Exhibit B

RECYCLED PAPER
RECYCLABLE

Agreement for Purchase of Pooled Benefits Trust Patent No. 5,974,390

This Agreement ("Agreement") between and among Newco, Inc. ("Newco"), on the one hand, and Alan Ross ("Ross") and SAVE Associates (Ross and SAVE Associates together, "SAVE") (Newco, Ross and SAVE Associates collectively, the "Parties"), is made as of April 11, 2008.

WHEREAS, Newco intends to purchase all right, title and interest held by SAVE in Patent No. 5,974,390 for the establishment of trusts for various entity-owned life insurance (the "'390 Patent");

**NOW THEREFORE, FOR THE MUTUAL CONSIDERATION SET FORTH HEREIN, IT IS HEREBY AGREED THAT**

1.     Newco will pay SAVE $75,000 by April 10, 2008.  In return, SAVE shall assign to Newco all ownership and rights to the '390 Patent held by Ross and SAVE Associates, and any of their affiliates, parents and assigns.

2.     Ross shall have the right to purchase the '390 Patent from Newco if and only if neither Newco nor any other person, entity or joint venture holding an interest in the '390 Patent, succeeds in establishing a trust and ensuring the enrollment of sufficient participants for the proper functioning of such trust within forty-eight (48) months of the effective date of this Agreement.  The purchase price shall be $250,000 plus 12% interest beginning October 1, 2008.

3.     This Agreement shall be governed under the laws of the State of Illinois. The Parties consent to the jurisdiction of the state or federal courts of Illinois for the resolution of any and all disputes hereunder and agree to all legal, equitable and injunctive relief to enforce the rights and obligations under this Agreement.  The Parties agree not to contest venue within either the City of Chicago.

4.     The Parties agree and acknowledge that the terms of this Agreement have been mutually negotiated between the Parties, and any rule of construction to construe ambiguous terms against the drafter is inapplicable.

5.     The Parties acknowledge that their respective rights and obligations are intended to be included in future documents to be executed by the Parties, including, without limitation, the any documents necessary to effectuate the assignment and recordation of assignment of the '390 Patent with the United States Patent and Trademark Office.  The Parties therefore agree to cooperate in good faith to execute any and all necessary documents to effectuate the terms of this Agreement.

6.     Ross and SAVE Associates warrant that other than Ross and SAVE Associates, no other entity other than an affiliated entity of AXA Group, as successor in interest to the Mutual Life Insurance Company of New York, hold any title, right or interest in the '390 Patent.

7.     This Agreement may be signed in counterparts and exchanged by facsimile, with each copy having the validity as an original whole.

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the first date set forth below.

ALAN ROSS


_____

Date:


NEWCO


By:_____
　　　David Simon
Its:
Date:

SAVE Associates


By:_____
　　　Alan Ross
Its:
Date:

2

Exhibit C

RECYCLED PAPER
RECYCLABLE

<u>Agreement Regarding Pooled Benefits Trusts</u>

This Agreement ("Agreement") between and among STP Enterprises, Inc. ("STP") and Alan Ross ("Ross") (collectively, the "Parties"), is made as of April 11, 2008.

WHEREAS, STP intends to form an entity ("PBTCo") with several of its partners, including, without limitation, an operating entity affiliated with Corridor Capital Group Holdings LLC ("Corridor") to pursue the establishment of pooled benefits trusts for various entity-owned life insurance, including, without limitation, bank-owned, company-owned, government-owned , non-profit-owned or insurance carrier-owned life insurance pursuant to Patent No. 5,974,390 (the "'390 Patent"), and all resulting corporate opportunities reasonably arising from such activities (the "Business"); and

WHEREAS, the Parties intend for PBTCo to be a beneficiary of this Agreement at such time that PBTCo is formed; and

WHEREAS, STP or PBTCo, when formed, intends to purchase all right, title and interest in the '390 Patent from one of its current owners and assignees, an affiliated company of the AXA Group, as successor in interest to the Mutual Life Insurance Company of New York ("AXA");

**NOW THEREFORE, FOR THE MUTUAL CONSIDERATION SET FORTH HEREIN, IT IS HEREBY AGREED THAT**

1.     STP, or PBTCo when formed, shall pay Ross $10,000 per month for 17 months beginning June 1, 2008.

2.     Ross shall provide consulting and marketing services to STP and PBTCo when formed. Ross agrees that he shall not engage in any activities competitive with the Business during such time that he receives any payment pursuant to this Agreement and for a period of three (3) years after receipt of the last payment hereunder, except as specifically allowed herein.

3.     STP or PBTCo, when formed, shall pay Ross 10% of the net profits of the Business (the "Net Sharing Percentage"). Ross shall also be entitled to 10% of the proceeds of the sale of PBTCo.

4.     STP or PBTCo, when formed, shall pay Ross a percentage (the "Ross Sharing Percentage") in the amount of 80% of the net profits solely related to enrollment, renewal and administration fees generated by policies obtained or otherwise enrolled by Ross in one or more pooled benefits trusts (the "Trusts") to be established by STP or PBTCo, as appropriate, pursuant to the '390 Patent (such net profits undiminished by the Ross Sharing Percentage, the "Ross Generated Profits"). In applying the Ross Sharing Percentage to the Ross Generated Profits to determine any payments to be made to Ross, the amount of any payments made under the Net Sharing Percentage as set forth in Paragraph 3 attributable to Ross Generated Profits shall be excluded to avoid double-counting. For the purposes of clarity, the Ross Generated Profits exclude all profits not

directly obtained from enrollment, renewal and administration fees charged to participants in the Trust. Such excluded profits include, without limitation, profits arising from the capture of enhanced yield of enrolled policies, the procurement of replacement insurance for matured policies, and the purchase of policies by STP, PBT or their affiliates from participants in the Trust, including, without limitation, policies for insured lives over 70 years old.

5.  Upon the aggregate payment of $150,000 in expenses or other capital expenditures by the investors in PBTCo for the development of the Business, the Ross Sharing Percentage shall be decreased to 75% for all Ross Generated Profits obtained from that point forward. The Ross Sharing Percentage shall decrease 5% for every additional $250,000 in expenses or other capital contributions made by the investors in PBTCo to develop the Business, provided that the Ross Sharing Percentage shall never fall below the 10% Net Sharing Percentage set forth in Paragraph 3.

6.  STP or PBTCo, when formed, shall grant Ross a non-exclusive license to enroll policies into the Trust, provided that all documents, marketing materials and other information provided by Ross to any customer or potential customer must first be approved by STP or PBTCo, when formed. Ross agrees not to approach or otherwise solicit any customers without the prior written approval of STP or PBTCo, when formed.

7.  Once the sum of all payments to Ross under this Agreement equals or exceeds $10,000,000.00, the Ross Sharing Percentage shall fall to zero percent (0%). After that point, Ross's total compensation shall be solely from the Net Sharing Percentage described in Paragraph 3.

8.  This Agreement shall be governed under the laws of the State of New York. The Parties consent to the jurisdiction of the state or federal courts of both New York and Illinois for the resolution of any and all disputes hereunder and agree to all legal, equitable and injunctive relief to enforce the rights and obligations under this Agreement. The Parties agree not to contest venue within either the City of New York or the City of Chicago.

9.  The Parties agree and acknowledge that the terms of this Agreement have been mutually negotiated between the Parties, and any rule of construction to construe ambiguous terms against the drafter is inapplicable.

10.  The Parties acknowledge that their respective rights and obligations are intended to be included in future documents to be executed by the Parties, including, without limitation, marketing, brokerage, service and other agreements in connection with the Business, and any necessary agreements with PBTCo once that company is formed. The Parties therefore agree to cooperate in good faith to execute any and all necessary documents to effectuate the terms of this Agreement.

11.  This Agreement may be signed in counterparts and exchanged by facsimile, with each copy having the validity as an original whole.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as

2

of the first date set forth below.

ALAN ROSS


_____

Date:


STP ENTERPRISES, INC.


By:_____
　　　　David Simon
Its:
Date:

Exhibit D

RECYCLED PAPER
RECYCLABLE

## ASSIGNMENT AGREEMENT

This Assignment is entered into effective as of May 1, 2008 by and among STP Enterprises, Inc. ("STP") and Newco, Inc. ("Newco") (collectively, the "Assignors") and Balshe LLC, a Delaware limited liability company (the "Assignee").

FOR VALUE RECEIVED, INCLUDING $10.00 AND OTHER GOOD AND VALUABLE CONSIDERATION, THE RECEIPT AND SUFFICIENCY OF WHICH ARE HEREBY ACKNOWLEDGED, Assignors hereby assign, convey, quitclaim and transfer to Assignee all right, title, claim and interest of any kind whatever that Assignors have or may have in or with respect to any and all claims or causes of action, including, without limitation, claims for misappropriation of trade secrets, breach of contract, breach of fiduciary duty, fraud, unjust enrichment and promissory estoppel arising from or relating to any acts or omissions by Alan Ross and SAVE Associates (collectively, "Ross"), arising out of or related to that certain Agreement for Purchase of Pooled Benefits Trust Patent No. 5,974,390 between Assignors and Ross (the "Purchase Agreement") and/or that certain Agreement Regarding Pooled Benefits Trusts between Assignors and Ross (the "Consulting Agreement"), and any of the Assignors' dealings with Ross in connection with the Purchase Agreement, the Consulting Agreement or the '390 Patent (such claims or causes of action being, collectively, the "Assigned Claims").

Assignors represent and warrant that, collectively, they own the Assigned Claims, and each of them represents and warrants that he or it has not assigned, conveyed, quitclaimed or transferred, in whole or in part, the Assigned Claims, nor created or incurred any lien, encumbrance, or security interest with respect thereto.

Executed and delivered at Chicago, Illinois as of the above date.

STP Enterprises, Inc.

By: _____
Name: ___David B. Simon___
Its: ___V.P.___

Newco, Inc.

By: _____
Name: ___David B. Simon___
Its: ___Organizer___

# EXHIBIT 3

Westlaw.

Slip Copy                                                                Page 1
Slip Copy, 2007 WL 433100 (N.D.Ill.)
**(Cite as: 2007 WL 433100 (N.D.Ill.))**

**C**
Nano-Proprietary, Inc. v. Keesmann
N.D.Ill.,2007.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
NANO-PROPRIETARY, INC. Plaintiff,
v.
Till KEESMANN, Defendant.
**No. 06 C 2689.**

Jan. 30, 2007.

Joanna Baden-Mayer, Thomas E. Gilbertsen, William M. Bailey, Kelley Drye & Warren, LLP, Washington, DC, Matthew Charles Luzadder, Stephen Arthur Wood, Kelley, Drye & Warren, Chicago, IL, for Plaintiff.
James R. Sobieraj, Kelly J. Eberspecher, Nicholas G. de la Torre, Brinks, Hofer, Gilson & Lione, Chicago, IL, for Defendant.

*MEMORANDUM OPINION AND ORDER*

ANDERSEN, J.
*1 Plaintiff Nano-Proprietary, Inc. ("NPI") brought this action against Defendant Till Keesmann ("Keesmann"), alleging that Keesmann's purported termination of the May 26, 2000 Patent License Agreement (the "License Agreement") between NPI and Keesmann was invalid. On May 19, 2006, this court approved the parties' agreed stipulation to Plaintiff's motion for a temporary restraining order. NPI now asks this court to enjoin Keesmann from terminating the License Agreement to prevent permanent and irreparable damage to NPI's business and intellectual property. For the foregoing reasons, Plaintiff's motion for a preliminary injunction will be granted when the Court sets the appropriate bond.

*BACKGROUND*

NPI is a technology company specializing in intellectual property. On May 26, 2000, NPI, then operating as $1 Diamond Technology, Inc., entered into a Patent License Agreement with Till Keesmann, a German citizen. The agreement gave NPI the exclusive, worldwide right and license to sublicense Keesmann's patents pertaining to carbon nanotubes as cathodes for field emission displays. The License Agreement was entered into by the parties for the primary purpose of selling sublicenses for the patents to third parties. NPI covenanted that it would support Keesmann in maintaining and strengthening the patents, actively market the patents to third parties, identify infringers of the patents, and use commercially reasonable efforts to seek remedies for infringements. In turn, Keesmann agreed not to license or sublicense his patents to anyone other than NPI during the term of the License Agreement, and not to unreasonably withhold approval of proposed sublicenses. NPI promised to pay Keesmann quarterly royalties, and agreed to pay Keesmann an aggregate sum of $1,000,000 within four years of the beginning of the License Agreement.

Termination of the License Agreement is triggered in the event of default of any obligation under the License Agreement. If either party were to terminate the License Agreement, that party must give sixty days' notice by registered mail, specifying the basis for termination. The party receiving the termination notice has sixty days to cure the default. Specifically, the default provision of the License Agreement reads:

If either party shall be in default of any obligation hereunder, or shall be adjudged bankrupt, or become insolvent, or make an assignment for the benefit of creditors, or be placed in the hands of a receiver or a trustee in bankruptcy, the other Party may terminate this Agreement by giving sixty (60) days' notice by registered mail to the other Party, specifying the basis for termination. If within sixty (60) days after the receipt of such notice, the Party receiving notice shall remedy the condition forming the basis for termination, such notice shall cease to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 433100 (N.D.Ill.)
**(Cite as: 2007 WL 433100 (N.D.Ill.))**

be operative, and this Agreement shall continue in full force.

Keesmann's belief that NPI was in default under this provision led to Keesmann's early declaration of termination of the License Agreement and forms the basis of NPI's claim for a preliminary injunction.

**\*2** When the License Agreement was formed, the market for carbon nanotubes was undeveloped, but both NPI and Keesmann believed there was tremendous potential for its commercial success, especially in the flat panel displays market. The parties agree that several multinational corporations are close to developing, or have developed, products using carbon nanotube cathodes. The patents under the umbrella of the License Agreement have the potential to make flat panel displays more energy efficient, last longer than plasma displays, and have a brighter and wider viewing area than liquid crystal displays. NPI and Keesmann believe carbon nanotube displays can displace plasma and liquid crystal displays in the flat panel display market and stand to generate potentially tens of billions of dollars a year.

Since the execution of the License Agreement, NPI helped to complete the United States reissue process for one of Keesman's patents covered by the License Agreement, and, with the assistance of NPI, Keesmann was reissued two additional patents covered by the License Agreement by the United States Patent and Trademark Office. The parties agree that these reissuances significantly enhanced the value and marketability of the License Agreement.

After the patents were reissued, NPI solicited nineteen different large electronics corporations to sublicense the patents pursuant to the License Agreement. NPI made developmental sales of carbon nanotube cathodes to eighteen different research corporations, government agencies and universities in order to spur development of a market for the new technology. NPI also participated in worldwide

trade shows and technical exhibitions to publicize, commercialize, and encourage licensing of the patents under the License Agreement and manufactured 14 inch and 25 inch flat displays using the carbon nanotube technology for "proof of concept" demonstrations at the shows.

By May, 2004, NPI had paid Keesmann all the required royalty payments under the License Agreement, totaling approximately $1,250,000. On June 7, 2005, Keesmann notified NPI of his contact with a German capital market fund consisting of private investors closely connected with IBP AG ("IBP"), a German company specializing in valuing patents. Keesmann indicated that IBP evaluated the patents under the License Agreement and concluded they had significant potential and value. Keesmann also informed NPI that he had assigned 16% of his royalty rights under the License Agreement to the investors.

On September 28, 2005, Keesmann notified NPI of an additional assignation of his royalty rights to another German company, and a client of IBP, which specialized in finding transaction partners for licenses. The new assignee, NPV Nano Patent Gmbh & Co, received 10% of Keesmann's royalty rights under the License Agreement.

Keesmann arranged a meeting so that NPI and IBP executives could meet. On November 30, 2005, NPI's President, Dr. Zvi Yaniv, attended a meeting in Dresden, Germany. Keesmann's German representatives indicated that Keesmann intended to sell the patents under the License Agreement. On December 12, 2005, Keesmann asked NPI to grant him the right to auction off NPI's interest in the License Agreement. NPI rejected Keesman's request, stating it would not release the patents for less than a minimum bid of $200,000,000. Keesmann did not accept the offer.

**\*3** Between December 21, 2005, when Keesmann confirmed, by letter, his intention to find a buyer for the patents, and March 22, 2006, when Keesmann provided his notice of termination under the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 433100 (N.D.Ill.)
**(Cite as: 2007 WL 433100 (N.D.Ill.))**

License Agreement, the parties entered into prolonged discussion about Keesmann's right to sell the patents and NPI's responsibility to allow an audit under the License Agreement. On December 30, 2005 Keesmann requested a full audit under the License Agreement. On January 3, 2006, NPI consented to the audit, but noted that "there have been no sublicenses signed related to this patent and therefore the only payments made have been the minimum royalty payments specified under the agreement. As a result, there will not be many records for you to look at."Over the next two and a half months, the parties fought over the scope of the audit as well as NPI's insistence on a confidentiality agreement.

The License Agreement provides, in relevant part:

Licensee shall keep accurate records of all operations affecting payments hereunder, and shall permit Licensor or its duly authorized agent to inspect all such records and to make copies of or extracts from such records.... Licensee shall report to Licensor information about all important incidents concerning the Patents. Also, any agreements with sub-licensees and the related correspondence is to be made available to the Licensor....

Keesmann's audit request sought production of documents including all agreements with Canon, Inc., documents relating to operations affecting payments under the License Agreement, and all documents relating to (1) NPI's efforts to maintain and strengthen Keesmann's patents, (2) NPI's efforts to actively market Keesmann's patents, (3) NPI's efforts to identify infringers, and (4) NPI's manufacture, use, sale, or offer for sale of products using an emission of electrons from a carbon nanotube. NPI sought to restrict the scope of the audit to conform with its interpretation of the License Agreement, and asked Keesmann to sign a confidentiality agreement, the propriety and extent about which the parties disagreed.

On March 22, 2006, Keesmann provided notice of termination under the License Agreement, citing as

bases:

(1) NPI's failure to actively market the Keesmann patents, (2) NPI's failure to identify those infringing on the Keesmann patents and to use commercially reasonable remedies to seek remedies for the infringement, and (3) NPI's failure to comply with Keesmann's audit requests.

NPI responded on March 30, 2006, arguing that NPI was not in default of the License Agreement, and that Keesmann's termination notice was ineffective. NPI further accused Keesmann of demanding an audit solely as pretext for termination of the License Agreement.

NPI filed its federal lawsuit on May 15, 2006. This court approved Plaintiff's motion for a temporary restraining order, and on June 12, 2006, the motion for a TRO was converted into a motion for a preliminary injunction.

*DISCUSSION*

**\*4** NPI seeks preliminary injunctive relief to prevent substantial injury and irreparable harm to its business and intellectual property. Specifically, NPI seeks to enjoin Keesmann, his agents, employees, and all those acting in concert with him regarding his patents from terminating the License Agreement or otherwise acting in violation of the License Agreement.

In order to prevail on a motion for preliminary injunction, a party must show that (1) it is reasonably likely to succeed on the merits, (2) it is suffering an irreparable harm that outweighs the nonmovant's harm if the injunction were granted, (3) there is no adequate remedy at law, and (4) an injunction would not harm the public interest. *Joelner v. Vill. of Wash. Park,* 378 F.3d 613, 619 (7th Cir.2004). Plaintiff has the burden of proving each of these factors.*Roland v. Air Line Employees Ass'n, Int'l,* 753 F.2d 1385, 1392 (7th Cir.1985). In this case, the court is satisfied that Plaintiff has met each of the four requirements.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*A. Likelihood of Success*

The first threshold Plaintiff must prove to support the issuance of a preliminary injunction is a reasonable likelihood of success on the merits. *Medco Research v. Fujisawa USA,* 1994 U.S. Dist. Lexis 18323 at *10 (D.Ill.1994), citing *Retired Chicago Police Assoc. v. City of Chicago,* 7 F.3d 584, 608 (7th Cir.1993). To demonstrate a reasonable likelihood of success on the merits, Plaintiff must show that its chance of prevailing is "better than negligible." *Kinney v. Int'l Union of Operating Engineers,* 994 F.2d 1271, 1275 (7th Cir.1993).

NPI claims it has a strong likelihood of success on the merits because it will establish that (1) Keesmann had no right to terminate under the License Agreement, (2) Keesmann's method of termination was invalid, and (3) Keesmann failed to allow NPI sixty days to cure, as provided under the License Agreement. Keesmann argues that NPI defaulted, that he complied with the terms of the License Agreement, and that he properly terminated the contract.

1. Termination under the License Agreement

As noted above, in Keesmann's March 22, 2006 letter terminating the License Agreement, he claims NPI is in default of the License Agreement for three reasons: (1) NPI's failure to actively market the Keesmann patents, (2) NPI's failure to identify infringers and use commercially reasonable efforts to seek remedies for infringement, and (3) NPI's failure to comply with Keesmann's audit requests.

a. Failure to Actively Market

NPI is required to "actively market" the patents under the License Agreement. However, in the discovery documents, depositions and oral arguments, Keesmann fails to identify deficiencies, nor does he highlight in what ways NPI could have more actively marketed the patents over the past five years. Notwithstanding the parties' agreement that there is no current developed market for Keesmann's patents, NPI presented evidence that it solicited nineteen different large electronics corporations to sublicense the patents, it made developmental sales of carbon nanotube cathodes to eighteen different research corporations, government agencies and universities in order to spur development of a market for the new technology, and it manufactured 14 inch and 25 inch flat "proof of concept" prototype displays using the carbon nanotube technology. In addition, NPI also participated in worldwide trade shows and technical exhibitions to publicize, commercialize, and encourage licensing of the patents under the License Agreement.

*5 The parties agree that Keesmann's patents are potentially worth hundreds of millions, if not billions, of dollars, but that no commercial application for the patents yet exists. The geographic sector of the electronics industry most receptive to the use of Keesmann's patents is Asia, a place in which Keesmann does not own patents. Until the market has identified both a commercial application for the patents, as well as a viable method of manufacturing those applications on a commercial scale, the sublicensing will be difficult. The absence of sublicensees, however, does not in itself, lead us to conclude that there has been a failure to actively market. We believe that NPI has adequately established that it actively marketed the sublicense agreements as contemplated under the License Agreement.

b. Failure to identify infringers

Keesmann's second basis for claiming default is that NPI failed to identify infringers of the patents and use commercially available reasonable efforts to seek remedies for the infringement. In the preliminary injunction hearing, however, NPI established that on several occasions from 2002 through 2005, Keesmann and NPI discussed other companies using similar carbon nanotube technology and whether any of Keesmann's patents were being illicitly used in their development. Email conversations between Keesmann, his agent, Keith Willi-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 433100 (N.D.Ill.)
**(Cite as: 2007 WL 433100 (N.D.Ill.))**

ams, his former business partner, Hubert Grosse-Wilde, and NPI's president, Zvi Yaniv, establish that the lines of communication were open regarding infringers. From this dialogue, it appears that Keesmann was aware of other companies attempting to develop carbon nanotube technology. Further, the emails also show Keesmann was presented with multiple opportunities to discuss with NPI whether any infringement was occurring. However, Keesmann first introduced infringement as an adverse issue in his March 22, 2006 termination letter, offering no opportunity for cure. Moreover, Keesmann has not disputed NPI's assertions that the parties have discussed infringers, nor has Keesmann offered any support to establish that there were actual infringers against whom NPI failed to seek remedies. NPI has satisfactorily shown that it was not negligent in identifying infringers.

c. Failure to comply with audit requests

The License Agreement provides that NPI shall keep accurate records of "all operations affecting payments" under the License Agreement and permit Keesmann to inspect and make copies of such records during the term of the License Agreement. Keesmann claims that NPI's failure to comply with this audit provision is another reason to justify termination.

Keesmann requested an audit in late December, 2005, and, in early January, 2006, NPI agreed to comply. An audit request for specific documents was presented to NPI on January 17, 2006 and letters authorizing Keesmann's counsel to conduct the audit were finalized in mid-February, 2006. Between that time and March 22, 2006, when Keesmann terminated the License Agreement, NPI disagreed with Keesmann about the scope of the audit, and requested that Keesmann sign a confidentiality agreement prior to conducting the audit. Despite these stumbling blocks, we believe that, in light of the unique property that NPI was trying to protect, NPI's request for a confidentiality agreement and attempt to contain the extent of the audit is not ne-

cessarily unreasonable. However, we find that NPI's seeming attempts to change Keesmann's rights to records, as well as the controlling venue and substantive law provided in the License Agreement, is somewhat troubling. Nevertheless, whether Keesmann was seeking to jettison his patents and use the audit as a bargaining tool to insure NPI's compliance, or whether NPI was unreasonably restricting scope or requesting confidentiality in the audit, we conclude that NPI has sufficiently established that its response to Keesmann's audit requests under the License Agreement was reasonable.

2. Method of termination

*6 The License Agreement provides that the method of termination is for the terminating party to provide sixty days' notice by registered mail, and that, within those sixty days, the party receiving the termination notice may "remedy the condition forming the basis for termination."Keesmann provided his notice of termination to NPI on March 22, 2006. He stated, in the last paragraph of a three page letter via facsimile to NPI's counsel that:

In light of NPI's many defaults in its obligations under the Patent License Agreement, Keesmann hereby provides notice of termination. There are several, independent bases for termination, including (1)[NPI]'s failure to actively market the Keesmann patents, (2)[NPI]'s failure to identify those infringing on the Keesmann patents and to use commercially reasonable efforts to seek remedies for infringement, and (3)[NPI]'s failure to comply with Keesmann's audit requests.

No reference to the termination process was provided, nor was there any indication of the opportunity for sixty days to cure.

NPI stated it was surprised about the suddenness of the termination, but nonetheless, offered to cure the alleged defaults with a proposed sublicense for the patents. Keesmann's final response, on April 28,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Page 6

Slip Copy, 2007 WL 433100 (N.D.Ill.)
(Cite as: 2007 WL 433100 (N.D.Ill.))

2006, made clear his desire to terminate the License Agreement immediately. He informed NPI that discussions about the audit and sublicense should cease. Keesmann refused to honor the sixty day cure period.

At the time the License Agreement was drafted, Keesmann was free to negotiate its terms to his satisfaction. The agreement provides for certain performance hurdles and provisions that were agreed upon by both parties. Moreover, the agreement provided relief if a party defaulted or if the License Agreement was dissolved. It appears that NPI has complied with the terms of the agreement and for the foregoing reasons, this Court believes that NPI has demonstrated that it has a reasonable, and better than negligible, chance of prevailing on the merits. Thus, the first prong of the preliminary injunction analysis is satisfied.

### B. Irreparable Harm and Inadequate Remedy at Law

Having met the first element of a preliminary injunction claim, NPI must now show that it has no adequate remedy at law and, as a result, that it will suffer irreparable harm if the injunction is not issued. *Roland Machinery Co. v. Dresser Industries,* 749 F.2d 380, 386 (7th Cir.1984). Inadequate remedy at law does not mean wholly ineffectual; rather, the remedy must be seriously deficient as compared to the harm suffered. *Id.*

NPI argues that if a preliminary injunction is not issued, Keesmann will likely sell the patents to bona fide purchasers before the lawsuit is settled. Those purchasers would likely be foreign and, thus, be outside of this court's jurisdiction. NPI also claims that there is no adequate remedy at law because the value of the patents has not been tested in the undeveloped carbon nanotube cathode market. Finally, NPI claims that because patent rights are unique personal property, money would not adequately compensate for their loss. The preliminary injunction, NPI states, protects its unique patent

rights and protects pending joint ventures seeking commercial applications for the patents. A preliminary injunction safeguards NPI's current and future customers, including its sales, profits and business goodwill. Keesmann argues that there is, in fact, a value for the patents, namely the $200,000,000 price tag that NPI placed on the patent rights in December, 2005 when Keesmann first expressed his desire to sell the patents.

*7 We conclude that the sale of the patents, before the end of litigation, would constitute irreparable harm to NPI because their rights under the License Agreement would be irretrievably damaged. Moreover, because of the nature of the unique patents and their undeveloped market, evaluating the amount of damages due to NPI is speculative, leaving equity as a more just remedy than money damages. Therefore, the Court believes that NPI has also met its burden to demonstrate irreparable harm and an inadequate remedy at law.

### C. Balance of Hardships

In balancing the harms, the Court must weigh the error of denying a preliminary injunction to the party who would win the case on the merits against the error of granting an injunction to the party who would lose.*Roland,* 749 F.2d at 387-88. Having concluded there is an irreparable harm to NPI if the preliminary injunction is not issued, the Court must now assess the harm Keesmann may suffer under the preliminary injunction.

Keesmann argues that he will suffer because his patents have "languished" over the past six years, and that half of the lives of the patents have almost passed. Although both sides agree that a successful sublicense could generate hundreds of millions of dollars, NPI argues that it has shouldered the majority of risk of an undeveloped market. Further, in oral arguments, Keesmann did little to disprove NPI's reasoning that there has been no sublicense because there is not yet a market in carbon nanotube cathodes. Finally, the error of denying a pre-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

liminary injunction to NPI could place it in a position in which the patent rights revert back to Keesmann, while the error of granting the preliminary injunction would merely delay Keesmann's ability to claim his patents during the pendency of this lawsuit. In light of the above, the Court believes the balance of harms weights in NPI's favor.

### D. The Public Interest

The last element in a preliminary injunction analysis is whether, if granting the preliminary injunction will have consequences beyond the immediate parties, the public interest should be considered. *Roland,* 749 F.2d at 388. Because this is essentially a private contract dispute, the Court is not inclined to weigh the public interest here. The parties agree that Keesmann's patents are potentially some of the preeminent patents in the nanotechnology field. Keesmann argues that the public interest is not served by the patents being frozen in litigation. However, the consequences of this dispute, beyond NPI and Keesmann, are purely speculative. The public interest we do consider is the sanctity of contracts and ownership. Because the denial of the preliminary injunction could result in the premature or invalid termination of the contract, we conclude this last element also weighs in NPI's favor.

A "preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."*Mazurek v. Armstrong,* 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) (quoting 11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice And Procedure § 2948, pp. 129-30 (2d ed.1995)). We believe that NPI has carried that burden successfully here, and thus, Plaintiff's motion for preliminary injunction is granted.

### BOND

**\*8** Rule 65(c) of the Federal Rules of Civil Procedure provides that:

[n]o restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

The purpose of an injunction bond is to compensate the defendant, in the event he prevails on the merits, for the harm that an injunction entered before the final decision caused him. *Ty, Inc. v. Publications Intern. Ltd.,* 292 F.3d 512 (7th Cir.2002). The amount of a security bond is in the discretion of the Court. *Scherr v. Volpe,* 466 F.2d 1027, 1035 (7th Cir.1972).

The parties are invited to suggest what bond would be appropriate. The Court shall hold a hearing to discuss this on February 8, 2007, at 2:00 p.m.

This injunction will not issue until the Court determines the correct bond.

### CONCLUSION

Keesmann, his agents, employees, and all those acting in concert with him, will be enjoined from terminating the License Agreement or otherwise acting in violation of the License Agreement, subject to bond determination as indicated above.

For all of the reasons stated above, Plaintiff's motion for a preliminary injunction [7] will be granted, subject to bond determination. Plaintiff's other pending motions [15] and [35] for hearings were granted.

It is so ordered.

N.D.Ill.,2007.
Nano-Proprietary, Inc. v. Keesmann
Slip Copy, 2007 WL 433100 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                 Page 1
Not Reported in F.Supp., 1994 WL 91932 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1994 WL 91932 (N.D.Ill.))**

**H**

Noddings Investment Group, Inc. v. Kelley
N.D.Ill.,1994.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.
NODDINGS INVESTMENT GROUP, INC., Plaintiff,
v.
Brian D. KELLEY, individually and Kelley Capital Management, Ltd., Defendants.
No. 93 C 1458.

March 18, 1994.

MEMORANDUM OPINION

KOCORAS, District Judge:

*1 This matter is before the Court following a preliminary injunction hearing conducted by Magistrate Judge Guzman on the plaintiff's motion for preliminary injunctive relief. For the reasons that follow, the requested relief is granted.

BACKGROUND

This is a trade secrets and unfair competition case. Defendant Brian Kelley ("Kelley") was formerly employed by plaintiff Noddings Investment Group as a managing director and by Noddings & Associates (collectively, "Noddings") as executive vice president and later, president. As in so many trade secret misappropriation cases, Kelley left his employer and started his own business in competition with his former employer. Kelley's new investment advising firm, Kelley Capital Management ("KCM"), allegedly used an investment strategy developed by Noddings and made allegedly false statements concerning his role at Noddings.

Noddings instituted this lawsuit and sought a preliminary injunction to prevent Kelley and KCM (collectively, "Kelley") from using or disclosing

the strategy, which Noddings claims is a trade secret, and from making allegedly false statements in advertisements concerning Kelley's role in the development and implementation of the strategy at Noddings. We referred the case to Magistrate Judge Guzman for a preliminary injunction hearing. Evidence adduced at that hearing showed that Kelley left Noddings and took with him a copy of the strategy after Noddings rejected his proposal that would have allowed Kelley, Daniel Czuba, and Chip Travis to buy out or control Noddings. Findings of Fact ("FF") ¶ 93. Travis testified that Kelley threatened to take the strategy and use it on his own if Noddings rejected his offer. FF ¶ 93. There is significant evidence that that is what happened.

The magistrate judge prepared a Report and Recommendation ("R & R"), recommending that we enter a preliminary injunction on both the false advertising and trade secret claims. Kelley filed his objections to the R & R and Noddings has filed its response to those objections, after prevailing on a motion to strike certain portions of Kelley's objections for failure to cite to the record.

Additional facts are set forth in the thorough R & R prepared by Magistrate Judge Guzman.

DISCUSSION

Our standard of review of the magistrate judge's recommendation is defined by 28 U.S.C. § 636(b)(1). For dispositive motions, the statute requires that the district court judge "make a de novo determination of those portions of the [magistrate judge's] ... recommendations to which objection is made." 28 U.S.C. § 636(b)(1). "A district judge may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." *Id.*

To obtain a preliminary injunction, the plaintiff must show that he has a better than negligible likelihood of success on the merits, that he will suffer irreparable harm in the absence of an injunction,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 2
Not Reported in F.Supp., 1994 WL 91932 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1994 WL 91932 (N.D.Ill.))**

and that he has no adequate remedy at law. *See Ping v. National Education Ass'n,* 870 F.2d 1369, 1371 (7th Cir.1989). Once this threshold showing is made, the court applies a sliding scale analysis of the harm to the parties and to the public from the grant or denial of the injunction and the actual likelihood of success on the merits. *Id.* The application of these factors to Noddings' Lanham Act and trade secrets claims will be discussed below.

### I. The Lanham Act False Advertising Claim

*\*2* Kelley challenges the magistrate judge's finding that two statements violate the Lanham Act. Def. Obj. at 4. Those two statements are as follows:

1. "[Kelley] was responsible for the development and direction of [Noddings'] stock index futures trading program." *See* PTX 3, fifth unnumbered page.

2. "KCM provided CTA [FN1] services" for the Noddings partnership. *See* PTX 3, fourth unnumbered page.

We will refer to these statements as "the Development and Direction statement" and "the CTA statement," respectively. These statements were contained in a Disclosure Document dated December 10, 1992 and filed with the Commodities Future Trading Commission. This Document was later mailed by KCM to potential investors. The Direction and Development statement was also contained in documents dated June 10, July 14, and July 15, 1993.

As a threshold matter, we agree with the magistrate judge's determination that these statements make representations about the quality of Kelley's advice, which is the "product" that KCM is selling, and thus, these statements are within the scope of the Lanham Act. *See* Rep. at 70.

Upon careful consideration of the magistrate judge's R & R and the relevant case law, we will accept the magistrate judge's recommendation concerning the entry of a preliminary injunction on the Lanham Act claim. We agree with the magistrate judge that the CTA statement is explicitly false. *See* Rep. at 68. KCM did not perform any trades for the Noddings Partnership. Tr. at 75, 285, 289-90. We acknowledge Kelley's position that the magistrate judge discussed the Development and Direction statement in the context of cases concerning implicitly false statements. Although the magistrate judge did not deem it important to classify the statement as implicitly misleading or explicitly false, *see* Rep. at 67, we believe that a careful reading of the R & R shows that the magistrate judge believed the statement was explicitly false. At page 66, the magistrate judge states, "[The Development and Direction Statement] explicitly asserts that Kelley is responsible for developing and directing the actual trading. As such it is not a substantially true statement. The record is clear that he had no such role."

An examination of the record here shows that the Development and Direction statement is explicitly false, because Horton and Ludwigson developed the Noddings Seasonality Trading Rules ("NSTR") and were responsible for identifying and incorporating revisions to it. Tr. at 144-48, 176-180, 199-207, 220, 244-49, 288-89, 577-85, 1565-69. Thus, we find that the Development and Direction statement is explicitly false; hence, extrinsic evidence of consumer confusion was not necessary in this case. We note, nonetheless, that Horton testified that at least one client was actually misled by the statements. Horton testified that a client asked him, "who is trading the seasonality program or who is managing the seasonality program now that Brian Kelley is no longer there?" Tr. at 290-91. This is anecdotal evidence of consumer confusion resulting from the Development and Direction statement. Based on the above analysis, we find that Noddings has a better than negligible likelihood of success on the merits. We agree with the magistrate judge's findings that the other elements necessary for preliminary injunctive relief have been met and we will enter a preliminary injunction

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

enjoining Kelley and KCM from distributing documents or making oral statements to investors or potential investors that represent (1) that Kelly or KCM provided CTA services for the Noddings Seasonality Limited Partnership or (2) that represent that Kelley or KCM were responsible for the development and direction of Noddings' stock index futures trading program.

## II. The Trade Secrets Claim

**\*3** The magistrate judge also recommended that a preliminary injunction issue on the trade secrets claim. Misappropriation of a trade secret is a tort under Illinois law. The Illinois Trade Secrets Act protects information that is sufficiently secret to derive actual or potential economic value from not being generally known to other persons who could derive economic value from its disclosure or use and that is the subject of efforts that are reasonable under the circumstances to protect its secrecy. 765 ILCS 1065/2(d)(1), (2). The issue in this case, as in many trade secret cases, is whether the plaintiff took sufficient precautions to avoid the disclosure of its trade secret. The law will not protect that which the owner did not bother to protect. *See Rockwell Graphic Systems, Inc. v. DEV Indus.,* 925 F.2d 174, 179 (7th Cir.1991). Whether reasonable precautions were taken is to be determined on a case-by-case basis. *Id.*

The available means of protecting trade secrets include limiting access to the secret to those with a need to know, requiring those to whom the secret is disclosed to sign nondisclosure agreements, marking documents with a "confidential" or "proprietary" legend, keeping documents under lock and key, and instituting physical security measures at the plant or office. A trade secret owner need not do all of the above to show that he has undertaken reasonable measures to protect his trade secret. Here, the magistrate judge highlighted evidence that Noddings did not use written confidentiality agreements. Rep. at 53. That fact is not fatal to Noddings' claim, though, because under Illinois

law, certain employees owe a duty to their employers to keep the employers' trade secrets confidential, regardless of the existence of a confidentiality agreement. *See Schulenburg v. Signatrol, Inc.,* 33 Ill.2d 379, 387 (1965). These employees include officers, directors, and agents of the company. *Vendo Co. v. Stoner,* 58 Ill.2d 289 (1974); *cert. denied* 420 U.S. 975 (1975). The Illinois Supreme Court in *Schulenburg* stated that an employee "may not take with him confidential particularized plans or processes developed by his employer and disclosed to him while the employee/employer relationship exist[ed], which are unknown to others in the industry and which give the employer advantage over his competitors." *Schulenburg,* 33 Ill.2d at 387. That admonition fits the circumstances alleged here perfectly. Noddings had developed a particularized strategy for buying and selling stock futures. This strategy was disclosed to Kelley during an employer/employee relationship. The strategy was apparently not known to others in the industry and it provided successful results, which are advantageous to a firm trying to entice investors to place their money under its management. The only element of the formulation not yet addressed is the confidential nature of the strategy. Thus, this formulation leads us to the same question as that reached above: was the strategy held in sufficient confidence to justify judicial protection?

**\*4** The magistrate judge reported that Noddings did not keep the written NSTR rules under lock and key. Rep. at 53. Moreover, employees were not forbidden from taking the written rules out of the office. These facts point to a lack of precautions. Additionally, Noddings personnel divulged portions of the NSTR to clients or prospective clients to entice them to invest with Noddings. FF ¶ 70-73. Apparently the most comprehensive disclosure was from Horton to Mark Bradley. From the information Horton presented, Bradley was able to implement certain of the concepts in his own trading in OEX 100 futures contracts (whereas Noddings applies the NSTR to S & P 500 futures). Tr. of Bradley Test. at 71. Horton did not require Bradley to sign a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 4
Not Reported in F.Supp., 1994 WL 91932 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1994 WL 91932 (N.D.Ill.))**

confidentiality agreement or warn him not to divulge the system to others. Tr. of Bradley Test. at 55. Bradley shared some of the information with his stockbroker. Tr. of Bradley Test. at 73. However, neither Bradley nor any other client learned enough of the NSTR to duplicate it or to use all of its components. *See* FF ¶ 72. Moreover, we note that certain components of the system are known in the industry; thus, divulging the use of those components is not tantamount to disclosure of the purported trade secret, where such disclosure does not reveal the combination of the components or other specifics.

The only persons to whom the entire set of rules was divulged were four or five persons who were "high corporate officers" and those "intimately or necessarily involved" in the development of the rules. *Id.* Kelley was the only one to see the rules who did not have a long-standing relationship with Noddings. Kelley is the only person alleged to have ever taken the rules for his own use; this is an indication that other persons with access to the rules considered them to be confidential. Further, there was evidence that others who knew the NSTR considered it to be proprietary. Travis testified that he told Kelley the system was proprietary when Kelley unveiled his plan to take over Noddings. FF ¶ 93. In fact, Kelley himself recognized the proprietary nature of the NSTR during his employment with Noddings. FF ¶ 78-83.

Certainly, Noddings could have taken more security measures. However, it is not clear that more security would have prevented Kelley, who was determined to either control Noddings or use the NSTR for his own benefit, from pursuing his plan. In light of all of the above, we find that there is a more than negligible likelihood that Noddings will succeed in establishing the existence of a protectable trade secret.

One issue remains. The magistrate judge found that Kelley ceased using the NSTR by March 27, 1993. A suit for injunctive relief is moot if the offending conduct has ceased and there is no reasonable ex-

pectation that it will resume. *American Express Travel Related Services v. Mastercard*, 776 F.Supp. 787, 790 (S.D.N.Y.1991) (citations omitted). Although the magistrate judge found that Kelley's use of the NSTR ceased approximately one year ago, he also found that Kelley holds a copy of the NSTR, an incentive exists for Kelley to revert to using the NSTR, and it would be very easy for Kelley to use the NSTR. Rep. at 59. Kelley denies that he used the NSTR and he represented to the magistrate judge that he would not use the NSTR in the future. If this is true, there would be no harm to him if a preliminary injunction issued. On the other hand, if we refused to issue a preliminary injunction and Kelley were to use the NSTR, the harm to Noddings from the loss of clients to Kelley and the loss of reputation would be difficult to quantify. As the magistrate judge observed, if Kelley were allowed to build a track record of success from using the allegedly misappropriated NSTR, he could enjoy a wrongfully-attained positive reputation among investors for a long time to come. On balance, we find that entry of a preliminary injunction barring Kelley and KCM from using or disclosing the NSTR is appropriate. Specifically, Kelley and KCM are enjoined from using the NSTR and from disclosing the NSTR in whole or in part to anyone.

## CONCLUSION

**\*5** For the reasons stated above, we issue a preliminary injunction enjoining Kelley and KCM from distributing documents or making oral statements to investors or potential investors that represent (1) that Kelly or KCM provided CTA services for the Noddings Seasonality Limited Partnership or (2) that represent that Kelley or KCM were responsible for the development and direction of Noddings' stock index futures trading program, and from using the NSTR and from disclosing the NSTR in whole or in part to anyone.

FN1. "CTA" means commodities trading advisor.

N.D.Ill.,1994.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 5
Not Reported in F.Supp., 1994 WL 91932 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1994 WL 91932 (N.D.Ill.))**


Noddings Investment Group, Inc. v. Kelley
Not Reported in F.Supp., 1994 WL 91932 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2003 WL 22956016 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22956016 (N.D.Ill.))**

**C**
Toyoda Machinery USA Corp. v. Gorski
N.D.Ill.,2003.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
TOYODA MACHINERY USA CORPORATION,
an Illinois corporation, Plaintiff,
v.
Raymond GORSKI, Individually and d/b/a Gorski
Power, Defendants.
**No. 03 C 7020.**

Dec. 12, 2003.

Edward Joseph Underhill, Natalie Anne Harris,
Masuda, Funai, Eifert & Mitchell, Ltd., Chicago,
IL, for Plaintiff.

*REPORT AND RECOMMENDATION*

MASON, Magistrate J.
*1 Plaintiff, Toyoda Machinery USA Corp.
("Toyoda"), has filed a motion for a preliminary in-
junction against defendant, Raymond Gorski
("Gorski"), seeking the return of its machinery.
After entering a temporary restraining order against
Gorski on November 25, 2003,[FN1] the District
Court referred this matter to us to conduct a hearing
on the motion for a preliminary injunction, which
we held on December 11, 2003. Defendant Gorski
received notice of the motion and hearing, and was
given an opportunity to retain counsel. Gorski de-
clined to retain counsel and was not present in court
for the hearing. Mr. Gorski failed to file any plead-
ings with the court and did not present a defense to
Toyoda's claims.[FN2]For the reasons stated herein,
we recommend that the District Court GRANT the
motion. In rendering this decision, the Court has
considered the testimony of Mark Elliott [FN3] and
his supporting affidavit, the seven documents ad-
mitted into evidence,[FN4] the arguments and plead-
ings from the plaintiff, statements made by Gorski
during three status calls before this Court, and the

relevant case law. Pursuant to Fed.R.Civ.P. 52, we
make the following findings of fact and conclusions
of law.

> FN1. On December 4, 2003, the initial
> temporary restraining order was extended
> for an additional ten days to December 19,
> 2003.

> FN2. We conducted three status hearings
> on this motion on December 2,3 and 4,
> 2003. Defendant was allowed to participate
> telephonically for each of those hearings
> and was informed of his rights and urged
> to speak with and retain counsel. Defend-
> ant was also told to appear in court for the
> preliminary injunction hearing on Decem-
> ber 11, 2003.

> FN3. Mark Elliott is the Director of Ad-
> ministration of Toyoda Machinery USA
> Corporation and has held that position for
> the duration of this dispute.

> FN4. Plaintiff's Exhibit 1 is the purchase
> order agreement signed by Gorski for the
> two Horizontal Machining Centers
> ("Equipment") at issue in this case. Exhibit
> 2 is the Security Agreement for the Equip-
> ment signed by Gorski and Toyoda. Exhib-
> it 3 is Toyoda's UCC Financing Statement
> for the Equipment. Exhibit 4 is the Bill of
> Lading for the Horizontal Machining Cen-
> ter with serial number 8799 and Exhibit 5
> is the Bill of Lading for the machine with
> serial number 8800. Both documents are
> signed by Gorski. Exhibit 6 is the February
> 21, 2003 letter modifying the payment
> terms for the Equipment, which both
> parties signed. Exhibit 7 is the August 29,
> 2003 letter Toyoda sent Gorski demanding
> full payment for the Equipment.

FINDINGS OF FACT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                           Page 2
Not Reported in F.Supp.2d, 2003 WL 22956016 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 22956016 (N.D.Ill.))

This matter stems from a June, 2002 business transaction between the parties. At that time, Toyoda and Gorski entered into a sales contract whereby Gorski agreed to purchase two Toyoda Horizontal Machining Centers from Toyoda for $555,000. On June 27, 2002, the parties entered into a Security Agreement granting to Toyoda "a continuing general security interest in two (2) Toyoda Horizontal Machining Centers, Model No. FA630, Serial Nos. NM8799 and NM8800, together with all standard equipment and accessories" (hereinafter the "Equipment"). Pursuant to the Security Agreement, a purchase money security interest in the Equipment was created in favor of Toyoda. The Security Agreement also provided that all loan and sales documents by and between the parties, including, but not limited to, all purchase orders, confirmations of sale and any other documents of agreement, were made subject to the terms of the Security Agreement.

Gorski accepted delivery of the Equipment on August 1, 2002 and August 5, 2002. Toyoda perfected its security interest in the Equipment by filing a UCC-1 Financing Statement with the Secretary of State of New York on August 5, 2002. Pursuant to a February 21, 2003 letter agreement signed by the parties, they modified the payment terms and the purchase price for the Equipment. According to the new terms, Gorski was to pay a purchase price of $710,000 for the Equipment in full on or before June 20, 2003. To date, Gorski has not paid any of the $710,000 he owes Toyoda, leaving the full purchase price of the Equipment due and owing. In a letter dated August 29, 2003, Toyoda made a demand for full payment of Gorski's outstanding liability on the Equipment. Gorski has not responded to or complied with Toyoda's demand.

*2 Paragraph 5 of the Security Agreement provides that Gorski "shall be in default" if he fails to "pay any indebtedness when due or payable."As a result of his failure to pay the $710,000 purchase price, Gorski is in default of the Security Agreement. The Security Agreement further states in paragraph 6 that upon default by Gorski, the unpaid balance of any and all indebtedness, obligations, and liabilities however evidenced and secured shall be accelerated and become immediately due and payable. Paragraph 6 also provides that upon default, Toyoda has the right to immediate possession of the Equipment and can enter Gorski's premises and remove the Equipment.

Gorski has represented and we find that he has never used the Equipment and that it is currently located on his leased business premises in upstate New York. The Equipment is subject to depreciation and deterioration and is not under any safeguard. The Equipment is a depreciating asset and therefore the value of Toyoda's interest in it diminishes daily. Due to Mr. Gorski's current financial position, he does not have the ability to pay his $710,000 debt to Toyoda.

CONCLUSIONS OF LAW

In order to obtain a preliminary injunction, a party must satisfy five criteria. First, it must show: 1) some likelihood of success on the merits; 2) that no adequate remedy at law exists; and 3) that it will suffer irreparable harm if the injunction is not granted. *See Ty, Inc. v. The Jones Group,* 237 F.3d 891, 895 (7th Cir.2001) (*citing Abbott Labs. v. Mead Johnson & Co.,* 971 F.2d 6, 11 (7th Cir.1992)."If the court is satisfied that these three conditions have been met, then it must consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied. *Ty, Inc.,* 237 F.3d at 895. Last, the court considers whether and how the public interest will be affected if the injunction is granted or denied.*Id.*"This process involves engaging in what we term the sliding scale approach; the more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms need favor the plaintiff's position."*Id.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 3
Not Reported in F.Supp.2d, 2003 WL 22956016 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 22956016 (N.D.Ill.))

*Likelihood of Success on the Merits*

In order to demonstrate a likelihood of success on the merits, Toyoda must show that it has a better than negligible chance of success. *See Platinum Home Mortgage Corp. v. Platinum Financial Group, Inc.,* 149 F.3d 722, 726 (7th Cir.1998). In this case, Toyoda has shown a likelihood of success on the merits of its claim. In the February 21, 2003 letter agreement signed by Gorski, he agreed to pay Toyoda $710,000, the full outstanding purchase price for the Equipment, by June 20, 2003. It is undisputed that the entire purchase price remains unpaid and that Toyoda perfected its purchase money security interest in the Equipment on August 5, 2003.

Gorski is in default of the Security Agreement because he has failed to pay the $710,000 purchase price of the Equipment in full and Toyoda has a perfected security interest in the Equipment. The Security Agreement provides that upon default by Gorski, Toyoda has the right to exercise its secured rights to the Equipment, including its right to require Gorski to make the Equipment available for repossession and/or enter Gorski's premises and remove the Equipment. Upon default, Toyoda additionally has all of the rights of a secured creditor under the Uniform Commercial Code. Gorski has not presented any defense to the allegations in Toyoda's complaint or motion for preliminary injunction. We find that Toyoda has established a likelihood of success on the merits of its complaint.

*Inadequate Remedy at Law and Irreparable Harm*

**\*3** Next, Toyoda must establish that it does not have an adequate remedy at law and that it will suffer irreparable harm if the injunction is not granted. Toyoda can meet this burden by showing that any damage award it may obtain after a trial on the merits would be seriously deficient as a remedy for the harm it suffered. *See Roland Machinery Company v. Dresser Industries, Inc.,* 749 F.2d 380, 386 (7th Cir.1984). Toyoda has met its burden and we find

that it has an inadequate remedy at law and faces irreparable harm if the injunction is not granted.

Gorski represented to the Court that he is in serious financial trouble and does not have the financial resources to meet his monetary obligations to Toyoda and other creditors. There is a real possibility that Gorski may become insolvent or file for bankruptcy before a final judgment can be entered and collected in this case, making any potential monetary award inadequate. Replevin is also an impractical and inadequate remedy because the Equipment is located in upstate New York. After many demands by Toyoda, Gorski has not and will not agree to return the Equipment, forcing Toyoda to seek this Court's intervention. We find that without injunctive relief, Toyoda faces the loss of the benefit of the contractual right of repossession in the Security Agreement.

Toyoda has also established irreparable harm because the Equipment is a depreciating asset. Toyoda loses money each day it is delayed in repossessing the Equipment. As with all depreciating assets, each day the Equipment sits on Gorski's premise, it loses value. The sooner Toyoda takes possession of the Equipment, the sooner it can resell it, maximizing the Equipment's resale value and minimizing the damages it can and presumably will seek from Gorski.

*Balance of Harms and The Public Interest*

The balance of harms clearly weighs in Toyoda's favor. Gorski has represented to the court that the Equipment is not currently in use and may never have been used. The Equipment is merely sitting on his business premises continuing to depreciate. As stated above, Toyoda is harmed by the ever increasing depreciation of the Equipment and should be allowed to repossess the Equipment and resell it as soon as possible, thus maximizing its resale value and minimizing both parties' loss.

The last factor we must consider is whether and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22956016 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22956016 (N.D.Ill.))**

how the public interest will be affected if the injunction is granted or denied. We find that our decision one way or the other in this case will not affect the public interest. This is a relatively insignificant commercial dispute between two private parties, with no bearing on the public at large.

CONCLUSION

For the reasons stated above, we recommend that the District Court GRANT Toyoda's request for a preliminary injunction. Specific written objections to this report and recommendation may be served and filed within 10 business days from the date that this order is served. Fed.R.Civ.P. 72(a). Failure to file objections with the District Court within the specified time will result in a waiver of the rights to appeal all findings, factual and legal, made by this Court in the report and recommendation. *Lorentzen v. Anderson Pest Control,* 64 F.3d 327, 330 (7th Cir.1995).

N.D.Ill.,2003.
Toyoda Machinery USA Corp. v. Gorski
Not Reported in F.Supp.2d, 2003 WL 22956016 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.