


**FILED**

MAY 2 0 2010
May 20 2010
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| BALSHE LLC and the SIMON LAW FIRM )<br><br>Plaintiffs )<br>)<br>v. )<br>)<br>ALAN J. ROSS and SAVE ASSOCIATES )<br>)<br>Defendants ) | Case No. 08-CV-3256<br><br>Judge James B. Zagel<br><br>Magistrate Judge Susan E. Cox |

**MOTION TO COMPEL COMPLIANCE WITH THE**
**JUNE 26, 2008 SETTLEMENT AGREEMENT BETWEEN THE PARTIES**

**I. Introduction**

Defendants in the above-captioned Action, Case No. 08-CV-3256, Alan J. Ross

and SAVE Associates ("Ross"), represented by Alan J. Ross, Pro Se, move this Court to

compel Plaintiffs, Balshe LLC and The Simon Law Firm ("Simon") and Bennett S.

Meyer and the Meyer-Chatfield, Corporation ("Meyer"), to comply with the terms of

their June 26, 2008 Settlement Agreement (the "Settlement Agreement" or the

"Agreement" or the "Settlement") which despite Ross' good faith efforts for the past two

years, have yet to be completed. In support of this Motion to Compel, Defendants state:

1.     The referenced settlement of the above-captioned Action (the "Action") was reached on June 26, 2008. (A copy of the Agreement is attached as Exhibit A). The parties to the Settlement were the Plaintiffs and Defendants in the Action; and Bennett S. Meyer and the Meyer-Chatfield Corporation ("Meyer") (the "Parties"). *

2.     The Action, including all claims and counterclaims of either party, was dismissed, with prejudice, in the United States District Court Northern District of Illinois Eastern Division (the "Court"), Judge James B. Zagel presiding, pursuant to the Settlement Agreement and General Release between and among the parties and others, dated June 26, 2008. The Court retained jurisdiction to enforce the terms of the Settlement Agreement. (A copy of the "Agreed Order of Dismissal With Prejudice" is attached as Exhibit B).

3.     As part of the Settlement Agreement the Parties agreed to "form a new entity" "Newco", now to be known as "Institutional Pooled Benefits LLC" or "IPB" (by agreement of the Parties), for the purpose of commercially exploiting the Patent" - U.S. Patent No. 5,974,390 (the "Patent") - through the enrollment of life insurance owned by various Banking, Corporate, Insurance Carrier and Governmental entities.

---

* Subsequent to the execution of the Settlement Agreement, the names of the Parties have been modified with respect to their identification as signatories to a final document and participation in the new entity, with the approval of all the parties. Simon has formed an entity doing business as Institutional Longevity Assets LLC ("ILA") for this purpose. Simultaneous the execution of the Settlement Agreement, Meyer, Ross and the principals of the legal firm known as Braverman-Kaskey, - David Braverman and John Kaskey ("Braverman") - formed an entity to be known as the MRB LLC ("MRB"). Meyer placed his forty five percent (45%) voting equity into the newly formed MRB entity. All MRB management decisions Meyer, Ross and Braverman are required by contractual obligation to be approved unanimously. Ross continues to maintain his individual ten percent (10%) non-voting equity in the to be formed new entity. Ross has named Bennett Meyer and the Mayer-Chatfield Corporation as a party to this Motion for reasons that will be enumerated below.

2

## II. Factual Background

4.     The Settlement Agreement established the rights and obligations of the parties as it concerns the ongoing ownership, management and administration of IPB. It was agreed that the form and jurisdiction in which IPB is to be organized/created is to be as mutually agreed by Balshe and Meyer, and that the ownership and management of IPB shall be in accordance with the Agreement (see Paragraph 3 of the Settlement Agreement). The parties agreed that those rights and obligations, as specified in the Settlement Agreement, were to be included in future documents to be executed by the parties, including without limitation, the documents necessary for the formation and governance of IPB and any documents necessary to effectuate the assignment of the Patent as specified (see Paragraph 22 of the Settlement Agreement).

5.     Ross and SAVE agreed to execute all necessary documents to assign to IPB - still not currently formed as mandated by the terms of the Settlement Agreement - all right, title and interest held by him and any of his/their affiliates, parents and assigns in the Patent.

6.     The Settlement Agreement also required that IPB use its best efforts to acquire all right, title and interest in the Patent held at that time by an affiliated entity of the AXA Group, as successor in interest to the Mutual Life Insurance Company of New York("AXA") (the AXA Patent Interest). Pursuant to the Agreement Ross/SAVE was required to exercise its option on the AXA Patent Interest, on behalf of IPB and

immediately assign the AXA Patent Interest to IPB. Simon and Meyer were required in Paragraph 3 to share equally, the cost ($250,000 - Two Hundred and Fifty Thousand - each) of acquiring the AXA Patent Interest as required in Paragraph 3 of the Agreement. The final date to exercise the option was September 25, 2008.

7.      During the months of July and August of 2008, Ross and legal counsel for Ross ("Mintz Levin"), communicated to Simon and Meyer on numerous occasions that it would assign and transfer the Patent to IPB pursuant to its formation, which could not be accomplished without the execution of the documents required in Paragraph 22 of the Agreement. Both Simon and Meyer expressed the opinion that those documents were unnecessary and that Ross was required to transfer the Patent (including the AXA portion) without deference to the Paragraph 22 requirement that the Parties cooperate in good faith to execute any and all necessary documents to effectuate the terms of the Settlement Agreement.

8.      In response to Ross' insistence for adherence to the Paragraph 22 requirements and considering the closeness to September 25th deadline to exercise the option for the AXA share of the Patent, counsel for Meyer (John Kaskey, the partner in the law firm of Braverman Kaskey mentioned above) circulated a Draft document that was intended to meet the Paragraph 22 requirements, to be known as the "LLC Agreement". Ross, through his legal counsel, indicated a willingness to approve the Kaskey Draft (subject to some revisions that were technical in nature).

4

9.      Stroock & Stroock & Lavan ("Stroock"), counsel to Simon in connection with drafting of the LLC agreement, submitted initial comments to Braverman Kaskey in the form of a marked-up Agreement dated September 22, 2008, which was received on afternoon of September 23rd. Ross received a copy (from Meyer) on the morning of September 24th – only one day prior to the deadline to exercise the option to purchase the AXA half of the Patent. The overall tenor of this mark-up appeared to be in keeping with the spirit of the Settlement Agreement and a good faith effort on the part of Simon to adhere to the requirements of the Agreement.

10.      It was not possible to finalize the LLC Agreement, given the extremely short time for review and commentary afforded to Meyer and his counsel as well as Ross and his counsel. Despite this fact, Simon and Meyer insisted that Ross transfer and assign both halves of the Patent to IPB, which at that time was wholly owned by Simon. Ross did not accede to that demand. However, after contentious negotiations, in order to assure that the Option purchase deadline would be met, and to provide Simon assurance of good intent, Ross offered to have the AXA half of the Patent assigned to IPB with Ross continuing to retain his half until such time as the LLC Agreement could be executed as soon as possible according to the requirements of the Settlement. This compromise was approved by all of the parties. The option was exercised and AXA received $500,000 (Five Hundred Thousand Dollars), the cost of which was borne evenly by Simon and Meyer, equally, as they agreed in the Settlement and which was a principal part of the Settlement Agreement.

11.     Approximately one month later on October 23 Stroock submitted a marked-up

Draft LLC Agreement (the "October Draft"). This new mark-up contained more

extensive commentary than their initial September 22nd Draft, and numerous revisions to

the September 22 Draft which was submitted prior to the purchase (and payment thereof)

of the AXA portion of the Patent. A number of those revisions and comments were

inconsistent with the Settlement Agreement and detrimental to the interests of Ross. (A

copy is attached as Exhibit C). On October 30, 2008 Mintz Levin responded with a

number of comments and suggestions regarding the Stroock mark-up. (A copy is attached

as Exhibit D).

12.     On December 30, 2008 Ross and Mintz Levin received correspondence

from the law firm of Novack Macey, counsel to Simon and also Meyer in connection

with matters pertaining to the Settlement Agreement. In that correspondence they allege

that Ross is in breach of Paragraphs 2 and 22 of the Settlement Agreement. Ross denies

that accusation.

13.     In the December 30th correspondence Simon and Meyer also allege that

Ross *anticipatorily* breached Paragraphs 7, 9 and 10 of the Agreement by insisting on

participation in the gross profits of IPB instead of the net profits. Ross had and has no

intention, desire or even the *ability*\* to commit such a breach, given the fact that he does

not possess the power, authority or even the means to engage in such a breach, nor did he

insist on such participation (A copy of the Novack Macey December 30, 2008

\* Payments to the Parties of "Distributable Cash" will be executed by a Third Party Administrator. Ross will have
absolutely no contact with monies other than his own distributions

correspondence is attached as Exhibit E). (A copy of the response to that correspondence, from Mintz Levin is attached as Exhibit F).

14.     On January 8, 2009 Simon and Meyer also demanded (through counsel) that Ross execute an LLC Agreement that was identical to the October Draft (now the "January 2009 Draft") and immediately afterward assign and transfer the Patent to IPB, or they would commence to initiate the threatened legal Action against Ross. It is Ross' contention that the inconsistencies and revisions contained in the October Draft were so potently harmful to Ross' interests, that they represented (when accompanied by a threat to litigate) an attempt to force from Ross to approve a rewritten and revised Settlement Agreement. There were many items in the January 2009 Draft that Meyer subsequently demanded to be omitted or revised, that were in fact ultimately deleted from future Drafts.

15.     As of this time the requirements in Paragraphs 1, 2 and 22 of the Settlement Agreement still have not been executed by the Parties.

## III. Defendants Request to the Court to Compel Simon and Meyer to Comply With the Requirements of the Settlement Agreement

16.     Between December of 2008 and the current time multiple versions of suggested Draft Agreements were produced and forwarded between parties. The most recent Draft was forwarded to the Parties on December 11, 2009 (the "December 2009 Draft"). It continues to contain a number of provisions that are modifications of the Settlement Agreement that are not permitted to be included in the LLC Agreement without the approval of all three of the Parties. (A copy is attached as Exhibit G).

17.     Ross stands ready to execute the December 2009 Draft and immediately transfer the Patent to IPB if it is modified in such a manner that the provisions that are modifications to and inconsistent with the Settlement Agreement are removed. The provisions that are contained in the December Draft that are modifications to and inconsistent with the Settlement Agreement are as follows (a detailed description is attached as Exhibit H):

A. Shared Expenses

B. Procedures Covering Policy Lapses

C. Policy Purchase Rights

D. Ross' Right to Dissuade

E. Bankruptcy Provisions

F. New Patent Use

**IV. Conclusion**

Therefore, for the reasons stated above, Ross respectfully requests the court to order Simon and Meyer to execute the December 2009 Draft without the inclusion of those provisions contained in that Draft that are inconsistent with the terms and conditions of

the Settlement Agreement. Ross will then immediately assign his portion of the Patent to

IPB.

Respectfully Submitted,

Alan J. Ross,
Pro Se

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above document was served upon the attorney of record for each party by first class mail, postage prepaid, on MAY 20 , 2010.

**Alan J. Ross**

# Exhibit H:

**Memorandum in Support of the Defendant's Motion to Compel Compliance with the June 26 Settlement Agreement:**

## I. Introduction

As addressed in the Motion, the revisions that are demanded by Simon and Meyer are modifications to, inconsistent with and contrary to the applicable plain language, terms and conditions in the Settlement Agreement. Paragraph 19 of the Settlement Agreement (which was inserted for inclusion by Simon in the very first draft Agreement distributed to the Parties) states (emphasis added):

> "This Agreement contains the *entire agreement* between the Parties relating to the rights herein granted and the obligations herein assumed......Any oral representation or *modification* concerning this Agreement shall be of no force or effect. <u>This Agreement can be modified only by a writing signed by all the Parties to this Agreement.</u>"

By virtue of the unambiguous language and terms of the above quoted Paragraph 19 and other provisions in the Settlement Agreement, no Party is required to accede to any modification, of any kind, to be included in the final document mandated in Paragraph 22. These provisions are also significantly detrimental to Ross' interests and they are in conflict with the purpose and probity of the Trust.

The following is an explanation of this issue:

## A. Shared Expenses

The concept of "Shared Expenses" is defined in Section 1, and again appears in Sections 4 and 5 of the December 2009 Draft (Exhibit G). It is an invention of Simon and Meyer and does not exist in the Settlement Agreement. Ross does not agree with this new term. Its inclusion represents a modification of the Settlement Agreement that requires the approval of all of the Parties.

Section 5(a)(1) "Initial Distributions" (a term also not resident in the Settlement Agreement) states that prior to making the initial distributions of "Distributable Cash" from various Trust operations, up to $1,000,000 of the distributable cash from net trust profits (cumulative) will be diverted to repay Simon and Meyer for certain "out of pocket costs and expenses", without distributing to Ross his 10% share, thus causing Ross to assume up to $100,000 of costs not anticipated in the Settlement Agreement.

Moreover, the out of pocket costs and expenses delineated in the Simon and Meyer's Shared Expenses definition are specifically required in the Settlement Agreement to be assumed *solely by Simon and Meyer*. Ross is not required to participate in the costs in connection with the formation and start-up of the company (see Paragraph 14 of Exhibit A), the acquisition of the Patent from AXA (see Paragraph 3 of Exhibit A) or expenses incurred by Simon and Meyer in connection with the required LLC Agreement or any post June 26, 2008 expenses regarding the Settlement Agreement (see Paragraph 14 of the Exhibit A Settlement Agreement).

2

As part of the Settlement Agreement Ross agreed to receive a minority equity interest level (10%), *without* voting rights and without any requirement for the assumption of operational expenses of *any* kind. Thus, the retroactive incorporation into the Settlement Agreement of Simon and Meyer's new and additional requirement represents a modification that is unacceptable to Ross and not mandated in any way by the Settlement Agreement.

## B. Procedures Covering Policy Lapses

There are no references whatsoever regarding procedures covering PBT policies in danger of lapsing (the "lapse procedure(s)"). The lapse references in Sections 6 (starting at end of line 14) of the December 2009 Draft represent a further substantial modification of the Settlement Agreement, and in a final document that purports to satisfy the requirements of Paragraph 22 of the Agreement, unless their inclusion is approved by all of the parties. Ross does not approve this modification.

In addition, these Procedures, which were not contemplated in the Settlement Agreement, can potentially allow for the "gaming" of the Trust in a number of ways that are harmful to its integrity. For instance, if a number of Trust participants may wish to make policy loans by removing all of their policy cash values as a means to facilitate an accelerated lapse, which would allow for exiting from the Trust. This would reduce the Trust population and potentially negatively affect the actuarial certitude of the Trust. This is also inconsistent with the requirements stated in Paragraph 15 of the Agreement. Ross also contends that a procedural issue of this type is by its very nature a function of

3

negotiation between the Parties and the PBT Trustee and does not belong in this document.

## C. Policy Purchase Rights

In regard to the actual execution of the aforementioned BOLI policy purchases, in Section 6(a) "the Company", which includes Simon, must effect the policy purchase "on behalf of the PBT Trust" within only 20 days, which is well short of the time it will normally take to underwrite and procure financing for such a purchase.

However, after 20 days have elapsed, Simon would be permitted to step out of his position as a member of the Company - which begs the issue of conflict of interest - and assume, *individually*, the exclusive right to purchase such policies (with no facilitation time constraints and no longer exclusively for the benefit of the PBT Trust) and *all compensation related to the sale is retained by him*. The language in Section 6(b) is identical except that Simon does not even have to wait the 20 day time period. Additionally, please note that the first sentence of Paragraph 12 of the Settlement Agreement reads as follows (emphasis added):

> "MC and SAVE acknowledge and agree with Balshe (Simon) that banks or companies that decide to assign the NAR (note - death benefit minus policy cash value = NAR) of any policies held by them into a PBT Trust may be given, prior to enrollment, an option for BOLI and/or option or mandate for COLI and/or GOLI, as appropriate, to sell policies on lives approximately aged 67 or older to an asset management company affiliated with Balshe or other third party investors (an "Age Policy"). "

On line 31 Ross is directed to agree to give Simon the right to arrange for the "direct purchase" of the Age Polices not just the actual provision of an *option* for BOLI as

4

agreed upon. The application of the agreed upon appropriateness condition, which covers all enrolled policies, including COLI/GOLI, has also been removed. The addition of the Policy Purchase rights addressed above also represent a modification that Ross does not wish to approve.

## D. Ross' Right to Dissuade

In Section 6(a) lines 32/33, Ross is directed to agree to being prohibited from dissuading Trust clients or potential clients from agreeing to allow for a purchase of their policies, by Simon; which may be beneficial to Simon and his business associates, but may be in many situations deleterious to the interests of these clients and may place the integrity of the PBT at risk.

There are absolutely no provisions in the Settlement Agreement prohibiting Ross from attempting to conserve Trust clientele by dissuading them from allowing Simon to make such a purchase nor could one be reasonably implied or intended. Ross would not have executed the Settlement if such a prohibition had been resident in the proposed language.

The first two sentences in Paragraph 12 of the Agreement begin with MC and SAVE but the very next sentence (which is the sentence relevant to this aspect of the discussion) begins with only MC designated:

> "MC agrees that it will not dissuade any banks from selling an Age Policy............".

MC - not MC *and* SAVE - as is the case in the previous two sentences. It should also be noted that this language was incorporated into the Settlement Agreement by *Simon* and

continued to remain in all of the succeeding Drafts. Incorporating this new provision in a

final agreement is a most significant modification that requires the approval of all of the

Parties and Ross does not approve.

### E. Bankruptcy Provisions

Language appears in Section 8(c) that discusses actions to be taken in the event of the

bankruptcy of any of the parties. Notwithstanding the fact that there is nothing in the

Settlement Agreement covering terms, conditions or requirements in the event of the

bankruptcy of any of the Parties and that this provision is not included or required in the

applicable Delaware LLC statutes, the language in Section 8(c)(2) accords rights to

Simon and Meyer that are not accorded to Ross. This is an example of another

modification of the Settlement Agreement that requires the approval of all three of the

Parties. Ross does not agree to this modification.

### F. New Patent Use

Ross has developed additional uses for the Patent that are outside of the purview of

Section 1 of the Settlement Agreement. He proposed the insertion of additional language

under the heading of "New Patent Use" that was meant to create some additional

opportunities for development (his and as well as those of Simon and Meyer, if any)

regarding use of the Patent, unrelated to the ownership of Policies exclusively by

corporations, banks, insurance carriers or governmental entities as delineated in Section

Although Ross contends that there are many potential profit centers outside the Section 1 stated purpose that may be exploited, his proposed language is also a modification that requires the approval of all three of the Parties. Until that is accomplished it also must be removed from the final document.

.

A

# EXHIBIT A

## <u>SETTLEMENT AGREEMENT AND GENERAL RELEASE</u>

This Settlement Agreement (the "Agreement") is entered into this 26th day of June, 2008 by and among: (i) Balshe LLC and The Simon Law Firm (collectively "Balshe"); and (ii) Alan J. Ross ("Ross") and SAVE Associates (Save Associates and Ross are sometimes collectively referred to as "SAVE"); and (iii) The Meyer-Chatfield Corporation ("MC") (Balshe, SAVE and MC are collectively referenced herein as the "Parties" and individually referenced as a "Party").

WHEREAS, on May 27, 2008, Balshe filed a Verified Complaint for Injunctive and Other Relief in the Circuit Court of Cook County, Illinois, styled, *Balshe LLC and The Simon Law Firm v. Alan J. Ross and SAVE Associates*, No. 08 CH 19180 (the "Action"), in which Balshe asserted, inter alia, that Ross had sold to Balshe all of his right, title and interest in United States Patent No. 5,974,390 (the "Patent");

WHEREAS, on June 5, 2008, Ross filed a Petition to Remove the Action to the United States District Court for the Northern District of Illinois, Eastern Division (the "Northern District");

WHEREAS, the Action is now pending in the Northern District as Case No. 08 CV 3256 (the "District Court Action");

WHEREAS, MC claims an interest in the Patent and the outcome of the District Court Action; and

WHEREAS, the Parties intend to settle all disputes and claims between them regarding the ownership and commercial exploitation of the Patent.

NOW, THEREFORE, in consideration of the foregoing recitals (which recitals are expressly incorporated herein by this reference), the mutual covenants contained herein, and the terms and conditions hereof, and other good and valuable consideration, the receipt and sufficiency of which consideration are hereby mutually acknowledged, the Parties hereto agrees as follows:

1.     The Parties shall form a new entity ("Newco") for the purpose of commercially exploiting the Patent through the enrollment of bank-owned life insurance ("BOLI"), carrier-owned life insurance ("IOLI"), non –BOLI and non-IOLI corporate-owned life insurance ("COLI") and/or government-owned life insurance ("GOLI") in one or more trusts (each a "PBT Trust") utilizing the Patent. The form and jurisdiction in which Newco will be organized/created shall be as mutually agreed to by Balshe and MC. The ownership and management of Newco shall be in accordance with this Agreement.

2.     SAVE and Ross shall execute all necessary documents to assign to Newco all right, title and interest in the Patent held by Ross and SAVE, and any of his/their affiliates, parents and assigns.

3.     Newco shall use its reasonable best efforts to acquire all right, title and interest in the Patent held by an affiliated entity of the AXA Group, as successor in interest to the



Mutual Life Insurance Company of New York ("AXA") (the "AXA Patent Interest"). SAVE shall exercise its option on the AXA Patent Interest on behalf of Newco and immediately assign the AXA Patent Interest to Newco. Balshe and MC shall share equally the cost of acquiring the AXA Patent Interest.

4.    SAVE shall be granted a ten percent (10%) non-voting equity interest in Newco. Balshe and MC shall each be granted a forty five percent (45%) voting equity interest in Newco. All equity interests shall enjoy tag-along rights upon the sale of Newco and subject to drag-along rights by the remaining equity interests upon a purchase offer exceeding an amount to be negotiated by the parties in good faith at a later date approximating $1 billion. Any equity interests exercising tag-along rights shall participate on a 1/3 basis if the purchase or contribution of additional equity does not result in a complete sale of Newco. The Parties acknowledge that MC may transfer a portion of its ownership interest in Newco to SAVE or other third parties.

5.    MC shall have the exclusive right to manage all aspects of Newco's involvement with BOLI with respect to any PBT Trust. Notwithstanding the foregoing, the Parties acknowledge that Balshe retains the right to negotiate with banks, including foreign banks and those that have large capital markets groups or which are primary dealers, to participate in broader strategic businesses. Balshe is free to conduct those negotiations in its sole discretion, and without MC's interference, provided that Balshe shall not enter into transaction for the creation, sale, or structure of BOLI policies, or the enrollment of BOLI policies in a PBT Trust, without MC's prior written consent, which consent shall not be unreasonably withheld.

6.    The Parties agree that Balshe shall be permitted to form a strategic relationship (a "Balshe Strategic Partner") with up to three (3) banks, provided, however, that under no circumstances will any bank which is not interested in forming a strategic partnership broader than the purchase and enrollment of BOLI policies into a PBT Trust, be a Balshe Strategic Partner. Any sales of BOLI and/or IOLI by Balshe shall be effectuated through MC and Balshe shall be entitled to BOLI and/or IOLI insurance commissions with respect to new BOLI policies and/or IOLI policies sold through MC at the highest rate that MC compensates any of its agents, and shall further be entitled to commissions relating to the replacement of any BOLI policy and/or IOLI policy owned by a Balshe Strategic Partner that reaches maturity and is replaced by MC ("Replacement Revenue"), or any BOLI policy and/or IOLI policy exchanged by a Balshe Strategic Partner through MC pursuant to Section 1035 of the Internal Revenue Code ("Exchange Revenue") at the same rate.

7.    (a)    Except as otherwise provided in subsection (b), all of Newco's net trust enrollment fees related to BOLI policies, the capture of any enhancements in the expected value of BOLI policies from the assignment of their net amount at risk (i.e. the excess of the total death benefit over the cash surrender value) ("NAR") into a PBT Trust, any net profits derived from trust renewal fees related to BOLI policies and any other net fees directly generated from the use of the PBT Trust relating to BOLI (collectively, "BOLI PBT Profits") shall be divided as follows: (a) ten percent (10%) to SAVE; (b) seventy two percent (72%) to MC; and (c) eighteen percent (18%) to Balshe.

(b)     BOLI PBT Profits with respect to the Balshe Strategic Partners shall be divided as follows: (a) ten percent (10%) to SAVE; (b) forty five percent (45%) to MC; and (c) forty five percent (45%) to Balshe.

(c)     Except for commission income otherwise payable to Balshe under Section 6, SAVE and Balshe each acknowledge and agree that MC shall retain all revenue related to insurance commissions and administrative fees it derives from its sale of BOLI, COLI, IOLI, GOLI, Replacement Revenue and Exchange Revenue. Balshe further acknowledges and agrees that Ross shall retain all revenue related to insurance commissions he derives from his sale of BOLI, COLI, IOLI, GOLI, Replacement Revenue and Exchange Revenue.

8.     Balshe shall have exclusive right to manage all of Newco's involvement with corporate-owned life insurance ("COLI") and government-owned life insurance ("GOLI") with respect to any PBT Trust. The parties acknowledge that MC has significant contacts with banks and other institutions and contemplate that MC will continue to maintain and develop such contacts to further the business of Newco and MC's traditional business, including the sale of BOLI and IOLI. MC shall not enter into transaction for the creation, sale, or structure of COLI and/or GOLI policies or the enrollment of COLI and/or GOLI policies in a PBT Trust, without Balshe's prior written consent, which consent shall not be unreasonably withheld.

9.     Except as otherwise provided in subsection (b), all of Newco's net trust enrollment fees related to COLI policies and/or GOLI policies, the capture of any enhancements in the expected value of COLI policies and/or GOLI policies from the assignment of their NAR into a PBT Trust, any net profits derived from trust renewal fees related to COLI policies and/or GOLI policies and any other net fees generated from the use of the PBT relating to COLI and/or GOLI (collectively, "COLI PBT Profits") shall be divided as follows: (a) ten percent (10%) to SAVE; (b) seventy two percent (72%) to Balshe; and (c) eighteen percent (18%) to MC.

(b)     In the event that Newco utilizes a methodology provided to it by MC, which methodology is similar to the methodology utilized by MC for BOLI transactions (the "MC Methodology"), MC's share of Newco's net fees generated from the use of the PBT relating to COLI and/or GOLI utilizing the MC Methodology (specifically excluding Newco's net trust enrollment fees, the capture of any enhancements in the expected value of policies from the assignment of their net assets at risk into a PBT Trust, and any net profits derived from trust renewal fees) shall be increased to: (i) forty-five percent (45%) for COLI and/or GOLI policies sold by or enrolled in a PBT Trust by MC; and (ii) twenty-seven percent (27%) for COLI and/or GOLI policies sold by or enrolled in a PBT Trust by Balshe.

10.     All of Newco's net trust enrollment fees related to IOLI policies, the capture of any enhancements in the expected value of IOLI policies from the assignment of their NAR into a PBT Trust, any net profits derived from trust renewal fees related to IOLI policies and any other net fees generated from the use of the PBT relating to IOLI shall be divided as follows: (a) ten percent (10%) to SAVE; (b) forty-five percent (45%) to Balshe; and (c) forty-five percent (45%) to MC.

11. MC's and Balshe's splits of BOLI PBT Profits, COLI PBT Profits and GOLI PBT Profits set forth above shall be readjusted annually beginning on the third anniversary of the date of creation of Newco, based upon the proportion of policies enrolled by Balshe and MC in the PBT Trust(s), provided, however, that in no event shall: (i) MC's interest in BOLI PBT Profits or Balshe's interest in COLI PBT Profits and GOLI PBT Profits ever fall below 45%; and/or (ii) Balshe's interest in BOLI PBT Profits or MC's interest in COLI PBT Profits and GOLI PBT Profits ever fall below 9%. Moreover, no readjustments shall be made to a party's percentage interest once such party has enrolled a minimum of 25,000 lives in the PBT Trust. MC and Balshe each acknowledge and agree that no adjustment shall ever be made to SAVE's 10% non-voting interest in BOLI PBT Profits, COLI PBT Profits, IOLI PBT Profits and GOLI PBT Profits unless previously sold pursuant to Par. 4 hereof.

12. MC and SAVE acknowledge and agree with Balshe that banks or companies that decide to assign the NAR of any policies held by them into a PBT Trust may be given, prior to enrollment of such policies in a PBT Trust or as allowed by the PBT Trust to other settlement companies, an option for BOLI and/or option or mandate for COLI and/or GOLI, as appropriate, to sell policies on lives approximately aged 67 or older to an asset management company affiliated with Balshe or other third-party investors (an "Age Policy"). MC and SAVE acknowledge and agree that Balshe shall retain all revenues relating to the purchase or sale of an Age Policy. MC agrees that it will not dissuade any banks from selling an Age Policy to such asset management company or other third-party investors. Balshe agrees that it will keep any Age Policy that is a BOLI policy that is purchased by Balshe or an asset management company affiliated with Balshe and is being serviced by MC in full force and effect and that MC will continue to administratively service such policies at its best price applicable for other policies, or at an arm's length market-competitive price, whichever is lower. Balshe further agrees that any Age Policy that is being serviced by MC and is sold to a third-party investor, that such Age Policy will not be exchanged pursuant to Section 1035 of the Internal Revenue Code. In the event that administrative servicing on any Age Policy that is serviced by MC is transferred to another administrator, either by Balshe, its affiliates, or a third-party investor, Balshe shall reimburse MC for the net profit lost by MC as a result of the transfer of the administrative servicing based on MC's prices or an arm's-length market-competitive price, whichever is lower. For the sake of clarity, the Parties acknowledge and agree that the purpose of this Section is to reimburse MC for loss of its servicing revenue or residual commissions for policies which are purchased or sold to an asset management company affiliated with Balshe or other third-party investors and that nothing herein should be construed to permit MC to recover revenue it would not otherwise have obtained, such as, for example and illustrative purposes only, if the Age Policy would have otherwise matured, or if MC would not have otherwise received administrative servicing fees were the policy not an Age Policy.

13. On or before July 31, 2008, Balshe shall pay MC $125,000 to reimburse MC for half of MC's out of pocket costs. Balshe shall be entitled to the use of any illustration systems developed by MC relating to the exploitation of the Patent.

14. The Parties agree to share on a 50%/50% basis between Balshe and MC all expenses incurred after the date of this Agreement, which are necessary to develop the business of Newco, including, without limitation, the procurement of additional patents.

Otherwise, the Parties agree to bear their own expenses, including, but not limited to, offices and overheard relating to their separate offices and marketing operations, and owner-related expenses.

15.     Each party to this Agreement covenants to each other party to this Agreement that it will not take any action that will harm or damage the PBT Trust. For the sake of clarity, the Parties acknowledge that activities contemplated by this Agreement shall not be construed as harming or causing damage to the PBT Trust.

16.     Balshe LLC, Simon Law Firm, STP Enterprises, Inc., David Simon, Nicomedes Sy Herrera, Pierre Wolf, David Henritze, Robert Stuchiner and Corridor Capital Group Holdings LLC, on behalf of itself/themselves and each of its/their respective shareholders, officers, directors, employees, agents, subsidiaries, affiliates, heirs, legal representatives, attorneys, executors, beneficiaries, trustees, administrators, successors and assigns predecessors, successors and assigns and all of its/their affiliated organizations and entities (the "Balshe Releasors") forever release and discharge Ross, SAVE, Bennett Meyer and MC, and each of his/its/their respective shareholders, officers, directors, employees, agents, attorneys, subsidiaries, affiliates, heirs, legal representatives, executors, beneficiaries, trustees, administrators, successors and assigns (the "Paragraph 16 Releasees"), of and from any and all duties and obligations and all claims, demands, actions or causes of action, debts, sums of money, accounts, damages, judgments and demands whatsoever, whether at law or in equity, whether presently known or unknown, whether matured, unmatured, potential or contingent, and whether in tort, in contract, or otherwise (the "Claims"), which the Balshe Releasors ever had, now have or may have, or hereafter can, shall or may have against the Paragraph 16 Releasees, for, upon, or by reason of any action, cause, matter or thing, whatsoever, from the beginning of time to the date hereof; provided, however, that nothing herein shall release, remise, remit, discharge or in any way affect any actions, causes of actions, suits, debts, dues, damages, sums of money, accounts, covenants, contracts, controversies, agreements, loans, promises, executions, judgments, claims, demands or defenses that all or any of the Balshe Releasors may assert against a Paragraph 16 Releasee for the breach by such Paragraph 16 Releasee of any of his/its representations, warranties, covenants, agreements and obligations under this Agreement. The foregoing release, when pleaded, shall be and constitute a complete defense to any proceeding of any kind that violates its terms.

17.     Ross and SAVE on behalf of himself/itself/themselves and each of his/its/their respective shareholders, officers, directors, employees, agents, subsidiaries, affiliates, heirs, legal representatives, attorneys executors, beneficiaries, trustees, administrators, successors and assigns predecessors, successors and assigns and all of its/their affiliated organizations and entities (the "SAVE Releasors") forever release and discharge Balshe LLC, Simon Law Firm, STP Enterprises, Inc., David Simon, Nicomedes Sy Herrera, Pierre Wolf, David Henritze, Robert Stuchiner and Corridor Capital Group Holdings LLC and each of its/their respective shareholders, officers, directors, employees, agents, attorneys, subsidiaries, affiliates, heirs, legal representatives, executors, beneficiaries, trustees, administrators, successors and assigns (the "Paragraph 17 Releasees"), of and from any all Claims, which the SAVE Releasors ever had, now have or may have, or hereafter can, shall or may have against the Paragraph 17 Releasees, for, upon, or by reason of any action, cause, matter or thing, whatsoever, from the



beginning of time to the date hereof; provided, however, that nothing herein shall release, remise, remit, discharge or in any way affect any actions, causes of actions, suits, debts, dues, damages, sums of money, accounts, covenants, contracts, controversies, agreements, loans, promises, executions, judgments, claims, demands or defenses that all or any of the SAVE Releasors may assert against a Paragraph 17 Releasee for the breach by such Paragraph 17 Releasee of any of his/its representations, warranties, covenants, agreements and obligations under this Agreement. The foregoing release, when pleaded, shall be and constitute a complete defense to any proceeding of any kind that violates its terms.

18.    MC and Bennett Meyer, on behalf of itself/himself/themselves and each of his/its/their respective shareholders, officers, directors, employees, agents, subsidiaries, affiliates, heirs, legal representatives, attorneys, executors, beneficiaries, trustees, administrators, successors and assigns predecessors, successors and assigns and all of its/their affiliated organizations and entities (the "MC Releasors") forever release and discharge Balshe LLC, Simon Law Firm, STP Enterprises, Inc., David Simon, Nicomedes Sy Herrera, Pierre Wolf, David Henritze, Robert Stuchiner and Corridor Capital Group Holdings LLC and each of its/their respective shareholders, officers, directors, employees, agents, attorneys, subsidiaries, affiliates, heirs, legal representatives, executors, beneficiaries, trustees, administrators, successors and assigns, (the "Paragraph 18 Releasees"), of and from any Claims, which the MC Releasors ever had, now have or may have, or hereafter can, shall or may have against the Paragraph 18 Releasees, for, upon, or by reason of any action, cause, matter or thing, whatsoever, from the beginning of time to the date hereof; provided, however, that nothing herein shall release, remise, remit, discharge or in any way affect any actions, causes of actions, suits, debts, dues, damages, sums of money, accounts, covenants, contracts, controversies, agreements, loans, promises, executions, judgments, claims, demands or defenses that all or any of the MC Releasors may assert against a Paragraph 18 Releasee for the breach by such Paragraph 18 Releasee of any of his/its representations, warranties, covenants, agreements and obligations under this Agreement. The foregoing release, when pleaded, shall be and constitute a complete defense to any proceeding of any kind that violates its terms.

19.    This Agreement contains the entire agreement between the Parties relating to the rights herein granted and the obligations herein assumed, and completely merges and supersedes any prior written or oral agreements or representations between the Parties concerning the subject matter hereof. Any oral representation or modification concerning this Agreement shall be of no force or effect. This Agreement can be modified only by a writing signed by all of the parties to this Agreement. All Parties warrant that no statement, promise, representation, warranty, condition, inducement or agreement of any kind with respect to the subject matter of this Agreement shall be, or has been, relied upon by the respective Party unless specifically contained and incorporated herein.

20.    This Agreement shall be governed under the laws of the State of Delaware. The parties agree that the Northern District shall retain jurisdiction to enforce or settle any disputes arising out of or relating to this Agreement and agree that they will not dispute jurisdiction in the Northern District.

21.    Each Party has participated in, cooperated in, or contributed to the drafting and preparation of this Agreement. In any construction of this Agreement, this Agreement shall not be construed for, or against, any Party, but shall be construed fairly according to its plain meaning.

22.    The Parties acknowledge that their respective rights and obligations are intended to be included in future documents to be executed by the Parties, including, without limitation, the documents necessary for the formation and governance of Newco and any documents necessary to effectuate the assignment and recordation of assignment of the Patent with the United States Patent and Trademark Office. The Parties agree to cooperate in good faith to execute any and all necessary documents to effectuate the terms of this Agreement.

23.    Ross and SAVE Associates warrant that they have not assigned any right, title or interest in the Patent to any person or entity other than AXA, and that they have no reason to believe that AXA has transferred any or all of its right, title or interest in the Patent to any other person or entity. Balshe warrants that it has not assigned any right, title or interest in the Patent to any person or entity. MC warrants that it has not assigned any right, title or interest in the Patent to any person or entity.

24.    The Parties shall seek and obtain, as soon as practicable, the dismissal with prejudice of the District Court Action, including all claims and counterclaims made therein, with each Party to bear its/his own costs and attorney fees.

25.    The provisions of this Agreement are severable. If any provision of this Agreement is declared invalid or unenforceable by a tribunal of competent jurisdiction, the ruling will not affect the validity and enforceability of any other provision of the Agreement.

26.    The Parties may disclose the terms of this Agreement as reasonably necessary to satisfy all applicable laws and pre-existing contractual obligations or in enforcement of this Agreement; otherwise the terms of this Agreement shall be held as strictly confidential information.

27.    Each party to this Agreement agrees to indemnify and hold each of the other parties to this Agreement harmless from and against any loss, damage (including incidental and consequential damages), deficiency, cost, expense (including costs of investigation and reasonable attorneys' fees) claims, actions or judgments, whether or not involving a third-party claim, resulting from: (i) its breach of any representation or warranty contained in this Agreement; and (ii) its failure to perform any of its obligations under this Agreement or any other agreement contemplated by this Agreement.

**[The remainder of this page is intentionally left blank.]**

BALSHE LLC

By: _____


Title: _____

Dated: _____

THE SIMON LAW FIRM

By: _____

Title: _____

Dated: _____


_____
Alan R. Ross

Dated: June 27, 2008


SAVE ASSOCIATES

By: _____

Title: President

Dated: June 27, 2008

MEYER-CHATFIELD CORP.

By: _____

Title: _____

Dated: _____

The undersigned hereby execute and join in this Agreement solely for the purpose of

effectuating the Releases contained in Sections 16, 17 and 18.

CORRIDOR CAPITAL GROUP
HOLDINGS LLC

By: _____              _____
                                          Bennett S. Meyer


Title: _____           Dated: __6-27-08_____

Dated: _____


STP ENTERPRISES, INC.

By: _____

Title: _____

Dated: _____


_____
Pierre Wolf

Dated: _____


_____
Nicomedes Sy Herrera

Dated: _____


_____
David Simon

Dated: _____


_____

The undersigned hereby execute and join in this Agreement solely for the purpose of

effectuating the Releases contained in Sections 16, 17 and 18.

CORRIDOR CAPITAL GROUP
HOLDINGS LLC

By: _____                    _____
                                                  Bennett S. Meyer


Title: _____                 Dated: _____

Dated: _____


STP ENTERPRISES, INC.

By: _____

Title: _____

Dated: _____


_____
Pierre Wolf


Dated: _____


_____
Nicomedes Sy Herrera


Dated: _____
_____
David Simon

Dated: _____

_____

9

ØBS

The undersigned hereby execute and join in this Agreement solely for the purpose of effectuating the Releases contained in Sections 16, 17 and 18.

CORRIDOR CAPITAL GROUP
HOLDINGS LLC

By: _____            _____
                                        Bennett S. Meyer

Title: _____         Dated: _____

Dated: _____

STP ENTERPRISES, INC.

By: _____

Title: _____

Dated: _____


_____
Pierre Wolf

Dated: _____

_____
Nicomedes Sy Herrera

Dated: _____

_____
David Simon

Dated: _____

_____

Robert Stuchiner

Dated: _____

_____
David Henritze

Dated: _____

**B**

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| BALSHE LLC and THE SIMON LAW FIRM, ) | |
| ) | Case No. 08-CV-3256 |
| Plaintiffs, ) | |
| ) | Judge James B. Zagel |
| v. ) | |
| ) | Magistrate Judge Susan E. Cox |
| ALAN J. ROSS and SAVE ASSOCIATES, ) | |
| ) | |
| Defendants. ) | |

## AGREED ORDER OF DISMISSAL WITH PREJUDICE

Pursuant to the Stipulation of Dismissal With Prejudice filed by the parties in the above-captioned action,

IT IS HEREBY ORDERED THAT:

1.      The above-captioned action, including all claims and counterclaims of either party, is hereby dismissed with prejudice, and without costs or attorneys' fees to any party, pursuant to that certain Settlement Agreement and General Release between and among the parties and others dated as of June 26, 2008 (the "Settlement Agreement");

2.      The Temporary Restraining Order entered in the above-captioned action, as extended from time to time, is dissolved *instanter* and the Temporary Restraining Order Bond is hereby released; and

3.      The Court hereby retains jurisdiction to enforce the terms of the Settlement Agreement.

ENTERED:

_____
**Honorable James B. Zagel**
United States District Court Judge

**C**

# EXHIBIT C

**SSL Draft 10/23/08**

**LIMITED LIABILITY COMPANY AGREEMENT
OF
INSTITUTIONAL POOLED BENEFITS LLC**

This LIMITED LIABILITY COMPANY AGREEMENT (**this** "Agreement") **for** INSTITUTIONAL POOLED BENEFITS LLC (the "Company"), a limited liability company organized pursuant to the Delaware Limited Liability Company Act (the "Act"), is entered into by and among **MRB POOLED BENEFITS LLC ("MRB"),** a Delaware limited liability company ("MRB"), with an address at 1284 Fritz Circle, Huntingdon Valley, PA 19006, **ALAN J. ROSS** ("Ross") an individual with an address at 687 Highland Avenue, Needham MA 02494160102494-1601 and **INSTITUTIONAL LONGEVITY ASSETS LLC ("ILA"),** a Delaware limited liability company ("ILA"), with an address at 303 East Wacker Drive, Suite 210, Chicago IL 60601-5210.

## SECTION 1. FORMATION; DEFINITIONS

(a) **Formation**. The parties formed the Company under the Act by causing an authorized person (within the meaning of the Act) to deliver and file a certificate of formation with the Delaware Secretary of State.

(b) **Name**. The name of the Company is "Institutional Pooled Benefits LLC" and all of the Company business **conducted by the Company** will be conducted under that name or such other names that comply with applicable law as the Members may select from time to time. **For avoidance of doubt, each of ILA and MRB may market any PBT Trust transaction subject to this Agreement in its own name**.

(c) **Registered Office; Registered Agent**. The registered office of the Company will be located at _____ or at such other location (which need not be a place of business of the Company) as the Members may designate from time to time.

(d) **Purposes**. The purposes of the Company are to engage in any activities to exploit the economic value of the Patent.

(e) **Term**. The Company will continue in existence until the winding up and liquidation of the Company in accordance with Section 12 hereof.

(f) **No State Law Partnership**. The Members intend that the Company will not be a partnership (including, without limitation, a limited partnership), and that no Member shall be a partner or joint venturer of any other Member for any purposes other than federal, state and local tax purposes, and the provisions of this Agreement shall not be construed otherwise. The rights and obligations of the Members amongst themselves shall be governed by the Act, this Agreement and the law of the State of Delaware.

**(g)** **Definitions**.  As used in this Agreement, the following terms have the following meanings, unless the context otherwise requires:

"**"**Adjusted Capital Account Deficit**"**" means, with respect to any Member, the deficit balance, if any, in the Member's Capital Account as of the end of the relevant taxable year, after giving effect to the following adjustments:

> (1) The deficit shall be decreased by the amounts which the Interest Holder is obligated to restore pursuant to Section 4, or is treated as obligated to restore pursuant to Regulation Section 1.704-1 (b)(2)(ii)(c), or is deemed obligated to restore under the penultimate sentences of Regulation Sections 1.704-2(g)(i) and (i)(5); and

> (2) The deficit shall be increased by the items described in Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5), and (6).

"Agreement" means this Limited Liability Company Agreement as it may be amended and/or restated from time to time.

"Bankrupt" means, with respect to any Person:  (a) the filing of an application by such Person for, or such Person's consent to, the appointment of a trustee, receiver, or custodian of its assets; (b) the entry of an order for relief with respect to such Person in proceedings under the United States Bankruptcy Code, as amended or superseded from time to time; (c) the making by such Person of a general assignment for the benefit of creditors; (d) the entry of an order, judgment, or decree by any court of competent jurisdiction appointing a trustee, receiver, or custodian of the assets of such Person unless the proceedings and the trustee, receiver, or custodian appointed are dismissed within one hundred twenty (120) days; or (e) the failure by such Person generally to pay such Person's debts as the debts become due within the meaning of Section 303(h)(1) of the United States Bankruptcy Code, as determined by the Bankruptcy Court, or the admission in writing of such Person's inability to pay its debts as they become due.

"BOLI" means bank-owned life insurance.

"BOLI Profits and Losses" means all of the Company's net income or net loss, as the case may be, other than from a Capital Transaction, generated from ~~the~~**any** PBT Trust relating to BOLI, including but not limited to such net income or net loss attributable to net trust enrollment **or service** fees related to BOLI policies, the capture of any enhancements in the expected value of BOLI policies from the assignment of their net amount at risk (i.e.**,** the excess of the total death benefit over the cash surrender value) ("NAR") into a PBT Trust, **net fees related to the use of the Patent or any product or services offered by the Company to increase the balance sheet of any client or customer of the Company,** and trust renewal fees related to BOLI policies.

 **"Capital Account" has the meaning ascribed to it in Section 3(c) hereof.**

2

"Capital Contribution" means a contribution in cash or property to the capital of the Company (and if required by the context of this Agreement, "Capital Contribution" shall also refer to the total amount of cash and the fair market value of property so contributed).

"Capital Transaction" means any: (i) ~~any~~ sale of membership interests in the Company or any sale of the rights to cash flow in or flowing from the Company; (ii) ~~any~~ sale of any portion of the Patent or any sale of any rights to cash flow in or flowing from the Patent; (iii) ~~any~~ other sale of substantially all of the Company's assets; (iv) ~~any~~ liquidation of, or transaction in contemplation of liquidation of, the Company; or (v) any merger of the Company where the Company is not the surviving entity or the Members of the Company do not continue to own at least 50 percent of the Company's capital or profits interests.

"Capital Transaction Profits and Losses" means all of the Company's net income or net loss, as the case may be, from a Capital Transaction.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"COLI" means non-BOLI and non-IOLI corporate-owned life insurance.

"COLI Profits and Losses" means all of the Company's net income or net loss, as the case may be, other than from a Capital Transaction, generated from ~~the~~**any** PBT Trust relating to COLI and/or GOLI, including but not limited to such net income or net loss attributable to net trust enrollment **or service** fees related to COLI and/or GOLI policies, the capture of any enhancements in the expected value of COLI and/or GOLI policies from the assignment of their NAR into a PBT Trust, **net fees related to the use of the Patent or any product or services offered by the Company to increase the balance sheet of any client or customer of the Company,** and trust renewal fees related to COLI and/or GOLI policies.

"Distributable Cash From BOLI Operations" means all of the Company's aggregate cash receipts, other than from a Capital Transaction, generated from ~~the~~**a** PBT Trust relating to BOLI, including but not limited to such receipts attributable to net trust enrollment **or service** fees related to BOLI policies, the capture of any enhancements in the expected value of BOLI policies from the assignment of their NAR into a PBT Trust, **net fees related to the use of the Patent or any product or services offered by the Company to increase the balance sheet of any client or customer of the Company,** and trust renewal fees related to BOLI policies, less amounts necessary to pay related expenses and establish reasonable reserves, and less amounts previously distributed under Section 5(a**b**) below.

"Distributable Cash From COLI Operations" means all of the Company's aggregate cash receipts, other than from a Capital Transaction, generated from ~~the~~**a** PBT Trust relating to COLI and/or GOLI, including but not limited to such receipts attributable to net trust enrollment **or service** fees related to COLI and/or GOLI policies, the capture of any enhancements in the expected value of COLI and/or GOLI policies from the assignment of their NAR into a PBT Trust, **net fees related to the use of the Patent or any product or services offered by the**

3

**Company to increase the balance sheet of any client or customer of the Company,** and trust renewal fees related to COLI and/or GOLI policies, less amounts necessary to pay related expenses and establish reasonable reserves, and less amounts previously distributed under Section 5(b**c**) below.

"Distributable Cash From IOLI Operations" means all of the Company's aggregate cash receipts, other than from a Capital Transaction, generated from the**a** PBT Trust relating to IOLI, including but not limited to such receipts attributable to net trust enrollment **or service** fees related to IOLI policies, the capture of any enhancements in the expected value of IOLI policies from the assignment of their NAR into a PBT Trust, **net fees related to the use of the Patent or any product or services offered by the Company to increase the balance sheet of any client or customer of the Company,** and trust renewal fees related to IOLI policies, less amounts necessary to pay related expenses and establish reasonable reserves, and less amounts previously distributed under Section 5(e**d**) below.

"Distributable Cash From Capital Transactions" means all of the Company's aggregate cash receipts from a Capital Transaction, less amounts necessary to pay related expenses and establish reasonable reserves, less amounts previously distributed under Sections 5(e) below.

"GOLI" means government-owned life insurance.

"Fiscal Year" means the calendar year, but with respect to the first Fiscal Year of the Company, Fiscal Year means the period from the first day of the term of the Company to the next following December 31, and with respect to the last Fiscal Year of the Company, shall mean the period from the end of the last preceding Fiscal Year to the date of such dissolution.

"ILA" means Institutional Longevity Assets, LLC, a Delaware limited liability company.

"ILA Strategic Partner" means up to three (3) banks with whom ILA forms a strategic relationship**;** provided, however, that under no circumstances will any bank which is not interested in forming a strategic relationship broader than the purchase and enrollment of BOLI policies into a PBT**the IPB** Trust be an ILA Strategic Partner.

"IOLI" means insurance carrier-owned life insurance.

"IOLI Profits and Losses" means all of the Company's net income or net loss, as the case may be, other than from a Capital Transaction, generated from the**a** PBT Trust relating to IOLI, including but not limited to such net income or net loss attributable to net trust enrollment **or service** fees related to IOLI policies, the capture of any enhancements in the expected value of IOLI policies from the assignment of their NAR into a PBT Trust, **net fees related to the use of the Patent or any product or services offered by the Company to increase the balance sheet of any client or customer of the Company,** and trust renewal fees related to IOLI policies.

**"Initial Percentage Interest" means (i) with respect to ILA, the ILA BOLI Initial Percentage, the ILA COLI Initial Percentage or the ILA IOLI Initial Percentage, as**

4

**applicable, and (ii) with respect to MRB, the MRB BOLI Initial Percentage, the MRB COLI Initial Percentage or the MRB IOLI Initial Percentage, as applicable.**
**"IPB Trust" means a PBT Trust established by the Company.**

**"Litigation" means, collectively,** *Balshe LLC v. Ross*, **No. 08 CH 19180 (Circuit Court of Cook County, Illinois) and** *Balshe LLC v. Ross*, **No. 08-CV-3256 (Northern District of Illinois).**

"MC" means Meyer Chatfield Corp.

"Member" means any Person executing this Agreement as a Member or any person subsequently admitted to the Company as a Member, as provided in this Agreement, but does not include any Person who has ceased to be a member of the Company.

"Membership Interest" means, for each Member, the ~~percentage~~**membership** interest **in the Company** set forth opposite ~~the name of such Member~~**their names** on Exhibit A, as such Exhibit A may be amended from time to time. Any Membership Interest owned by Ross shall be a non-voting interest.

**"Membership Percentage Interest" means, for each Member, the percentage interest set forth opposite the name of such Member on Exhibit A, as such Exhibit A may be amended from time to time.**

"**"**Minimum Gain"**"** has the meaning given "partnership minimum gain" in Regulation Section 1.704-2(d). Minimum Gain shall be computed separately for each Interest Holder in a manner consistent with the Regulations under IRC Section 704(b).

"**"**Negative Capital Account"**"** means a Capital Account with a balance of less than zero.

"**"**Nonrecourse Deductions"**"** has the meaning given "nonrecourse deductions" in Regulation Section 1.704-2(b)(1). The amount of Nonrecourse Deductions for a taxable year of the Company equals the net increase, if any, in the amount of Minimum Gain during that taxable year, determined according to the provisions of Regulation Section 1.704-2(c).

"**"**Nonrecourse Liability"**"** means any liability of the Company with respect to which no Member has personal liability determined in accordance with Code Section 752 and the Regulations promulgated thereunder.

"Party" means any person who is a signatory to this Agreement.

"Patent" means United States Patent No. 5,974,390 and all renewals, reissues, reexaminations, extensions, and any and all patents and patent applications that claim priority thereto, whether granted or filed now or in the future.

5

"PBT Trust" means a trust utilizing the Patent for the enrollment of BOLI, COLI, IOLI and GOLI.

"Permitted Transferee" means, with respect to a Member, a descendant or family member of such Member or an entity wholly-owned by such Member or an owner of such Member or descendant or family member of such Member or an owner of such Member.

"Person" means an individual, corporation, association, partnership, joint venture, limited liability company, estate, trust or any other legal entity.

""Positive Capital Account"" means a Capital Account with a balance greater than zero.

"Regulations" means the Income Tax Regulations promulgated under the Code, as such Regulations may be amended from time to time.

**"Settlement Agreement" means the Settlement Agreement and General Release, dated June 26, 2008, by and among Balshe LLC, The Simon Law Firm, Alan J. Ross, SAVE Associates and The Meyer-Chatfield Corporation (as such agreement may be amended or amended and restated from time to time).**

**"Shared Expenses" means the expenses incurred by either ILA or MRB in connection with establishing the Company, acquiring the Patent (including the purchase price thereof) from AXA Financial, Inc. or any of its subsidiaries or affiliates (including, without limitation, MONY Life Insurance Company (f/k/a The Mutual Life Insurance Company of New York), the negotiation and preparation of this Agreement, other similar start-up expenses and any other costs and expenses agreed by ILA and MRB to constitute Shared Expenses.**

"Transfer" means, any disposition (including, without limitation, gifts, sales, assignments, pledges, encumbrances, bequests, and all other inter vivos or testamentary dispositions) whether voluntary, involuntary or whether pursuant to court order or by operation of law.

## SECTION 2. MEMBERS

(a) **Members**. The Members of the Company shall be those Persons named on Exhibit A, as such Exhibit A may be amended from time to time. Each initial Member has executed this Agreement as of the date hereof and is hereby admitted to the Company as a Member.

(b) **Additional Members**. No Person will be admitted to the Company as an additional Member without the written consent of all Members, excluding any Member who has ceased to be a Member of the Company.

6

NY 71785305v5

**(c) Lack of Authority**. Except as otherwise provided in this Agreement, no Member has the authority or power to act for or on behalf of the Company or to incur any expenditures on behalf of the Company.

**(d) Liability to Third Parties**. No Member will be liable for the debts, obligations or liabilities of the Company beyond such Member's capital contribution, including under a judgment, decree or order of a court, except to the extent required under the Act with respect to amounts distributed to the Member at a time when the Company was insolvent or was rendered insolvent by virtue of such distribution.

## SECTION 3. MEMBERSHIP INTERESTS

**(a) Membership Interests**. The Members shall receive the Membership Interest in the Company set forth opposite their names on Exhibit A, as such Exhibit A may be amended from time to time.

**(b) Additional Capital Contributions**. No Member shall be required at any time to make any additional contributions to the capital of the Company, or be obligated or required under any circumstances to restore any negative balance in his, her or its Capital Account. If the Company requires additional capital for its operations, the**ILA and MRB (so long as ILA and MRB are then Members, otherwise the remaining Member of such** Members **or their successors, if any)**, by unanimous consent, may issue a call for additional capital contributions, in which case the Members will have the opportunity, but shall in no event be obligated, to make additional contributions. [No additional Capital Contributions will increase a Member's Percentage Interest unless all Members of the Company consent to such increase**; provided, that, in the event Members are requested to make a capital contribution to pay expenses of the Company, and one or more Members does not make such capital contribution, the Member's Percentage Interest of the Members making such capital contribution will be increased, pro rata, to reflect such additional capital contribution, and the Member's Percentage Interest of the Members not making such additional contribution shall be decreased, pro rata, by the amount of the increase.**]†

**(c) Capital Accounts**. The Company will maintain on its books and records a capital account ("Capital Account") for each Member initially reflecting an amount assigned to such Member's Initial Capital Contribution. The Capital Accounts will be adjusted from time to time as required by the Code and Regulations, including, but not limited to, the rules contained in Treas. Reg. Section 1.704-1(b)(2)(iv). At the discretion of the Executive Committee, the Company may revalue its assets in the Capital Accounts as provided in Regulation Section 1.704-1(b)(2)(iv)(f).

**(d)      No Interest on Capital Contributions**. Members shall not be paid interest on their Capital Contributions.

---

† If a Member has to make a capital contribution to pay expenses, etc., because the other Members are not doing so, either the Members' Percentages have to be adjusted or it has to be a loan at an agreed rate.

7

(e)     **Return of Capital Contributions**.  Except as otherwise provided in this Agreement, no Member shall have the right to receive the return of any Capital Contribution.  If a Member is entitled to receive a return of a Capital Contribution, the Member shall not have the right to receive anything but cash in return of the Member's Capital Contribution.

## SECTION 4.  ALLOCATION OF PROFITS AND LOSSES

(a)     **Profits From Operations**.  After giving effect to the special allocations set forth in subsections (d) and (e)**, and except as provided in subsection (f)**:

(1)     Except as provided in subsection (2), all BOLI Profits and Losses **(other than losses resulting from Shared Expenses)** of the Company for each Fiscal Year (or part thereof) as determined for federal income tax purposes, will be allocated seventy two percent (72%) to MRB, eighteen percent (18%) to ILA and ten percent (10%) to Ross;

(2)     BOLI Profits and Losses **(other than losses resulting from Shared Expenses)** of the Company for each Fiscal Year (or part thereof) as determined for federal income tax purposes, which are attributable to an ILA Strategic Partner shall be allocated forty five percent (45%) to ILA **(the "ILA BOLI Initial Percentage")**, forty five percent (45%) to MRB **(the "MRB BOLI Initial Percentage")** and ten percent (10%) to Ross;

(3)     Except as provided in subsection (4), all COLI Profits and Losses **(other than losses resulting from Shared Expenses)** of the Company for each Fiscal Year (or part thereof) as determined for federal income tax purposes, will be allocated seventy two percent (72%) to ILA **(the "ILA COLI Initial Percentage")**, eighteen percent (18%) to MRB **(the "MRB COLI Initial Percentage")** and ten percent (10%) to Ross;

(4)     In the event that the Company utilizes a methodology provided to it by MRB, which methodology is similar to the methodology utilized by MRB for BOLI transactions whereby MRB contemplates charging participants in the**a** PBT Trust at time of transfer a percentage of the amount of the capital added to the balance sheet of the participating bank or company by electing to book the fair value of the interests in the**such** PBT Trust under applicable accounting principles (the "MC Methodology"), MRB's share of COLI Profits and Losses **(other than losses resulting from Shared Expenses)** derived **specifically** from utilizing the MC Methodology (specifically excluding**, without limitation,** the Company 's net trust enrollment fees, the capture of any enhancements in the expected value of policies from the assignment of their NAR into a PBT Trust, **net fees related to the use of the Patent or any product or services offered by the Company to increase the balance sheet of any client or customer of the Company,** and any [net profits][2] derived from trust renewal fees) shall be increased to: (i) forty-five percent (45%) for COLI and/or GOLI policies sold by or enrolled by

---

[2] Conform to earlier language.

NY 71785305v5

MRB; and (ii) twenty-seven percent (27%) for COLI and/or GOLI policies sold by or enrolled by ILA.

(5) All IOLI Profits and Losses **(other than losses resulting from Shared Expenses)** of the Company for each Fiscal Year (or part thereof) as determined for federal income tax purposes, will be allocated forty five percent (45%) to ILA **(the "ILA IOLI Initial Percentage")**, forty five percent (45%) to MRB **(the "MRB IOLI Initial Percentage")** and ten percent (10%) to Ross;

**(b)** **Profits From Capital Transactions**. All Capital Transaction Profits and Losses ~~Profits~~ of the Company for each Fiscal Year (or part thereof) as determined for federal income tax purposes, will be allocated forty five percent (45%) to ILA, forty five percent (45%) to MRB and ten percent (10%) to Ross.

**(c)** **Losses and Expenses**. ~~For~~**Except as provided in subsection (f) below, for** purposes of Section 4(a) above, the Company's items of loss ~~and expense shall be apportioned among BOLI, COLI, GOLI, and IOLI to match gross income items generated by the same activity. For illustration purposes, brokerage fees incurred to enroll BOLI policies shall be included as an expense in calculating BOLI Profits and Losses. General administrative expenses not attributable to any activity shall be apportioned among BOLI, COLI, GOLI, and IOLI pro rata in accordance with their relative number of policies then enrolled in the PBT Trust.~~ **resulting from Shared Expenses shall be apportioned evenly between ILA and MRB (so long as they are then Members, otherwise their successors, if any).**

**(e~~d~~)** **Future Adjustment of MRB and ILA Allocations**. MRB's and ILA's splits of BOLI Profits and Losses, COLI Profits and Losses and GOLI Profits and Losses set forth above shall be readjusted annually beginning on the third anniversary of the date of creation of the Company, based upon the proportion of policies enrolled by MRB and ILA in ~~the~~ PBT Trust(s), provided, however, that in no event shall: (i) MRB's interest in BOLI Profits and Losses or ILA's interest in COLI Profits and Losses ever fall below forty five percent (45%); and/or (ii) ILA's interest in BOLI Profits and Losses or MRB's interest in COLI Profits and Losses ever fall below nine percent (9%). ~~Moreover, no readjustments shall be made to [MRB's percentage interest or ILA's percentage interest once such party~~**Once either ILA or MRB** has enrolled a minimum of 25,000 lives in ~~the PBT Trust.]³~~**PBT Trusts, such Party's Member's Percentage Interest shall be its Initial Percentage Interest, and except for readjustments pursuant to Section 3(b) hereof, shall not be otherwise re-adjusted thereafter,** MRB and ILA each acknowledge and agree that no adjustment shall ever be made to Ross's 10% interest in BOLI Profits and Losses, COLI Profits and Losses and/or IOLI Profits and Losses, ~~specifically excluding a~~**pursuant to this subsection 4(d), other than reductions relating to all other events, including, without limitation,** reduction caused by a sale of all or a portion of Ross's membership interest in the Company **or through dilution caused by the contribution of additional capital by new members in the Company**.

³ ~~Once a party contributes 25,000 lives, revert to that party's initial interest, e.g. 45%.~~

9

**(f͟g͟)**     **Regulatory Allocations**.

(1)     Qualified Income Offset.     No Member shall be allocated Losses or deductions if the allocation causes a Member to have an Adjusted Capital Account Deficit. If a Member receives an allocation of Loss or deduction (or item thereof) or any distribution, which causes the Member to have an Adjusted Capital Account Deficit at the end of any taxable year, then all items of income and gain of the Company (consisting of a pro rata portion of each item of Company income, including gross income and gain) for that taxable year shall be allocated to that Member, before any other allocation is made of Company items for that taxable year, in the amount and in proportions required to eliminate the excess as quickly as possible. This subsection (f) is intended to comply with, and shall be interpreted consistently with, the "qualified income offset" provisions of the Regulations promulgated under IRC Section 704(b).

(2)     Minimum Gain Chargeback. Except asset forth in Regulation Section 1.704-2(f)(2), (3), and (4), if, during any taxable year, there is a net decrease in Minimum Gain, each Member, prior to any other allocation pursuant to this Section 4, shall be specially allocated items of gross income and gain for such taxable year (and, if necessary, subsequent taxable years) in an amount equal to that Member's share of the net decrease of Minimum Gain, computed in accordance with Regulation Section 1.704-2(g). Allocations of gross income and gain pursuant to this subsection shall be made first from gain recognized from the disposition of Company assets subject to nonrecourse liabilities (within the meaning of the Regulations promulgated under Code Section 752), to the extent of the Minimum Gain attributable to those assets, and thereafter, from a pro rata portion of the Company's other items of income and gain for the taxable year. It is the intent of the parties hereto that any allocation pursuant to this Section 4.3.2 shall constitute a "minimum gain chargeback" under Regulation Section 1.704-2(f).

(3)     Contributed Property and Book-ups.     In accordance with IRC Section 704(c) and the Regulations thereunder, as well as Regulation Section 1.704-1(b)(2)(iv)(d)(3), income, gain, loss, and deduction with respect to any property contributed (or deemed contributed) to the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of the property to the Company for federal income tax purposes and its fair market value at the date of contribution (or deemed contribution). If the adjusted book value of any Company asset is adjusted as provided herein, subsequent allocations of income, gain, toss, and deduction with respect to the asset shall take account of any variation between the adjusted basis of the asset for federal income tax purposes and its adjusted book value in the manner required under IRC Section 704(c) and the Regulations thereunder. The Executive Committee shall determine the applicable method of applying IRC Section 704(c) and the Regulations thereunder.

(4)     IRC Section 754 Adjustment. To the extent an adjustment to the tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Regulation Section 1.704-1 (b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of the adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases basis), and the gain or loss shall be specially allocated to the Members in a manner

10

consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to that Section of the Regulations.

(5) <u>Nonrecourse Deductions</u>. Nonrecourse Deductions for a taxable year or other period shall be specially allocated among the Members in proportion to their Membership Interests.

(6) <u>Unrealized Receivables</u>. If a Member's Membership Interest is reduced (provided the reduction does not result in a complete termination of the Member's Member Interest), the Member's share of the Company's "unrealized receivables" and "substantially appreciated inventory" (within the meaning of Code Section 751) shall not be reduced, so that, notwithstanding any other provision of this Agreement to the contrary, that portion of the Profit otherwise allocable upon a liquidation or dissolution of the Company pursuant to Section 4.4 hereof which is taxable as ordinary income (recaptured) for federal income tax purposes shall, to the extent possible without increasing the total gain to the Company or to any Member, be specially allocated among the Member s in proportion to the deductions (or basis reductions treated as deductions) giving rise to such recapture. Any questions as to the aforesaid allocation of ordinary income (recapture), to the extent such questions cannot be resolved in the manner specified above, shall be resolved by the Executive Committee.

(7) <u>Withholding</u>. All amounts required to be withheld pursuant to Code Section 1445 or 1446 or any other provision of federal, state, or local tax law shall be treated as amounts actually distributed to the affected Interest Holders for all purposes under this Agreement.

**(f) Notwithstanding the other provisions of this Section 4 (other than Section 4(e)): (1) items of loss, expense and other deductions shall first be allocated 50% to MRB and 50% to ILA until they have been allocated an amount equal to their aggregate capital contributions and second pursuant to the other provisions of this Section 4; and (2) items of income and gain shall be allocated first, 50% to MRB and 50% to ILA until they have been allocated an amount equal to the amount allocated pursuant to Section 4(f)(1), and second, in the same amount and proportions as the cumulative distributions previously made pursuant to Section 5(a), and any remaining items of income pursuant to the other provisions of this Section 4.**

## SECTION 5.   DISTRIBUTIONS

**(a)  Initial Distributions.**

**(1)  Prior to making any distributions in accordance with clauses (b), (c), (d), (f) and (g) of this Section 5, any Distributable Cash From BOLI Operations, Distributable Cash From COLI Operations and Distributable Cash From IOLI Operations, shall be distributed to ILA and MRB to reimburse ILA and MRB for expenses incurred by such Parties or the principals or affiliates thereof, in connection with the acquisition of the Patent (including any amounts actually paid pursuant to, or in connection with, the**

11

**Litigation) from AXA Financial, Inc. or any of its subsidiaries or affiliates (including, without limitation, MONY Life Insurance Company (f/k/a The Mutual Life Insurance Company of New York) and the negotiation and preparation of this Agreement. Such distributions shall be made on a pro rata basis, based on the quotient, expressed as a percentage, the numerator of which is the amount of such expenses incurred by such Party or the principals or affiliates thereof, and the denominator of which is the aggregate amount of such expenses incurred by both ILA and MRB, and their respective principals or affiliates. Each Party (*i.e.*, MRB and ILA) being reimbursed shall provide written evidence of expenses to be reimbursed, reasonably acceptable to the other Party (*i.e.*, MRB or ILA, as the case may be).**

### (b) Distributions of Distributable Cash From BOLI Operations.

(1)     Except as otherwise provided in clause (a)(2) and subsection (d), Distributable Cash From BOLI Operations for each Fiscal Year (or part thereof) will be distributed seventy two percent (72%) to MRB, eighteen percent (18%) to ILA and ten percent (10%) to Ross; and

(2)     Distributable Cash From BOLI Operations for each Fiscal Year (or part thereof) which are attributable to an ILA Strategic Partner shall be distributed forty five percent (45%) to ILA, forty five percent (45%) to MRB and ten percent (10%) to Ross.

### (b̶c̲) Distributions of Distributable Cash From COLI Operations.

(1)     Except as otherwise provided in clause (b)(2) or subsection (d), Distributable Cash From COLI Operations for each Fiscal Year (or part thereof) will be distributed seventy two percent (72%) to ILA, eighteen percent (18%) to MRB and ten percent (10%) to Ross; and

(2)     In the event that the Company utilizes the MC Methodology, MRB's share of Distributable Cash From COLI Operations **specifically** derived from utilizing the MC Methodology (s̶p̶e̶c̶i̶f̶i̶c̶a̶l̶l̶y̶ excluding**, without limitation,** the Company's net trust enrollment fees, the capture of any enhancements in the expected value of policies from the assignment of their NAR into a PBT Trust, **net fees related to the use of the Patent or any product or services offered by the Company to increase the balance sheet of any client or customer of the Company,** and any [̶n̶e̶t̶ ̶p̶r̶o̶f̶i̶t̶s̶][4] d̶e̶r̶i̶v̶e̶d̶ ̶f̶r̶o̶m̶ trust renewal fees) shall be increased to: (i) forty-five percent (45%) for COLI and/or GOLI policies sold by or enrolled by MRB; and (ii) twenty-seven percent (27%) for COLI and/or GOLI policies sold by or enrolled by ILA.

### (e̶d̲) Distributions of Distributable Cash From IOLI Operations. Distributable Cash From IOLI Operations for each Fiscal Year (or part thereof) will be distributed forty five percent (45%) to ILA, forty five percent (45%) to MRB and ten percent (10%) to Ross.

---

[4] C̶o̶n̶f̶o̶r̶m̶ ̶t̶o̶ ̶e̶a̶r̶l̶i̶e̶r̶ ̶l̶a̶n̶g̶u̶a̶g̶e̶.

NY 71785305v5

(~~d~~e) **Future Adjustment of MRB and ILA Allocations**.   MRB's and ILA's splits of Distributable Cash From BOLI Operations, [BOLI Profits][5] and Distributable Cash From COLI Operations set forth above shall be readjusted annually beginning on the third anniversary of the date of creation of the Company, based upon the proportion of policies enrolled by MRB and LS in ~~the~~ PBT Trust(s), provided, however, that in no event shall: (i) MRB's interest in Distributable Cash From BOLI Operations or ILA's interest in Distributable Cash From COLI Operations ever fall below forty five percent (45%); and/or (ii) ILA's interest in Distributable Cash From BOLI Operations or MRB's interest in Distributable Cash From COLI Operations ever fall below nine percent (9%). ~~Moreover, no readjustments shall be made to MRB's percentage interest or ILA's percentage interest once such party~~**Once either ILA or MRB** has enrolled a minimum of [25,000 lives in ~~the PBT Trust~~][6]**PBT Trusts, such Party's Member's Percentage Interest shall be its Initial Percentage Interest, and except for readjustments pursuant to Section 3(b) hereof, shall not be otherwise re-adjusted thereafter**. MRB and LS each acknowledge and agree that no adjustment shall ever be made to Ross's 10% interest in Distributable Cash From BOLI Operations, Distributable Cash From COLI Operations~~, [COLI Profits][7]~~ and/or Distributable Cash From IOLI Operations, ~~specifically excluding a reduction caused by~~**solely as a result of whether 25,000 lives have been enrolled in PBT Trusts. Otherwise, adjustments to Ross' 10% interest in Distributable Cash From BOLI Operations, Distributable Cash From COLI Operations and/or Distributable Cash From IOLI Operations may be made, including, without limitation, due to** a sale of all or a portion of Ross's membership interest in the Company **or through dilution caused by the contribution of additional capital by new members in the Company**.

~~(e)~~   **(f) Distributions of Distributable Cash From Capital Transactions**. Subject to Section 12(b) regarding liquidating distributions, Distributable Cash From Capital Transactions will be distributed forty five percent (45%) to ILA, forty five percent (45%) to MRB and ten percent (10%) to Ross.

(~~f~~g)   **Liquidation and Dissolution.**   If the Company is liquidated, the assets of the Company shall be distributed to the Members in accordance with the provisions of Section 12 of this Agreement, after taking into account the allocations of Profit or Loss, if any, pursuant to Sections 4, and distributions, if any, of cash or property, if any, pursuant to Sections 5. No Member shall be obligated to restore a Negative Capital Account.

## SECTION 6.  MANAGEMENT

(a)   **Management of BOLI Transactions.** ~~MC~~ **MRB** shall have the exclusive right to manage all aspects of the Company's involvement with BOLI with respect to any PBT Trust. Notwithstanding the foregoing, the Parties acknowledge that ILA ~~retains~~**and its principals retain** the right to negotiate with banks, including foreign banks and those that have large capital markets groups or which are primary dealers, to participate in broader strategic businesses. ILA

---

[5] ~~Should this be COLI or IOLI Distributable Cash?~~

[6] ~~See comment to §4(e).~~

[7] ~~Covered in §4(e).~~

isand its principals are free to conduct those negotiations in itstheir sole discretion, and without MC's or MRB's interference, provided that ILA shall not enter into any transaction for the creation, sale, or structure of BOLI policies, or the enrollment of BOLI policies in a trust, without MCMRB's prior written consent, which consent shall not be unreasonably withheld or delayed. **Notwithstanding the foregoing, with respect to a BOLI policy in respect of which a participant in a PBT Trust is not reasonably likely to pay the related upcoming premium payment, or which is otherwise reasonably likely to lapse, ILA shall have the exclusive right to arrange for the sale of such BOLI policy and shall be entitled to retain any compensation related to such sale. Moreover, MRB and Ross acknowledge that, pursuant to the Settlement Agreement, ILA may arrange for the direct purchase of policies, including, without limitation, BOLI, where the age of the insured is over the age of approximately 65 years. Accordingly, neither MRB (and MRB shall cause its principals not to) nor Ross may dissuade any client or potential client of IPB, or create any barrier to such purchase, unless such purchase would result in a material negative tax consequence for the bank or institution selling such policy. Furthermore, MRB may establish and administer a separate PBT Trust solely for BOLI; provided, that it shall administer any such PBT Trust in good faith for the benefit of the Company, which shall include, without limitation, transferring all related BOLI Profits and Losses to the Company. Such BOLI Profits and Losses, as well as other financial results of any such separate PBT Trust, shall be applied for the benefit of the Company, a PBT Trust administered by the Company or a PBT Trust administered by ILA pursuant to the last sentence of Section 6(b) hereof, pursuant to a written agreement (including, without limitation, a derivative instrument (e.g. a swap)), as agreed to by MRB and ILA. ILA shall execute any such written agreement in form and substance reasonably acceptable to it.**

(b) **Management of COLI and GOLI Transactions.** ILA shall have the exclusive right to manage all of the Company's involvement with COLI and GOLI with respect to any PBT Trust. The parties acknowledge that MC hasMRB **and its principals have** significant contacts with banks and other institutions and contemplate that so long as such efforts do not have an adverse impact on ILA's ability to enroll lives in a PBT Trust, MCMRB **and its principals** will continue to maintain and develop such contacts to further the business of the Company and MC's traditional business, including the sale of BOLI and IOLI. Neither MCMRB nor any of its affiliates, shareholders or principals **(including MC)** shall enter into any transaction for the creation, sale, or structure of COLI and/or GOLI policies or the enrollment of COLI and/or GOLI policies in a trust, without ILA's prior written consent, which consent shall not be unreasonably withheld. **In furtherance of the foregoing, with respect to a COLI and/or GOLI policy in respect of which a participant in a PBT Trust is not reasonably likely to pay the related upcoming premium payment, or which is otherwise reasonably likely to lapse, ILA shall have the exclusive right to arrange for the sale of such COLI and/or GOLI policy and shall be entitled to retain any compensation related to such sale. Furthermore, ILA may establish and administer a separate PBT Trust solely for COLI and GOLI; provided, that it shall administer any such PBT Trust in good faith for the benefit of the Company, which shall include, without limitation, transferring all related COLI Profits and Losses to the Company. Such COLI Profits and Losses, as well as other financial results of any such separate PBT Trust, shall be applied for the benefit of the**

14

**Company, a PBT Trust administered by the Company or a PBT Trust administered by MRB pursuant to the last sentence of Section 6(a) hereof, pursuant to a written agreement (including, without limitation, a derivative instrument (e.g. a swap)), as agreed to by MRB and ILA. MRB shall execute any such written agreement in form and substance reasonably acceptable to it.**

(c) **Management by Executive Committee.** Except as otherwise provided in subsections (a) and (b), the Company shall be managed by a committee, consisting of a designated member of MRB and a designated member of ILA (the "Executive Committee"). Except as otherwise provided in this Agreement, or any written amendment hereto, all decisions regarding the management of the Company are within the purview of the Executive Committee and shall only be made by unanimous vote of the Executive Committee.

(d) **Delegation of Authority.** Except as otherwise required or specifically limited by any of the terms of this Agreement, or by non-waivable provisions of applicable law, the Executive Committee may delegate its powers to one or more persons.[8] **In furtherance of the foregoing, the Executive Committee shall have the right to appoint any officers of the Company and authorize such officers to negotiate and execute agreements, instruments, certificates and any other documents, and to exercise any other powers set forth in such appointment.**

(e) **Powers.** Except as otherwise provided in subsections (a) and (b), the Executive Committee will have the following rights and powers, which the Executive Committee may exercise at the cost, expense and risk of the Company:

(1) To carry out and implement any and all of the purposes of the Company;

(2) To engage the services of and consult with counsel, accountants and other consultants to the extent that is mutually deemed necessary, advisable, appropriate or convenient to carry out and implement any and all of the purposes of the Company;

(3) To employ the financial and other resources of the Company in the exercise of any rights or powers possessed by it hereunder or under this Act;

(4) To purchase from or through others contracts of liability, casualty and other insurance which is deemed advisable, appropriate or convenient for the protection of the Company, the Members, the Company's employees and agents, the assets or affairs of the Company, or for any other purpose convenient or beneficial to the Members;

(5) To execute, acknowledge and deliver powers of attorney, consents, waivers and other documents in connection with the business and affairs of the Company, including any proceeding before any court, arbitrator or board of arbitration, administrative board or agency or any governmental authority effecting the Company;

---

[8] Should we have a provision regarding appointment of officers?

(6)     To purchase, sell, transfer, pledge or otherwise exercise or acquire all rights, powers, privileges and other incidents of ownership or possession with respect to securities;

(7)     To acquire securities on the basis of investment representations and/or subject to transfer restrictions;

(8) ~~To~~ **Subject to clause (f) below, to** open, maintain and close bank and brokerage accounts, draw checks, or other orders for the payment of money;

(9)     To acquire long positions with respect to securities, and make purchases or sales increasing, decreasing or liquidating such positions without any limitation as to the frequency of the fluctuation in such positions;

(10)     To act in concert with others to achieve the foregoing objects and purposes;

(11)     To execute and file all documents and take any other actions necessary to comply with all federal and state laws regulating securities;

(12)     To take any action as is customary in the ordinary course of business of an investment partnership;

(13)     To file on behalf of the Company all required local, state and federal tax returns relating to the Company or its assets and to make elections with respect thereto;

(14)     To pay any and all fees and expenses incurred in the organization of the Company; and

(15)     To cause the Company to borrow money and to obtain extensions of credit that are necessary for the operation of the Company and to do all other things necessary and incidental thereto.

**(f)  Bank Accounts.  [ILA and MRB shall together have the exclusive right to manage any bank accounts maintained by the Company and to authorize any withdrawals therefrom, including jointly setting the terms and appointing representatives with signing authority over such bank accounts.]**

## SECTION 7.  LIABILITY OF MEMBERS

(a)  **Liability of Parties.**  The Executive Committee will not be liable to the Company or to any other Member for (i) the performance, or the omission to perform any act or duty on behalf of the Company if, in good faith, such conduct did not constitute fraud, gross negligence or reckless or intentional misconduct and (ii) the performance, or the omission to perform, on

16

behalf of the Company, any act upon good faith reliance on advice of legal counsel, accountants or other professional advisors to the Company.

(b) **Indemnification of Members.** No Member shall be liable to the Company, or any other person or entity who has an interest in the Company, for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Member in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Member by this Agreement. To the fullest extent permitted by applicable law, a Member shall be entitled to indemnification from the Company for any loss, damage or claim incurred by such Member by reason of any act or omission performed or omitted by such Member in good faith on behalf of the Company and within a manner reasonably believed to be within the scope of the authority conferred on such Member by this Agreement, provided, however that any indemnity under this Section shall be provided out of and to the extent of Company assets only.

## SECTION 8. TRANSFERABILITY OF MEMBERSHIP INTERESTS

(a) **Basic Restrictions.** A Member may not Transfer all or part of the Member's Membership Interest to a person or entity (hereinafter sometimes referred to as an "Assignee") unless the Transfer is made in accordance with the provisions of this Section 8. Any purported Transfer in violation of the provisions of this Section 8 shall be null and void and any non-transferring Member, in addition to any other remedies available under this Agreement and at law, in equity and otherwise, may seek to enjoin the Transfer and the transferring Member, or the Member's legal representatives, agrees to submit to the jurisdiction of any court of the State of Delaware and to be bound by any order of the court enjoining the purported Transfer. If a Transfer of a Membership Interest occurs (including a Transfer otherwise prohibited hereby that the Company is compelled by law, judicial process or otherwise to recognize), the Assignee shall have only the rights of an assignee who is not admitted as a Member unless the transferee is admitted as a Member pursuant to subsection (e) below. An Assignee shall: (i) only acquire the transferor's rights to distributions and allocations as provided in this Agreement with respect to the Membership Interest (or part thereof) subject to such Transfer (which, as to distributions, shall be subject to the Company's right of offset to satisfy any debts, obligations or liabilities that the transferor Member or the Assignee may have to the Company); (ii) have no rights to any information or accounting of the affairs of the Company; (iii) not be entitled to inspect the books or records of the Company; (iv) not have any other rights conferred on a Member in this Agreement or by law (including, where applicable, the right to grant or withhold approval on any matter that requires the approval of the Members under this Agreement or by law); and (v) not have any right to receive notice of any act, circumstance, event or proposed event or action of which Members are otherwise entitled to receive notice pursuant to this Agreement, or on which Members are otherwise entitled to act or to express consent or dissent.

(b) **Transfers by Members.** During the lifetime of a Member, a Member may only Transfer all or a portion of his or her Membership Interest if (i) the Transfer is to a Permitted Transferee, (ii) the Transfer is approved in writing by the remaining Members, or (iii) after the

17

Company and the other Members have been given the right of first refusal as set forth in the remainder of this subsection (b).

(1)     Right of First Refusal.  If a Member (hereinafter in this Section sometimes referred to as the "Selling Member") receives a bona fide written offer from an unrelated third party (the "Offeror") to purchase all or any portion of such Member's Membership Interest (the "Offered Interest") and the Selling Member desires to accept such offer, the Selling Member shall first give written notice of the offer (the "Offer Notice") to the Company and shall offer to sell the Offered Interest to the Company.  The offer to the Company shall be at a price and upon terms no less favorable to the Company or more favorable to the Selling Member  than those which the Selling Member is willing to accept from the Offeror and may be accepted by the Company within thirty (30) days of the date the Company received the Offer Notice.  The Selling Member shall give the Company a copy of the written offer from the Offeror.  If the Company fails to accept the offer made by the Selling Member within fifteen (15) days of the receipt of the Offer Notice then the**ILA and MRB (so long as ILA and MRB are then Members, otherwise the remaining Member of such** Members **or their successors, if any)** other than the Selling Member shall have the opportunity for a further period of fifteen (15) days immediately after the expiration of the Company's thirty-day purchase period to accept the offer set forth in the Offer Notice.  If more than one Member desires to purchase the Offered Interest, they shall purchase the Offered Interest in proportion to their relative Percentage Interests or in such other proportion as they may agree.

(2)     Sale to Offeror.     If neither the Company nor the other Members accept the Selling Member's offer to purchase the Offered Interest within the time periods described above, the Selling Member may, within ninety (90) days from the expiration of the fifteen-day period the other Members had to accept the offer, sell the Offered Interest to the Offeror at a price not less than the price, and on terms not less favorable to the Selling Member than the terms, at which the Offered Interest was offered to the Company and the other Members, provided that any such sale shall be specifically conditioned upon the Offeror honoring any Tag Along Rights of the other Members.  No sale to the Offeror shall be permitted or shall be recognized by the Company unless the Offeror agrees in writing to be bound by, and to hold the Offered Interest subject to, the terms and conditions of this Agreement, including without limitation any Tag Along Rights and the restrictions on Transfer set forth in this Section 8.  If the Offered Interest is not so sold to the Offeror within the ninety-day period described in this subsection, the Selling Member shall not thereafter sell all or any portion of his or her Membership Interest unless the Company and the other Members are again given a right of first refusal as proved in this subsection (b).

(3)     Sale to Company or Other Members.     If the Company or the other Members accept the offer of the Selling Member to sell the Offered Interest, the closing of such sale shall occur at the principal office of the Company no later than ninety (90) days after the acceptance of such offer.  The purchase price for the Offered Interest shall be paid on the terms and conditions set forth in the Offer Notice.

NY 71785305v5

~~(4)     Additional Requirements.     In addition to the other requirements of this subsection (b), unless such requirement is waived by the Member, no Transfer of any Membership Interest may be made unless the Company shall have received, at the expense of the Member seeking to effect the Transfer, [an opinion of counsel][9] reasonably satisfactory to the Members that the proposed Transfer (i) may be effected without registration of the Membership Interests under the Securities Act of 1933, as amended, (ii) would not be in violation of any applicable state securities or "Blue Sky" law (including investment suitability standards) and (iii) will not cause a termination of the Company for federal income tax purposes.~~
**(4) [Reserved].**

(5)     <u>Successive Transfers</u>.     If a Membership Interest is transferred under this <u>Section 8</u> to a Permitted Transferee, the only Permitted Transferees of such Assignee (and of any subsequent Assignee of such transferred Membership Interest or any portion thereof) shall be the Permitted Transferees of the original transferor Member.

(6)     <u>Tag Along Right</u>.     If a Selling Member proposes to transfer any portion of its Membership Interest, other than to a Permitted Transferee, then each of the Members other than the Selling Member ("Tag-Along Members") shall have the right ("Tag Along Right") to require the Offeror to purchase from such Tag-Along Member up to that percentage of the Tag-Along Member's Membership Interest calculated by dividing the Membership Interest percentage to be purchased by the Offeror and the product of (i) the total Membership Interest percentage owned by Selling Member and (ii) three. Any Membership Interest purchased from Tag-Along Members pursuant to this Section shall be paid for at the same price per Membership Interest percentage and upon the same terms of payment as such proposed transfer by the Selling Member.

(c)     **Bankruptcy of a Member; Involuntary Transfers**.     If any Member becomes Bankrupt **(such Member, a "Bankrupt Member")**, the following shall apply:

(1)     The trustee in bankruptcy or other successor in interest of the Bankrupt Member shall be entitled to receive the shares of revenues and other income, receipts, or gain which the Bankrupt Member would have been entitled to receive under the terms of this Agreement (net of the Member's share of the Company costs, expenses and losses) until the time, if any, that the Membership Interest of the Bankrupt Member is purchased as described in subsection (b), but the trustee in bankruptcy or other successor in interest shall not thereby become a Member, nor have any of the other rights herein conferred upon the ~~bankrupt~~**Bankrupt** Member.

(2)     At any time after the occurrence of the bankruptcy, ~~the Company and~~**(i) if the Bankrupt Member is Ross,** the other ~~[Members]~~[10] shall **each** have the right, but not the obligation, to purchase ~~the Bankrupt Member's~~**50% of Ross'** Membership Interest for its fair

---

[9] ~~Is this really necessary?~~

[10] ~~If the bankrupt Member is Alan Ross, then ILA and MC should have the right to buy his shares in equal amounts. If the bankrupt Member is ILA, then only MC can buy its shares, and vice-versa.~~

market value, as determined in an independent appraisal performed by a certified public accountant or other qualified appraiser selected by [the Member]¹¹. Unless [**such other Members, (ii) if the Bankrupt Member is ILA, only MRB shall have the right, but not the obligation, to purchase ILA's Membership Interest for its fair market value, as determined in an independent appraisal performed by a certified public accountant or other qualified appraiser selected by MRB and reasonably acceptable to ILA, and (iii) if the Bankrupt Member is MRB, only ILA shall have the right, but not the obligation, to purchase MRB's Membership Interest for its fair market value, as determined in an independent appraisal performed by a certified public accountant or other qualified appraiser selected by ILA and reasonably acceptable to MRB. Unless** the **Members (other than the Bankrupt** Member]) currently intends**intend** to liquidate the Company, the fair market value of the Bankrupt Member's Interest shall be determined based on the Bankrupt Member's right to receive distributions from the Company, assuming the Company will continue as a going concern, rather than on the basis of a hypothetical liquidation of the Company. The appraiser shall take all relevant facts and circumstances into account, including, without limitation, minority discounts, lack of liquidity and restrictions on Transfer.

(3)     If all or a portion of the Membership Interest held by a Member is transferred involuntarily or by operation of law (including without limitation a Transfer made in connection with divorce proceedings), and if the Company is compelled by law, judicial process or otherwise to recognize such Transfer, then the Member who held such Membership Interest shall be considered a Bankrupt Member, and the provisions of subsections (a) and (b) above shall apply to the Membership Interest (or portion thereof) that was transferred involuntarily or by operation of law.

(d)     **Admission of Assignee as Substitute Member.** An Assignee who acquires all or any portion of an existing Member's Membership Interest shall not be admitted to the Company as a substitute Member unless, in addition to meeting the other requirements set forth in this Section 8, the additional requirements set forth in this subsection (d) are satisfied:

(1)     the non-assigning Members consent to such substitution, which consent may be given or withheld for any reason which the non-assigning Members deem appropriate or for no reason;

(2)     the assigning Member grants the Assignee the right to be admitted as a substitute Member, provided however, that such grant shall not be required in the case of a Transfer which occurs by reason of the death, dissolution or bankruptcy of the assigning Member;

(3)     the Assignee shall have accepted and agreed to be bound by the terms and provisions of this Agreement by executing a counterpart thereof and other documents or instruments as the non-assigning Members may require in order to effect the admission of the Assignee as a Member; and

---

¹¹ Which Member?

20

(4)    if required by the non-assigning Members, the Assignee pays to the Company a sum that is sufficient to cover all expenses (including legal fees) connected with the admission of the Assignee as a substitute Member pursuant to this Agreement and the Act.

(e) **Effect of Prohibited Transfer**.  Any Transfer by a Member of any interest in the Company, which is not in compliance with the express terms of this Agreement, shall be void and of no effect.  Nevertheless, in the event any purported Transfer that is not in compliance with this Agreement is enforced by a court or tribunal of competent jurisdiction, the transferee's interest shall be fully subject to the restrictions and other provision of this Agreement, and shall be redeemable at the Company's sole option for a purchase price of One Dollar ($1.00).

## SECTION 9.   TERMINATION OF THIS AGREEMENT

This Agreement shall terminate upon the dissolution of the Company, in accordance with Section 12 of this Agreement.

## SECTION 10.   BOOKS AND RECORDS; ACCOUNTING AND TAX ELECTIONS

(a) **Maintenance of Records**.  The Company will maintain true and correct books and records, in which all transactions of the Company will be entered, and will maintain all other records necessary, convenient or incidental to recording the Company's business and affairs, which will be sufficient to record the allocation of Profits and Losses and distributions as provided for herein.  All decisions as to accounting principles, accounting methods and other accounting matters shall be made by the Executive Committee.

(b) **Reports to Members**.  As soon as practicable after the end of each Fiscal Year, the Company (i) will cause to be prepared and sent to each Member a balance sheet and a statement of income and expenses for the Company which may, but need not, be audited by a certified public accountant, and (ii) will cause to be prepared and sent to each Member a report setting forth in sufficient detail all such information and data with respect to the Company for such Fiscal Year as shall enable each Member to prepare his income tax returns in accordance with the laws, rules and regulations then prevailing.  The Company will also cause to be prepared and filed all tax returns required of the Company.  All balance sheets, statements, reports and tax returns required pursuant to this Section 10(b) shall be prepared at the expense of the Company.

(c) **Tax Election; Determinations Not Provided for in Agreement**.  The Executive Committee will be empowered to make or revoke any elections now or hereafter required or permitted to be made by the Code or any state or local tax law, and to decide in a fair and equitable manner any accounting procedures and other matters arising with respect to the Company or under this Agreement which are not expressly provided for in this Agreement. Notwithstanding the foregoing, neither the Company nor any Member shall make an election for the Company to be excluded from taxation as a partnership under the Code or any state or local law, and no provision of this Agreement will be construed to sanction or approve any such election.

21

**(d) Tax Matters Member**. MRB is to be the "tax matters partner" of the Company pursuant to the requirements of the Code.

## SECTION 11. REPAYMENT OF LOANS AND ADVANCES

In the event of a dissolution of the Company, all loans, advances, exchanges and accounts of any nature whatsoever between the Company and a Member, whether owing to or by the Company, shall become due and payable on the date on which equitable title to such Membership Interest is transferred.

## SECTION 12. DISSOLUTION AND LIQUIDATION; TERMINATION AND WITHDRAWAL

**(a) Dissolution**. The Company will dissolve and its affairs will be wound up only upon the ~~occurrence of one of the following events:~~ ~~(i) The~~ unanimous vote and written consent of all Members, except Ross~~; or~~**,**

~~(ii) [The occurrence of any other event which terminates the continued existence of the Company under this Agreement.]~~[12]

**(b) Liquidation**.

(i) Upon a dissolution of the Company requiring the winding-up of its affairs, the Company shall wind up its affairs, including, but not limited to, the collection of the Company's accounts receivable. The tangible assets of the Company may be sold to the extent deemed practicable and prudent by the Executive Committee, within a reasonable period of time, to the extent necessary to pay or provide for the payment of all debts and liabilities of the Company.

(ii) The net assets of the Company remaining after satisfaction of all debts and liabilities of the Company and the creation of any reserves, shall be distributed to the Members first in accordance with their positive Capital Account balances as of the date of such distribution, after giving effect to all contributions, distributions and allocations for all periods, including the period during which such liquidation occurs, with the balance, if any to ~~the~~**be** distributed to the Members in accordance with their ~~positive Capital Account balances~~**Membership Interests**. Any property distributed in kind in the liquidation shall be valued at fair market value.

(iii) Distribution to Members, pursuant to this Section 12, shall be made by the end of the taxable year of the liquidation, or, if later, ninety (90) days after the date of such liquidation in accordance with Regulations Section 1.704-1(b)(2)(ii)(q).

---

[12] ~~Where in the Agreement is such an event?~~

22

(iv) The Executive Committee may withhold from distribution under this Section 12, such reserves which are required by applicable law and such other reserves relating to pending or anticipated litigation or to Internal Revenue Service examinations. Any such reserves shall be held in a segregated interest-bearing account (which may be commingled with similar accounts). The unused portion of any reserve shall be distributed with interest thereon pursuant to this Section 12 after the Executive Committee shall have determined that the need therefore shall have ceased.

## SECTION 13. GENERAL PROVISIONS

(a) **Notices**. All notices or other communications to any Party to this Agreement, required or authorized under, pursuant to or relating to this Agreement and the transactions provided for herein, shall be in writing addressed to the Party at the address set forth in the introductory paragraph of this Agreement, or to such other address as any Party hereto may specify, in compliance with the requirements of this Section 13(a) for the giving of notice**, and may also be given by electronic mail**. All of such notices or other communications shall be deemed to have been duly given, made and received, when ~~personally~~ delivered to a Party, **(i)** as confirmed by a signed receipt, by United States certified mail **or overnight courier service or (ii) if delivered by electronic mail, as confirmed by an acknowledgement by the recipient in writing or by automated electronic response**.[13]

(b) **Interpretation**.

(1) Section headings are not to be considered part of this Agreement, are included solely for convenience of reference and are not intended to be full or accurate descriptions of the contents thereof.

(2) Use of the work "including" or a like term shall be construed to mean "including but not limited to."

(3) Schedules and Exhibits to this Agreement are an integral part of this Agreement.

(4) Any reference to a provision of the Code, Regulations or the Act shall be construed to be a reference to any successor provision thereof.

(c) **Governing Law**. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to any conflict-of-laws rule or principle that might refer the governance, construction or interpretation of this Agreement to the laws of another jurisdiction.

---

[13] ~~What about overnight courier or overnight mail service at least?~~

NY 71785305v5

**(d)** **Binding Agreement.** This Agreement shall be binding upon and inure to the benefit of the Members and their respective heirs, executors, administrators, personal representatives and successors and assigns.

**(e)** **Entire Agreement.** This Agreement (including the Exhibits and Schedules hereto) supersedes any and all other understandings and agreements, either oral or in writing, between the Members and the Executive Committee with respect to the Membership Interests and constitutes the sole and only agreement between the Members and the Executive Committee with respect to the Membership Interests. **For avoidance of doubt, to the extent not expressly set forth in this Agreement, the agreements of the Parties, their respective principals and/or affiliates contained in the Settlement Agreement shall not be superseded by this Agreement and shall remain in full force and effect.**

**(f)** **Amendment.** The provisions of this Agreement may be altered or amended only by written consent of all Members.

**(g)** **Further Action.** Each Member shall execute and deliver all papers, documents and instruments and perform all acts that are necessary or appropriate to implement the terms of this Agreement and the intent of the Members.

**(h)** **Parties Bound.** This Agreement shall be binding upon and shall inure to the benefit of any Person executing this Agreement as a Member or any person subsequently admitted to the Company as a Member, and their respective heirs, personal representatives, successors and assigns; except that no Member may assign or transfer his rights or obligations hereunder except in accordance with this Agreement.

**(i)** **Severability and Modification.** It is intended that each provision of this Agreement shall be viewed as severable, and if any provision shall be held to be invalid, the remaining provisions shall remain in full force and effect. In the event that any provision of this Agreement is determined by a court of competent jurisdiction to be contrary to any applicable statute, law or rule or for any reason unenforceable as written, such court may modify such provision so as to permit enforcement thereof as modified.

**(j)** **Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.

**(k)** **Gender; Number; Computation of Time.** All pronouns used herein shall include all genders and the singular and plural as the context requires. All days, including Saturdays, Sundays and holidays, shall be counted in computing periods defined by number of days.

**(l)** **No Third-Party Beneficiaries.** This Agreement shall not confer any rights or remedies upon any person other than the parties and their respective successors and permitted assigns.

24

NY 71785305v5

**(m)** **Failure to Enforce.** The failure to enforce at any time any of the provisions of this Agreement or to require at any time performance by any other ~~party~~**Party** of any of the provisions hereof shall in no way be construed to be a waiver of such provisions or to affect either the validity of this Agreement or any part thereof, or the right of any ~~party~~**Party** thereafter to enforce each and every provision in accordance with the terms of this Agreement.

**IN WITNESS WHEREOF**, the undersigned Members, intending to be legally bound hereby, have executed and agreed to the terms of this Agreement effective as of _____, 2008.

Witness:_____        _____(SEAL)
                                        ALAN J. ROSS

                                        **MRB POOLED BENEFITS, LLC**

                                        ~~By:~~_____

_____  By:_____  **Name:**  
                             ~~**LONGEVITY ASSETS LLC**~~
                                        **Title:**

_____             **INSTITUTIONAL LONGEVITY ASSETS LLC**

                                        **By:**_____
                                            **Name:**
                                            **Title:**

25

## EXHIBIT A

| MEMBERS | Membership Interest | Initial Capital Contribution |
|---|---|---|
| MRB Pooled Benefits, LLC | 45% | |
| Alan J. Ross | 10% (non-voting membership interest) | |
| Institutional Longevity Assets LLC | 45% | |

| MEMBERS | Membership Interest | Membership Percentage Interest | Initial Capital Contribution |
|---|---|---|---|
| MRB Pooled Benefits, LLC | 45% | 45% | [$120,000 cash and an unencumbered 1/4 interest in [the patent], having a value of [$250,000]and a tax basis of [$]]. |
| Alan J. Ross | 10% (non-voting membership interest) | 10% | $0 cash and an encumbered 1/2 interest in [the patent], having a value of [$25,000?] and a tax basis of [$0] |
| Institutional Longevity Assets LLC | 45% | 45% | [$120,000 cash and an unencumbered 1/4 interest in [the patent], having a value of [$250,000] and a tax basis of [$250,000].] |

NY 71785305v5

**D**



Alan Ross <saveassociates@gmail.com>

# Comments on Strook markup of IPB Operating Agreement
1 message

**Twarog, Stan <SATwarog@mintz.com>**                                    Thu, Oct 30, 2008 at 3:22 PM
To: jkaskey@braverlaw.com
Cc: Alan Ross <saveassociates@gmail.com>, "Sullivan, Henry" <HSullivan@mintz.com>, "Blais, Travis"
<TLBlais@mintz.com>

John---

I've been through the Strook markup and have conferred with Travis concerning some of the tax-related
provisions. I think there are a few fundamental issues that need to be discussed and addressed before it
makes sense to do a markup and I am using this email to bring these issues to your attention. I don't know if it
makes sense to have a three way discussion of these issues or whether it's more expedient to have you
continue to operate as a hub. I'm interested in your thoughts on this point.

The issues as I see them are as follows:

1. Ross Entity. References to Ross should be changed to PBT Sponsorship Group LLC as in the MRB
Operating Agreement.

2. Initial Capital Contributions. See Exhibit A. If the 1/4 interests in the patent contributed by each of MRB and
ILA are valued at $250,000, it does not make sense that Alan's 1/2 interest be valued at $25,000. It should be
$500,000.

3. Additional Capital Contribution Dilution. See Section 3(b). Apart from the fact that the dilution provision has
no mechanics that would be instructive as to how much dilution would be associated with failure to contribute
a particular amount, the concept is not acceptable in general. Section 14 of the Settlement Agreement says
that all expenses necessary to develop the business will be shared by Balshe and MC (ILA and MRB) on a
50/50 basis.

4. Section 4(a)(4) Clarification. It should be made clear that the increased percentages to MRB come out of
ILA, not Alan's entity.

5. Section 4(c). We feel that the deleted language should be reinserted. It is meant to cover general overhead
and other expenses that cannot, by their nature, be attributed to precisely the COLI, BOLI,IOLI and GOLI
lines of business. The Trustee's fee might be an example. We have suggested that such expense be
allocated according to the number of policies associated with each line of business, but are not wedded to this
measure and are open to alternatives.

6. "Shared Expenses" Issues. This concept pops up here and there throughout the document. As far as I can
tell, what is intended by the Strook markup is that MRB and ILA get all the money they have spent on
litigation, startup and patent acquisition (a lot of which is identified in Exhibit A as capital contribution) before
the allocation and distribution percentages agreed to in the Settlement Agreement kick in. Where did this
concept come from? I don't think it's in the Settlement Agreement, although I am willing to be educated. The
parties should pay their own legal expenses, whether for litigation or for preparing the organizational
documents and initial capital contributions should not be returned on a priority basis.

7. Sections 6(a) and (b). We don't understand why ILA should have the exclusive right to sell policies,
particularly BOLI policies, and retain the compensation. There is nothing about this in the Settlement
Agreement.

8. Rights of First Refusal. In general the Strook markup excludes Alan from participation in rights of first
refusal if other members want to sell membership interests. This does not seem justified. Also, and this is not

so much a deal point as an annoyance, the Strook markup gives the other two parties, if there is an appraisal of their interests in a bankruptcy scenario, a "reasonably acceptable" right with regard to the appraiser. But the same right is not afforded to Alan.

9. Liquidation Distributions. See Section 12(b). We believe that the correct and appropriate way to handle liquidating distributions is in accordance with capital accounts as we had previously suggested.

10. Section 13(e). I'm not quite sure what the suggested language means. It might be read to say that the Settlement Agreement controls with respect to Operating Agreement issues to the extent those issues are not addressed in the Operating Agreement and I don't think that should be the case. My guess is that it is intended to say that non-Operating Agreement matters, such as the releases and agreement not to harm the Trust, remain in force. If we are dealing with the latter situation it's just a matter of clarification.

Travis and I are available to talk over any or all of the points outlined above, either with you or with you and someone from Strook. Please let me know how you think we should proceed.

Regards

Stanley A. Twarog
Mintz, Levin, Cohn, Ferris, Glovsky and Popeo,P.C.
One Financial Center | Boston, MA 02111
Phone: 617 348 1749 | Fax: 617 542 2241
E-mail: stwarog@mintz.com
Web: www.mintz.com

---

IRS CIRCULAR 230 NOTICE

In compliance with IRS requirements, we inform you that any U.S. tax advice contained in this communication is not intended or written to be used, and cannot be used, for the purpose of avoiding tax penalties or in connection with marketing or promotional materials.

---

STATEMENT OF CONFIDENTIALITY:
The information contained in this electronic message and any attachments to this message are intended for the exclusive use of the addressee(s) and may contain confidential or privileged information. If you are not the intended recipient, or the person responsible for delivering the e-mail to the intended recipient, be advised you have received this message in error and that any use, dissemination, forwarding, printing, or copying is strictly prohibited. Please notify Mintz, Levin, Cohn, Ferris, Glovsky and Popeo immediately at either (617) 542-6000 or at ISDirector@Mintz.com, and destroy all copies of this message and any attachments. You will be reimbursed for reasonable costs incurred in notifying us.

**E**

# EXHIBIT E

# novack‣macey

P. Andrew Fleming
andrewf@novackmacey.com

December 30, 2008

**VIA E-MAIL AND U.S. MAIL**
Mr. Alan Ross
SAVE Associates
687 Highland Avenue
Needham, MA 02494

  **Re:**   *Breaches of the Settlement Agreement and General Release*

Dear Mr. Ross:

   This is a joint letter on behalf of certain parties to the Settlement Agreement and General Release dated as of June 26, 2008 (the "Settlement Agreement"), including The Meyer-Chatfield Corporation ("MC"), The Simon Law Firm ("Simon Law") and Balshe LLC ("Balshe"). This letter is also written on behalf of Institutional Pooled Benefits LLC ("IPB") (IPB, with MC, Simon Law and Balshe collectively, the "Demanding Parties"), which was formed pursuant to Paragraph 1 of the Settlement Agreement and referred to as "Newco" therein.

   Please take notice that, as set forth in a September 25, 2008 e-mail from Nicomedes Sy Herrera, Esq. to your attorney, Stan Twarog, you and SAVE Associates ("SAVE") have been and are continuing to breach Paragraphs 2 and 22 of the Settlement Agreement. In particular, you and SAVE have failed to assign to IPB all right, title and interest in Patent No. 5,974,390 (the "Patent") held by you, your affiliates, parents and assigns. You have also failed to execute all documents reasonably necessary for the formation and governance of IPB, or to assign and record IPB's full and undivided interest in the Patent with the United States Patent and Trademark Office. You have also failed to cooperate in good faith to execute all documents necessary to effectuate the terms of the Settlement Agreement.

   During our telephone calls over the past few weeks, you have also anticipatorily breached Paragraphs 7, 9 and 10 of the Settlement Agreement by insisting on participation in the gross profits of IPB, instead of your entitlement to only the net profits.

   We demand that you cease and desist from your continuing and anticipatory breaches of the Settlement Agreement. The Demanding Parties have incurred expenses, costs and attorneys' fees in connection with your breaches and anticipatory breaches of the Settlement Agreement. Accordingly, we also demand full indemnity pursuant to Paragraph 27 therein.

## novack·macey

Mr. Alan Ross
December 30, 2008
Page 2

To avoid the expense of further litigation, and in the spirit of preserving our business relationship, we will not seek direct recovery from you for indemnity under Paragraph 27 of the Settlement Agreement upon your strict compliance with the following terms: (i) you provide us written notice by the close of business on Monday, December 29, 2008 that you will cease your breaches of the Settlement Agreement; (ii) immediately execute the Patent assignment documents forwarded to you and your attorneys by Mr. Herrera on September 25, 2008; (iii) confirm that you will promptly execute all further documents reasonably necessary to effectuate the terms of the Settlement Agreement, including, without limitation, the document for the governance of IPB that the Demanding Parties request you to execute or acknowledge; and (iv) immediately cease obstructing the Demanding Parties from developing the business of IPB or any of its affiliates.

Nothing in this letter is intended to waive any of our rights with respect to any breaches of the Settlement Agreement not enumerated herein. We reserve all of our rights to recover for your continuing and anticipatory breaches of the Settlement Agreement. Pursuant to Paragraph 20 of the Settlement Agreement, we also reserve the right to reopen the Action, as defined in the first WHEREAS clause therein. Our offer to forego any indemnity under Paragraph 27 of the Settlement Agreement is not intended nor should be construed to waive our right to seek indemnity upon your failure to strictly follow the conditions set forth herein, which compliance shall be determined in our sole discretion, or for any future breaches of the Settlement Agreement by you.

Yours sincerely,

P. Andrew Fleming
*On behalf of Institutional Pooled Benefits LLC,*
*Balshe LLC, The Simon Law Firm, and the Meyer-*
*Chatfield Corporation.*

PAF:nlt

cc:     Stan Twarog, Esq. (*via e-mail*)
        Henry Sullivan, Esq. (*via e-mail*)

**F**

# MINTZ LEVIN

Stanley A. Twarog | 617 348 1749 | stwarog@mintz.com

One Financial Center
Boston, MA 02111
617-542-6000
617-542-2241 fax
www.mintz.com

January 6, 2009       **EXHIBIT F**

<u>VIA EMAIL and U.S. MAIL</u>

P. Andrew Fleming, Esq.
Novack and Macey LLP
100 North Riverside Plaza
Chicago, IL 60606-1501

Re:    Institutional Pooled Benefits LLC ("IPB")

Dear Mr. Fleming:

This is in response to your December 30, 2008 letter to our client, Alan Ross[1], as supplemented by your December 31, 2008 letter to Mr. Ross correcting an apparent typographical error.

In general, Mr. Ross vigorously disputes your characterization of the present situation and your allegations of breach.

*Mr. Ross has stated repeatedly, both directly and through correspondence from this firm, that he is prepared to execute and deliver the U.S. Patent No. 5,974,390 (the "Patent") assignment papers when the IPB Limited Liability Company Agreement (the "Operating Agreement") is signed.* Execution and delivery of the Operating Agreement and assignment of his 50% interest in the Patent are mutual executory obligations that should be performed simultaneously (see Paragraph 22 of Settlement Agreement). I suspect that your clients share the same view; if not, are they prepared to execute and deliver the Operating Agreement before the Patent is assigned?

The drafting of the Operating Agreement has not been completed and *Mr. Ross is under no compulsion to sign an Operating Agreement that is not consistent with the Settlement Agreement* (see Section 1 of the Settlement Agreement). We do have reason to believe, however, that there are only two Operating Agreement issues outstanding. If this is the case, I am hopeful that both the Operating Agreement and the Patent assignment documentation can be executed and delivered in the very near future. We have asked on more than one occasion (but

---

[1] Since you know that Mr. Ross has been represented by counsel in this matter, namely the Braverman Kaskey firm in connection with the June, 2008 litigation and the related Settlement Agreement dated June 27, 2008 as well as Mintz Levin, please direct future correspondence to counsel rather than Mr. Ross.

Separately, your December 30, 2008 letter indicates you represent the Meyer-Chatfield Corporation. Does this mean that you are successor counsel to the Braverman Kaskey firm in this respect? Clarification will be appreciated.

**Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.**

BOSTON | WASHINGTON | NEW YORK | STAMFORD | LOS ANGELES | PALO ALTO | SAN DIEGO | LONDON

**Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.**

January 6, 2009
Page 2

without success) for an updated draft of the Operating Agreement, both to confirm the parties' substantial progress and to verify our understanding as to the limited scope of the remaining issues.

We also take issue with the implication in your letter that Mr. Ross has somehow caused delay in completing the Operating Agreement. Since your firm may not have been included in the entire chain of correspondence concerning the Operating Agreement, allow me to present the chronology of the documentation process:

- June 26, 2008 – Settlement Agreement signed.

- September 9, 2008 – Braverman Kaskey circulates draft of IPB Operating Agreement.

- September 10, 2008 – Mintz Levin submits preliminary comments to Braverman Kaskey. There were nine (9) comments, technical in nature.

- September 22, 2008 – Stroock & Stroock & Lavan ("Stroock") counsel to The Simon Law Firm and Balshe in connection with drafting of the Operating Agreement, submits initial comments to Braverman Kaskey in the form of a marked-up Operating Agreement.

- September 24, 2008 – Mintz Levin submits additional tax-related comments to Braverman Kaskey in the form of a marked-up Operating Agreement.

- October 23, 2008 – Stroock submits additional, and significantly more extensive comments to Braverman Kaskey in the form of a marked-up Operating Agreement. A number of these comments are inconsistent with the Settlement Agreement and detrimental to the interests of Mr. Ross.

- October 30, 2008 – Mintz Levin submits comments on Stroock's October 23, 2008 mark-up to Braverman Kaskey. These comments point out several significant business issues implicated by the Stroock mark-up.

- December 3, 2008 – In a telephone conversation with Braverman Kaskey, we were told that three sets of Operating Agreement issues remained outstanding. One concerned allocations of operating profits and losses; one concerned the method for liquidating distributions; and the third concerned Stroock's proposal that the two members other than Ross receive priority distributions reflecting certain expenses. Braverman Kaskey also told us, among other things, that Stroock's proposal to dilute the membership interest of any member who did not contribute additional capital had been withdrawn. After conferring with Mr. Ross we informed Mr. Kaskey by telephone on December 15, 2008 that Mr. Ross was amenable to Braverman Kaskey's proposals relating to the first two issues, but

**Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.**

January 6, 2009
Page 3

that Mr. Ross objected to the priority distribution proposal on the ground that it
was inconsistent with, and not contemplated by, the Settlement Agreement.

- December 18, 2008 – Mintz Levin, by email, requests Braverman Kaskey to
prepare a new draft of the Operating Agreement synthesizing the various Mintz
Levin and Stroock comments as well as Braverman Kaskey input, so that Mintz
Levin and Mr. Ross could review a draft document that the other two parties were
prepared to sign, subject to resolution of the priority distributions issues.

- December 31, 2008 – Mr. Ross learns during a telephone call with representatives
of Meyer-Chatfield Corporation that Institutional Longevity Assets LLC (the
entity representing The Simon Law Firm and Balshe interests referenced to in
your letter) continues to insist on rights to sell certain "COLI" insurance policies
in accordance with Stroock's October 23, 2008 mark-up; we had been previously
been told by Braverman Kaskey that this demand had been dropped.

- January 2, 2009 – Mintz Levin again requests, this time by telephone, that
Braverman Kaskey prepare a new draft of the Operating Agreement. Braverman
Kaskey stated that they would not do so.

What this chronology points out is that over a seven month period beginning in June,
2008, there has been (i) one draft of the Operating Agreement, (ii) submission of comments by
Mintz Levin and Stroock, (iii) conversations between Braverman Kaskey and Mintz Levin, and
(iv) separate conversations between Braverman Kaskey and Stroock. We have suggested a
three-party dialogue to bring matters to closure, but this has not happened. As a result, there is
no document currently on the table incorporating agreements that have been reached and
identifying the limited number of issues that are still open.

Your letter asks Mr. Ross to confirm that he *"will promptly execute all further documents
reasonably necessary to effectuate the terms of the Settlement Agreement, including, without
limitation, the document for governance of IPB that the Demanding Parties request [he] execute
or acknowledge"* [emphasis added]. Are you seriously suggesting that Mr. Ross has legal
obligation to sign a document that the so-called Demanding Parties simply tell him to sign
without regard to whether it is consistent with the Settlement Agreement and before it has even
been presented to him? Would you advise any of your clients to do so?

If we are, indeed, two sets of issues away from completing a document that is satisfactory
to all parties, the open points should be resolvable through reasonable negotiation and both the
Operating Agreement and the Patent assignment can be put to bed in short order. This will allow
the parties to devote their entire attention to the much more rewarding exercise of launching the
IPB business. The key to getting to this stage, however, is presentation of a revised draft
Operating Agreement that all concerned can review and get comfortable with. In this respect,
the interests of your various clients are precisely aligned with those of Mr. Ross. If you can use
your good offices to make this happen, you will be doing a great service to our respective clients.

**Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.**

January 6, 2009
Page 4

With respect to your last assertion of breach by Mr. Ross of his obligations under the Settlement Agreement, namely anticipatory breaches of Sections 7, 9 and 10, nothing could be further from the truth or reality. These sections set forth the distribution splits of cash derived from operations of the various lines of proposed IPB business. Distributions will be effected by the management of IPB in accordance with the Operating Agreement. Once the Operating Agreement is in place, Mr. Ross will have no power, authority or means to breach any of the provisions relating to distributions. So how can he be accused of anticipatory breach?

I hope that the foregoing is of help to you in understanding Mr. Ross's positions. At the risk of beating a dead horse, the gating item that is ultimately generating the concern of all of the parties, including Mr. Ross, is the Operating Agreement. Mr. Ross, directly, and through this firm, has repeatedly communicated his desire to complete and sign the Operating Agreement since last summer. Having worked with Braverman Kaskey on the profit and loss allocation issues and liquidating distribution issues, Mr. Ross has withdrawn the comments on those points raised in the September 24, 2008 mark-up referred to above *and is prepared to sign the Operating Agreement in the form first circulated by Braverman Kaskey on September 9, 2008* (although he would prefer that the technical comments addressed in our September 10, 2008 preliminary comments be attended to).

The positions Mr. Ross has taken on the open issues introduced by Stroock's mark-up are reasonable; all he wants is an Operating Agreement that reflects his ownership interest in a way that is consistent in the terms with the Settlement Agreement. In his view and in our view the open issues introduced by the Stroock mark-ups are not consistent with the Settlement Agreement. Nonetheless, we remain ready and willing to attempt to resolve them in a mutually acceptable manner. Before further action is taken, it behooves all of the parties to have a three-way conversation involving counsel (which has not occurred to date in connection with drafting of the Operating Agreement) to try to bridge the gaps.

Please feel free to contact either me or Henry Sullivan if you wish to discuss any aspect of this letter. We are available to participate in meetings and/or conference calls to resolve the open issues once they have been identified and would welcome the opportunity to do so.

Very truly yours,

Stanley A. Twarog

cc:     Alan Ross
        Henry Sullivan, Esq.
        John Kaskey, Esq.
        David Braverman, Esq.

**G**

# EXHIBIT G

## LIMITED LIABILITY COMPANY AGREEMENT
## OF
## INSTITUTIONAL POOLED BENEFITS LLC

This LIMITED LIABILITY COMPANY AGREEMENT (this "Agreement") for **INSTITUTIONAL POOLED BENEFITS LLC** (the "Company"), a limited liability company organized pursuant to the Delaware Limited Liability Company Act (the "Act"), is entered into as of June 27, 2008 by and among **MRB POOLED BENEFITS LLC** ("MRB"), a Delaware limited liability company, with an address at 1284 Fritz Circle, Huntingdon Valley, PA 19006, **PBT SPONSORSHIP GROUP, LLC** ("Ross") a Massachusetts limited liability company with an address at 687 Highland Avenue, Needham MA 02494-1601 and **INSTITUTIONAL LONGEVITY ASSETS LLC** ("ILA"), a Delaware limited liability company with an address at 303 East Wacker Drive, Suite 210, Chicago IL 60601-5210.

### SECTION 1. FORMATION; DEFINITIONS

 (a) **Formation**. The parties formed the Company under the Act by causing an authorized person (within the meaning of the Act) to deliver and file a certificate of formation with the Delaware Secretary of State.

 (b) **Name**. The name of the Company is "Institutional Pooled Benefits LLC" and all of the business conducted by the Company will be conducted under that name or such other names that comply with applicable law as the Members may select from time to time. For avoidance of doubt, each of ILA and MRB may market any PBT Trust transaction subject to this Agreement in its own name.

 (c) **Registered Office; Registered Agent**. The Company's initial registered office will be located at the office of its registered agent at The Corporation Trust Company, 1209 Orange Street, City of Wilmington, County of New Castle, State of Delaware, and the name of its initial registered agent shall be The Corporation Trust Company. The registered office and registered agent may be changed to such other location (which need not be a place of business of the Company) and/or to such other person or entity as the Members may designate from time to time by filing the address of the new registered office and/or the name of the new registered agent with the Delaware Secretary of State pursuant to the Act.

 (d) **Purposes**. The purposes of the Company are to engage in any activities to exploit the economic value of the Patent.

 (e) **Term**. The Company will continue in existence until the winding up and liquidation of the Company in accordance with Section 12 hereof.

 (f) **No State Law Partnership**. The Members intend that the Company will not be a partnership (including, without limitation, a limited partnership), and that no Member shall be a partner of any other Member for any purposes other than federal, state and local tax purposes, and the provisions of this Agreement shall not be construed otherwise. The rights and

obligations of the Members amongst themselves shall be governed by the Act, this Agreement and the law of the State of Delaware.

    **(g) Definitions**. As used in this Agreement, the following terms have the following meanings, unless the context otherwise requires:

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in the Member's Capital Account as of the end of the relevant taxable year, after giving effect to the following adjustments:

        (1) The deficit shall be decreased by the amounts which the Member is obligated to restore pursuant to Section 4, or is treated as obligated to restore pursuant to Regulation Section 1.704-1(b)(2)(ii)(c), or is deemed obligated to restore under the penultimate sentences of Regulation Sections 1.704-2(g)(i) and (i)(5); and

        (2) The deficit shall be increased by the items described in Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5), and (6).

"Agreement" has the meaning ascribed to it in the preamble hereof.

"Bankrupt" means, with respect to any Person: (a) the filing of an application by such Person for, or such Person's consent to, the appointment of a trustee, receiver, or custodian of its assets; (b) the entry of an order for relief with respect to such Person in proceedings under the United States Bankruptcy Code, as amended or superseded from time to time; (c) the making by such Person of a general assignment for the benefit of creditors; (d) the entry of an order, judgment, or decree by any court of competent jurisdiction appointing a trustee, receiver, or custodian of the assets of such Person unless the proceedings and the trustee, receiver, or custodian appointed are dismissed within one hundred twenty (120) days; or (e) the failure by such Person generally to pay such Person's debts as the debts become due within the meaning of Section 303(h)(1) of the United States Bankruptcy Code, as determined by the Bankruptcy Court, or the admission in writing of such Person's inability to pay its debts as they become due.

"BOLI" means bank-owned life insurance.

"BOLI Profits and Losses" means all of the Company's net income or net loss, as the case may be, other than from a Capital Transaction, generated from any PBT Trust relating to BOLI, including but not limited to such net income or net loss attributable to net trust enrollment or service fees related to BOLI policies, the capture of any enhancements in the expected value of BOLI policies from the assignment of their NAR into a PBT Trust, net fees related to the use of the Patent or any product or services offered by the Company to increase the balance sheet of any client or customer of the Company, and trust renewal fees related to BOLI policies.

"Capital Account" has the meaning ascribed to it in Section 3(c) hereof.

"Capital Contribution" means a contribution in cash or property to the capital of the Company (and if required by the context of this Agreement, "Capital Contribution" shall also refer to the total amount of cash and the fair market value of property so contributed). The Capital Contributions of MRB and ILA shall not include their Shared Expenses.

"Capital Transaction" means any: (i) sale by the Company of (A) membership interests in the Company or (B) any rights to cash flow in or flowing from the Company; (ii) sale of any portion of the Patent or any sale of any rights to cash flow in or flowing from the Patent; (iii) other sale of substantially all of the Company's assets; (iv) liquidation of, or transaction in contemplation of liquidation of, the Company; or (v) any merger of the Company where the Company is not the surviving entity or the Members of the Company do not continue to own at least 50 percent of the Company's capital or profits interests.

"Capital Transaction Profits and Losses" means all of the Company's net income or net loss, as the case may be, from a Capital Transaction.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"COLI" means non-BOLI and non-IOLI company-owned life insurance.

"COLI Profits and Losses" means all of the Company's net income or net loss, as the case may be, other than from a Capital Transaction, generated from any PBT Trust relating to COLI and/or GOLI, including but not limited to such net income or net loss attributable to net trust enrollment or service fees related to COLI and/or GOLI policies, the capture of any enhancements in the expected value of COLI and/or GOLI policies from the assignment of their NAR into a PBT Trust, net fees related to the use of the Patent or any product or services offered by the Company to increase the balance sheet of any client or customer of the Company, and trust renewal fees related to COLI and/or GOLI policies.

"Distributable Cash From BOLI Operations" means all of the Company's aggregate cash receipts, other than from a Capital Transaction, generated from a PBT Trust relating to BOLI, including but not limited to such receipts attributable to net trust enrollment or service fees related to BOLI policies, the capture of any enhancements in the expected value of BOLI policies from the assignment of their NAR into a PBT Trust, net fees related to the use of the Patent or any product or services offered by the Company to increase the balance sheet of any client or customer of the Company, and trust renewal fees related to BOLI policies, less amounts necessary to pay related expenses and establish reasonable reserves, and less amounts previously distributed under Section 5(b) below. For the sake of clarity, the separate overhead expenses of MRB and ILA shall not reduce Distributable Cash from BOLI Operations unless unanimously agreed to by MRB and ILA. For the sake of further clarity, Distributable Cash from BOLI Operations are net of reasonable sales and distribution-related expenses, including, without limitation, reasonable commissions of salespersons, distribution partners, and non-employees directly involved with and necessary for the sales and marketing process of enrolling BOLI policies into PBT Trusts.

"Distributable Cash From COLI Operations" means all of the Company's aggregate cash receipts, other than from a Capital Transaction, generated from a PBT Trust relating to COLI and/or GOLI, including but not limited to such receipts attributable to net trust enrollment or service fees related to COLI and/or GOLI policies, the capture of any enhancements in the expected value of COLI and/or GOLI policies from the assignment of their NAR into a PBT Trust, net fees related to the use of the Patent or any product or services offered by the Company to increase the balance sheet of any client or customer of the Company, and trust renewal fees related to COLI and/or GOLI policies, less amounts necessary to pay related expenses and establish reasonable reserves, and less amounts previously distributed under Section 5(c) below. For the sake of clarity, the separate overhead expenses of MRB and ILA shall not reduce Distributable Cash from COLI Operations unless unanimously agreed to by MRB and ILA. For the sake of further clarity, Distributable Cash from COLI Operations are net of reasonable sales and distribution-related expenses, including, without limitation, reasonable commissions of salespersons, distribution partners, and non-employees directly involved with and necessary for the sales and marketing process of enrolling COLI policies into PBT Trusts.

"Distributable Cash From IOLI Operations" means all of the Company's aggregate cash receipts, other than from a Capital Transaction, generated from a PBT Trust relating to IOLI, including but not limited to such receipts attributable to net trust enrollment or service fees related to IOLI policies, the capture of any enhancements in the expected value of IOLI policies from the assignment of their NAR into a PBT Trust, net fees related to the use of the Patent or any product or services offered by the Company to increase the balance sheet of any client or customer of the Company, and trust renewal fees related to IOLI policies, less amounts necessary to pay related expenses and establish reasonable reserves, and less amounts previously distributed under Section 5(d) below. For the sake of clarity, the separate overhead expenses of MRB and ILA shall not reduce Distributable Cash from IOLI Operations unless unanimously agreed to by MRB and ILA. For the sake of further clarity, Distributable Cash from IOLI Operations are net of reasonable sales and distribution-related expenses, including, without limitation, reasonable commissions of salespersons, distribution partners, and non-employees directly involved with and necessary for the sales and marketing process of enrolling IOLI policies into PBT Trusts.

"Distributable Cash From a New Patent Use" means all of the Company's aggregate cash receipts, other than from a Capital Transaction, relating to a New Patent Use, including but not limited to such receipts attributable to net trust enrollment or service fees, less amounts necessary to pay related expenses and establish reasonable reserves, and less amounts previously distributed. For the sake of clarity, the separate overhead expenses of MRB and ILA shall not reduce Distributable Cash from New Patent Use Operations unless unanimously agreed to by MRB and ILA. For the sake of further clarity, Distributable Cash from New Patent Use Operations are net of reasonable sales and distribution-related expenses, including, without limitation, reasonable commissions of salespersons, distribution partners, and non-employees directly involved with and necessary for the sales and marketing process of the New Patent Use.

"Distributable Cash From Capital Transactions" means all of the Company's aggregate cash receipts from Capital Transactions, less amounts necessary to pay related expenses and establish reasonable reserves, less amounts previously distributed under Sections 5(e) below.

"GOLI" means government-owned life insurance.

"Fiscal Year" means the calendar year, but with respect to the first Fiscal Year of the Company, Fiscal Year means the period from the first day of the term of the Company to the next following December 31, and with respect to the last Fiscal Year of the Company, shall mean the period from the end of the last preceding Fiscal Year to the date of such dissolution.

"ILA" has the meaning ascribed to it in the preamble hereof.

"ILA BOLI Initial Percentage" has the meaning ascribed to it in Section 4(a)(1) hereof.

"ILA BOLI Initial Strategic Partner Percentage" has the meaning ascribed to it in Section 4(a)(2) hereof.

"ILA COLI Initial Percentage" has the meaning ascribed to it in Section 4(a)(3) hereof.

"ILA IOLI Initial Percentage" has the meaning ascribed to it in Section 4(a)(5) hereof.

"ILA Strategic Partner" means each of up to three (3) banks which are designated by ILA with whom ILA forms a strategic relationship, provided, however, that under no circumstances will any bank which has not formed, and is not interested in forming, a strategic relationship broader than the purchase and enrollment of BOLI policies into the IPB Trust be an ILA Strategic Partner, until such time as such bank's interest shall have changed and provided further that under no circumstances will any bank which has previously enrolled BOLI policies into the IPB Trust be an ILA Strategic Partner.

"IOLI" means insurance carrier-owned life insurance.

"IOLI Profits and Losses" means all of the Company's net income or net loss, as the case may be, other than from a Capital Transaction, generated from a PBT Trust relating to IOLI, including but not limited to such net income or net loss attributable to net trust enrollment or service fees related to IOLI policies, the capture of any enhancements in the expected value of IOLI policies from the assignment of their NAR into a PBT Trust, net fees related to the use of the Patent or any product or services offered by the Company to increase the balance sheet of any client or customer of the Company, and trust renewal fees related to IOLI policies.

"Initial Percentage Interest" means (i) with respect to ILA, the ILA BOLI Initial Percentage, the ILA BOLI Initial Strategic Partner Percentage, the ILA COLI Initial Percentage or the ILA IOLI Initial Percentage, as applicable, and (ii) with respect to MRB, the MRB BOLI

Initial Percentage, the MRB BOLI Initial Strategic Partner Percentage, the MRB COLI Initial Percentage or the MRB IOLI Initial Percentage, as applicable.

"IPB Trust" means a PBT Trust established by the Company.

"Litigation" means, collectively, *Balshe LLC v. Ross*, No. 08 CH 19180 (Circuit Court of Cook County, Illinois) and *Balshe LLC v. Ross*, No. 08-CV-3256 (Northern District of Illinois).

"MC" means Meyer Chatfield Corp.

"MC Methodology" has the meaning ascribed to it in Section 4(a)(4) hereof.

"Member" means any Person executing this Agreement as a Member or any person subsequently admitted to the Company as a Member, as provided in this Agreement, but does not include any Person who has ceased to be a member of the Company.

"Membership Interest" means, for each Member, the membership interest in the Company set forth opposite their names on Exhibit A, as such Exhibit A may be amended from time to time. Any Membership Interest owned by Ross shall be a non-voting interest.

"Membership Percentage Interest" means, for each Member, the percentage interest set forth opposite the name of such Member on Exhibit A, as such Exhibit A may be amended from time to time.

"Minimum Gain" has the meaning given "partnership minimum gain" in Regulation Section 1.704-2(d). Minimum Gain shall be computed separately for each Member in a manner consistent with the Regulations under IRC Section 704(b).

"MRB" has the meaning ascribed to it in the preamble.

"MRB BOLI Initial Percentage" has the meaning ascribed to it in Section 4(a)(1) hereof.

"MRB BOLI Initial Strategic Partner Percentage" has the meaning ascribed to it in Section 4(a)(2) hereof.

"MRB COLI Initial Percentage" has the meaning ascribed to it in Section 4(a)(3) hereof.

"MRB IOLI Initial Percentage" has the meaning ascribed to it in Section 4(a)(5) hereof.

"NAR" means, with respect to any policies, their net amount at risk (i.e., the excess of the total death benefit over the cash surrender value).

"Negative Capital Account" means a Capital Account with a balance of less than zero.

"New Patent Use Profits and Losses" means all of the Company's net income or net loss, as the case may be, other than from a Capital Transaction.

"Nonrecourse Deductions" has the meaning given "nonrecourse deductions" in Regulation Section 1.704-2(b)(1). The amount of Nonrecourse Deductions for a taxable year of the Company equals the net increase, if any, in the amount of Minimum Gain during that taxable year, determined according to the provisions of Regulation Section 1.704-2(c).

"Nonrecourse Liability" means any liability of the Company with respect to which no Member has personal liability determined in accordance with Code Section 752 and the Regulations promulgated thereunder.

"Party" means any person who is a signatory to this Agreement.

"Patent" means United States Patent No. 5,974,390 and all renewals, reissues, reexaminations, extensions, and any and all patents and patent applications that claim priority thereto, whether granted or filed now or in the future.

"PBT Trust" means a trust utilizing the Patent for the enrollment of BOLI, COLI, IOLI and/or GOLI.

"Permitted Transferee" means, with respect to a Member, a descendant or family member of such Member or an entity wholly-owned by such Member or an owner of such Member or descendant or family member of such Member or an owner of such Member.

"Person" means an individual, corporation, association, partnership, joint venture, limited liability company, estate, trust or any other legal entity.

"Positive Capital Account" means a Capital Account with a balance greater than zero.

"Regulations" means the Income Tax Regulations promulgated under the Code, as such Regulations may be amended from time to time.

"Settlement Agreement" means the Settlement Agreement and General Release, dated June 26, 2008, by and among Balshe LLC, The Simon Law Firm, Alan J. Ross, SAVE Associates and The Meyer-Chatfield Corporation (as such agreement may be amended or amended and restated from time to time).

"Shared Expenses" means all reasonable documented out of pocket costs and expenses that have been mutually agreed to by ILA and MRB to constitute Shared Expenses, up to a maximum amount of Five Hundred Thousand Dollars ($500,000.00) each, that were or are incurred by ILA or MRB in connection with (a) the formation and start-up of the Company, (b) the acquisition of the Patent (including, without limitation, the purchase price thereof) from AXA Financial, Inc. or any of its subsidiaries or affiliates (including, without limitation, MONY

Life Insurance Company (f/k/a The Mutual Life Insurance Company of New York); and (c) all costs and expenses incurred by ILA or MRB in connection with the negotiation, preparation and delivery of this Agreement or pursuant to the Settlement Agreement, provided that such payments were made after the date of the Settlement Agreement.

"Shared Expenses Account" means, at any date, the difference of (a) all Shared Expenses incurred prior to such date, less (b) all losses, expenses and other deductions allocated to such Person pursuant to Section 4(f) below prior to such date.

"Transfer" means, any disposition (including, without limitation, gifts, sales, assignments, pledges, encumbrances, bequests, and all other inter vivos or testamentary dispositions) whether voluntary, involuntary or whether pursuant to court order or by operation of law.

## SECTION 2. MEMBERS

(a) **Members**. The Members of the Company shall be those Persons named on Exhibit A, as such Exhibit A may be amended from time to time. Each initial Member has executed this Agreement as of the date hereof and is hereby admitted to the Company as a Member.

(b) **Additional Members**. No Person will be admitted to the Company as an additional Member without the written consent of all voting Members.

(c) **Lack of Authority**. Except as otherwise provided in this Agreement, no Member has the authority or power to act for or on behalf of the Company or to incur any expenditures on behalf of the Company.

(d) **Liability to Third Parties**. No Member will be liable for the debts, obligations or liabilities of the Company beyond such Member's Capital Contribution, including under a judgment, decree or order of a court, except to the extent required under the Act with respect to amounts distributed to the Member at a time when the Company was insolvent or was rendered insolvent by virtue of such distribution.

## SECTION 3. MEMBERSHIP INTERESTS

(a) **Membership Interests**. The Members shall receive the Membership Interest in the Company set forth opposite their names on Exhibit A, as such Exhibit A may be amended from time to time.

(b) **Additional Capital Contributions**. No Member shall be required at any time to make any additional contributions to the capital of the Company, or be obligated or required under any circumstances to restore any negative balance in his, her or its Capital Account.

(c) **Capital Accounts**. The Company will maintain on its books and records a capital account ("Capital Account") for each Member initially reflecting an amount assigned to such Member's Initial Capital Contribution. The Capital Accounts will be adjusted from time to time as required by the Code and Regulations, including, but not limited to, the rules contained in Treas. Reg. Section 1.704-1(b)(2)(iv). At the discretion of the Executive Committee, the Company may revalue its assets in the Capital Accounts as provided in Regulation Section 1.704-1(b)(2)(iv)(f).

(d) **No Interest on Capital Contributions**. Members shall not be paid interest on their Capital Contributions.

(e) **Return of Capital Contributions**. Except as otherwise provided in this Agreement, no Member shall have the right to receive the return of any Capital Contribution. If a Member is entitled to receive a return of a Capital Contribution, the Member shall not have the right to receive anything but cash in return of the Member's Capital Contribution.

## SECTION 4. ALLOCATION OF PROFITS AND LOSSES

(a) **Profits From Operations**. After giving effect to the special allocations set forth in subsections (d) and (e), and except as provided in subsection (f):

    (1)    Except as provided in subsection (2), all BOLI Profits and Losses (other than losses resulting from Shared Expenses) of the Company for each Fiscal Year (or part thereof) as determined for federal income tax purposes, will be allocated seventy-two percent (72%) (the "MRB BOLI Initial Percentage") to MRB, eighteen percent (18%) (the "ILA BOLI Initial Percentage") to ILA and ten percent (10%) to Ross;

    (2)    BOLI Profits and Losses (other than losses resulting from Shared Expenses) of the Company for each Fiscal Year (or part thereof) as determined for federal income tax purposes, which are attributable to an ILA Strategic Partner shall be allocated forty-five percent (45%) to ILA (the "ILA BOLI Initial Strategic Partner Percentage"), forty-five percent (45%) to MRB (the "MRB BOLI Initial Strategic Partner Percentage") and ten percent (10%) to Ross;

    (3)    Except as provided in subsection (4), all COLI Profits and Losses (other than losses resulting from Shared Expenses) of the Company for each Fiscal Year (or part thereof) as determined for federal income tax purposes, will be allocated seventy-two percent (72%) to ILA (the "ILA COLI Initial Percentage"), eighteen percent (18%) to MRB (the "MRB COLI Initial Percentage") and ten percent (10%) to Ross;

    (4)    In the event that the Company utilizes a methodology provided to it by MRB for COLI or GOLI, which methodology is similar to the methodology utilized by MRB for BOLI transactions whereby MRB charges participants in a PBT Trust a percentage of the

amount of the capital added to the balance sheet of the participating bank or company by electing to book the fair value of the interests in such PBT Trust under applicable accounting principles (the "MC Methodology"), MRB's share of COLI Profits and Losses (other than losses resulting from Shared Expenses) derived specifically from utilizing the MC Methodology (specifically excluding, without limitation, the Company 's net trust enrollment fees, the capture of any enhancements in the expected value of policies from the assignment of their NAR into a PBT Trust, and any net profits derived from trust renewal fees) shall be increased to: (i) forty-five percent (45%) for COLI and/or GOLI policies sold by or enrolled by MRB; and (ii) twenty-seven percent (27%) for COLI and/or GOLI policies sold by or enrolled by ILA.

(5) All IOLI Profits and Losses (other than losses resulting from Shared Expenses) of the Company for each Fiscal Year (or part thereof) as determined for federal income tax purposes, will be allocated forty-five percent (45%) to ILA (the "ILA IOLI Initial Percentage"), forty-five percent (45%) to MRB (the "MRB IOLI Initial Percentage") and ten percent (10%) to Ross;

(b) **Profits From Capital Transactions**. All Capital Transaction Profits and Losses of the Company for each Fiscal Year (or part thereof) as determined for federal income tax purposes, will be allocated forty-five percent (45%) to ILA, forty-five percent (45%) to MRB and ten percent (10%) to Ross.

(c) **Losses and Expenses**. Except as provided in subsection (f) below, for purposes of Section 4(a) above, the Company's items of loss resulting from Shared Expenses shall be apportioned evenly between ILA and MRB (so long as they are then Members, otherwise their successors, if any).

(d) **Future Adjustment of MRB and ILA Allocations**. MRB's and ILA's splits of BOLI Profits and Losses, COLI Profits and Losses and GOLI Profits and Losses set forth above shall be readjusted annually beginning on the third anniversary of the date of creation of the first PBT Trust, based upon the proportion of policies enrolled by MRB and ILA in PBT Trust(s), provided, however, that in no event shall: (i) MRB's interest in BOLI Profits and Losses or ILA's interest in COLI Profits and Losses ever fall below forty-five percent (45%); and/or (ii) ILA's interest in BOLI Profits and Losses or MRB's interest in COLI Profits and Losses ever fall below nine percent (9%). Once either ILA or MRB has enrolled a minimum of 25,000 lives in PBT Trusts, such Party's share of BOLI Profits and Losses, COLI Profits and Losses and GOLI Profits and Losses shall be as set forth in Section 4(a) above and shall not be otherwise re-adjusted thereafter. MRB and ILA each acknowledge and agree that no adjustment shall ever be made to Ross's 10% interest in BOLI Profits and Losses, COLI Profits and Losses and/or IOLI Profits and Losses, pursuant to this subsection 4(d), other than reductions caused by a sale of all or a portion of Ross's Membership Interest in the Company or through dilution caused by the contribution of additional capital to the Company by new members having no affiliation, direct or indirect, with ILA, MRB, or any of their respective members.

### (e) **Regulatory Allocations**.

(1) Qualified Income Offset. No Member shall be allocated losses or deductions to the extent the allocation causes a Member to have an Adjusted Capital Account Deficit. If a Member receives an allocation of Loss or deduction (or item thereof) or any distribution, which causes the Member to have an Adjusted Capital Account Deficit at the end of any taxable year, then all items of income and gain of the Company (consisting of a pro rata portion of each item of Company income, including gross income and gain) for that taxable year shall be allocated to that Member, before any other allocation is made of Company items for that taxable year, in the amount and in proportions required to eliminate the excess as quickly as possible. This subsection (f) is intended to comply with, and shall be interpreted consistently with, the "qualified income offset" provisions of the Regulations promulgated under IRC Section 704(b).

(2) Minimum Gain Chargeback. Except asset forth in Regulation Section 1.704-2(f)(2), (3), and (4), if, during any taxable year, there is a net decrease in Minimum Gain, each Member, prior to any other allocation pursuant to this Section 4, shall be specially allocated items of gross income and gain for such taxable year (and, if necessary, subsequent taxable years) in an amount equal to that Member's share of the net decrease of Minimum Gain, computed in accordance with Regulation Section 1.704-2(g). Allocations of gross income and gain pursuant to this subsection shall be made first from gain recognized from the disposition of Company assets subject to nonrecourse liabilities (within the meaning of the Regulations promulgated under Code Section 752), to the extent of the Minimum Gain attributable to those assets, and thereafter, from a pro rata portion of the Company's other items of income and gain for the taxable year. It is the intent of the parties hereto that any allocation pursuant to this Section 4.3.2 shall constitute a "minimum gain chargeback" under Regulation Section 1.704-2(f).

(3) Contributed Property and Book-ups. In accordance with IRC Section 704(c) and the Regulations thereunder, as well as Regulation Section 1.704-1(b)(2)(iv)(d)(3), income, gain, loss, and deduction with respect to any property contributed (or deemed contributed) to the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of the property to the Company for federal income tax purposes and its fair market value at the date of contribution (or deemed contribution). If the adjusted book value of any Company asset is adjusted as provided herein, subsequent allocations of income, gain, toss, and deduction with respect to the asset shall take account of any variation between the adjusted basis of the asset for federal income tax purposes and its adjusted book value in the manner required under IRC Section 704(c) and the Regulations thereunder. The Executive Committee shall determine the applicable method of applying IRC Section 704(c) and the Regulations thereunder.

(4) IRC Section 754 Adjustment. To the extent an adjustment to the tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Regulation Section 1.704-1 (b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of the adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment

decreases basis), and the gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to that Section of the Regulations.

(5) <u>Nonrecourse Deductions</u>. Nonrecourse Deductions for a taxable year or other period shall be specially allocated among the Members in proportion to their Membership Interests.

(6) <u>Unrealized Receivables</u>. If a Member's Membership Interest is reduced (provided the reduction does not result in a complete termination of the Member's Member Interest), the Member's share of the Company's "unrealized receivables" and "substantially appreciated inventory" (within the meaning of Code Section 751) shall not be reduced, so that, notwithstanding any other provision of this Agreement to the contrary, that portion of the Profit otherwise allocable upon a liquidation or dissolution of the Company pursuant to Section 4.4 hereof which is taxable as ordinary income (recaptured) for federal income tax purposes shall, to the extent possible without increasing the total gain to the Company or to any Member, be specially allocated among the Member s in proportion to the deductions (or basis reductions treated as deductions) giving rise to such recapture. Any questions as to the aforesaid allocation of ordinary income (recapture), to the extent such questions cannot be resolved in the manner specified above, shall be resolved by the Executive Committee.

(7) <u>Withholding</u>. All amounts required to be withheld pursuant to Code Section 1445 or 1446 or any other provision of federal, state, or local tax law shall be treated as amounts actually distributed to the affected Members for all purposes under this Agreement.

**(f) Shared Expenses.** Notwithstanding the other provisions of this Section 4 (other than Section 4(e)): (1) for so long as the Shared Expenses Account is greater than $0, all items of loss, expense and other deductions shall first be allocated 50% to MRB and 50% to ILA until they have been allocated an amount equal to their aggregate Shared Expenses and second pursuant to the other provisions of this Section 4; and (2) items of income and gain shall be allocated first, 50% to MRB and 50% to ILA until they have been allocated an amount of income and gain equal to the amount of loss, expense and deduction allocated pursuant to Section 4(f)(1), and second, in the same amount and proportions as the cumulative distributions previously made pursuant to Section 5(a), and any remaining items of income pursuant to the other provisions of this Section 4.

## SECTION 5. DISTRIBUTIONS

### (a) Initial Distributions.

(1) Prior to making any distributions in accordance with clauses (b), (c), (d), (f) and (g) of this Section 5, any Distributable Cash From BOLI Operations, Distributable Cash From COLI Operations and Distributable Cash From IOLI Operations up to the amount of Shared Expenses shall be distributed to ILA and MRB. Such distributions shall be made on a *pro rata* basis, based on the percentage that the Shared Expenses paid for by such Party bears to the aggregate Shared Expenses paid for by both ILA and MRB, and their respective principals or affiliates.

(2) If the Company requires loans to pay Company costs and expenses, incurred after September 1, 2009, ILA and MRB (so long as ILA and MRB are then Members, otherwise the remaining Member of such Members or their successors, if any), by unanimous consent, may issue a call for additional loans to be taken by the Company either from third-parties, including banks or other funding sources, or from ILA and MRB on commercially reasonable terms. If such loans are required to pay any invoices or other outstanding amounts for goods or services acquired or received after September 1, 2009, to which ILA and MRB have previously agreed should be purchased or incurred on behalf of the Company, neither MRB nor ILA may refuse consent to such additional loans to pay such outstanding invoices or amounts, and the unanimous consent of ILA and MRB for additional loans to pay such amounts is presumed. In the event ILA and MRB are requested to make additional loans to pay expenses of the Company, each shall loan the Company one-half of the required amount. Failure of either ILA or MRB to provide its half of the required loan amount shall entitle the party that advances its portion of the loan to recover two (2) times the amount of such loan from the distributions of the defaulting party. For the sake of clarity, Ross is not obligated to make any loans to the Company.

### (b) Distributions of Distributable Cash From BOLI Operations.

(1) Except as otherwise provided in clause (b)(2) and subsection (e), Distributable Cash From BOLI Operations for each Fiscal Year (or part thereof) will be distributed seventy-two percent (72%) to MRB, eighteen percent (18%) to ILA and ten percent (10%) to Ross; and

(2) Distributable Cash From BOLI Operations for each Fiscal Year (or part thereof) which are attributable to an ILA Strategic Partner shall be distributed forty-five percent (45%) to ILA, forty-five percent (45%) to MRB and ten percent (10%) to Ross.

### (c) Distributions of Distributable Cash From COLI Operations.

(1) Except as otherwise provided in clause (c)(2) or subsection (e), Distributable Cash From COLI Operations for each Fiscal Year (or part thereof) will be distributed seventy-two percent (72%) to ILA, eighteen percent (18%) to MRB and ten percent (10%) to Ross; and

(2) In the event that the Company utilizes the MC Methodology, MRB's share of Distributable Cash From COLI Operations specifically derived from utilizing the MC Methodology shall be increased to: (i) forty-five percent (45%) for COLI and/or GOLI policies sold by or enrolled by MRB; and (ii) twenty-seven percent (27%) for COLI and/or GOLI policies sold by or enrolled by ILA.

(d) **Distributions of Distributable Cash From IOLI Operations**. Distributable Cash From IOLI Operations for each Fiscal Year (or part thereof) will be distributed forty-five percent (45%) to ILA, forty-five percent (45%) to MRB and ten percent (10%) to Ross.

(e) **Future Adjustment of MRB and ILA Allocations**. MRB's and ILA's splits of Distributable Cash From BOLI Operations, BOLI Profits and Distributable Cash From COLI Operations set forth above shall be readjusted annually beginning on the third anniversary of the date of creation of the Company, based upon the proportion of policies enrolled by MRB and ILA in PBT Trust(s), provided, however, that in no event shall: (i) MRB's interest in Distributable Cash From BOLI Operations or ILA's interest in Distributable Cash From COLI Operations ever fall below forty-five percent (45%); and/or (ii) ILA's interest in Distributable Cash From BOLI Operations or MRB's interest in Distributable Cash From COLI Operations ever fall below nine percent (9%). Once either ILA or MRB has enrolled a minimum of 25,000 lives in PBT Trusts, such Party's Membership Percentage Interest shall be its Initial Percentage Interest, and except for readjustments pursuant to Section 3(b) hereof, shall not be otherwise re-adjusted thereafter. MRB and ILA each acknowledge and agree that no adjustment shall ever be made to Ross' 10% interest in Distributable Cash From BOLI Operations, Distributable Cash From COLI Operations and/or Distributable Cash From IOLI Operations other than due to a sale of all or a portion of Ross' membership interest in the Company or through dilution caused by the contribution of additional capital to the Company by new members having no affiliation, direct or indirect, with ILA, MRB, or any of their respective members.

(f) **Distributions of Distributable Cash From Capital Transactions**. Subject to Section 12(b) regarding liquidating distributions, Distributable Cash From Capital Transactions will be distributed forty-five percent (45%) to ILA, forty-five percent (45%) to MRB and ten percent (10%) to Ross.

(g) **Liquidation and Dissolution.** If the Company is liquidated, the assets of the Company shall be distributed to the Members in accordance with the provisions of Section 12 of this Agreement, after taking into account the allocations of profit or loss, if any, pursuant to Sections 4, and distributions, if any, of cash or property, if any, pursuant to Sections 5. No Member shall be obligated to restore a Negative Capital Account.

(h) **Effect of Distributions.** No distribution made pursuant to any of Sections 5(a) through 5(g) shall affect any Member's Membership Percentage Interest.

## SECTION 6. MANAGEMENT

(a) **Management of BOLI Transactions.** MRB shall have the exclusive right to manage all aspects of the Company's involvement with BOLI with respect to any PBT Trust. Notwithstanding the foregoing, the Parties acknowledge that ILA and its principals retain the right to negotiate with banks, including foreign banks and those that have large capital markets groups or which are primary dealers, to participate in broader strategic businesses. ILA and its principals are free to conduct those negotiations in their sole discretion, and without MRB's interference. The parties also acknowledge that ILA and its principals generally have significant contacts with banks and other institutions and contemplate that so long as any efforts on their part related to such contacts do not have an adverse impact on MRB's ability to enroll lives in a PBT Trust, ILA and its principals will continue to maintain and develop such contacts to further the business of the Company, including the sale or enrollment of BOLI (including BOLI not related to an ILA Strategic Partner). ILA shall not enter into any transaction for the creation, sale, or structure of BOLI policies, or the enrollment of BOLI policies in a trust, without MRB's prior written consent, which consent shall not be unreasonably withheld or delayed. With respect to a BOLI policy in respect of which a participant in a PBT Trust is not reasonably likely to pay the related upcoming premium payment if policy values are insufficient to continue the policy in force at prescribed NAR levels, or which is otherwise reasonably likely to lapse, the Company (acting at the direction of MRB) shall have the first right to purchase such policy on behalf of the PBT Trust to which the NAR of such BOLI policy is assigned, provided that the Company has obtained the proper authorizations and approvals for such purpose. The Company must exercise its right as a ready, willing and able purchaser to purchase such BOLI on behalf of the PBT Trust to which the NAR of such BOLI policy is assigned within (i) twenty (20) days of receiving notice that a participant in a PBT Trust is not reasonably likely to pay the related upcoming premium payment, or that such BOLI policy is otherwise reasonably likely to lapse; or (ii) five (5) business days prior to the lapse date of any such BOLI policy, whichever is earlier. If the Company does not exercise its right to purchase a particular BOLI policy on behalf of the PBT Trust to which the NAR of such BOLI policy is assigned, ILA shall have the exclusive right to purchase or arrange for the sale of such BOLI policy and shall be entitled to remove the related NAR from any PBT Trust and retain any compensation related to such sale. Moreover, MRB and Ross acknowledge that, prior to enrollment of a policy in a PBT Trust, ILA may arrange for the direct purchase of policies, including, without limitation, BOLI, where the age of the insured is over the age of approximately 67 years (an "Age Policy"). Accordingly, neither MRB (and MRB shall cause its principals not to) nor Ross may dissuade any client or potential client of IPB or any PBT Trust, or create any barrier to such purchase of an Age Policy, unless such purchase would result in a material negative tax consequence for the bank or institution selling such policy. Furthermore, MRB may establish and administer separate PBT Trusts for BOLI and IOLI; provided, that it shall administer any such PBT Trust in good faith for the benefit of the Company, which shall include, without limitation, transferring all related BOLI Profits and Losses, COLI Profits and Losses and IOLI Profits and Losses to the Company. The financial results of any such separate PBT Trust, including, without limitation, the death benefits collected by such separate PBT Trust, shall be pooled with other PBT Trusts established by the Company or ILA pursuant to Section 6(b) hereof, or contributed to a separate entity whose

members, shareholders or partners are other PBT Trusts established by the Company or ILA under Section 6(b), pursuant to a written agreement (including, without limitation, a derivative instrument (*e.g.* a swap) or operating agreement), as agreed to by MRB and ILA. ILA and MRB shall execute any such written agreement in form and substance reasonably acceptable to them to effectuate the pooling of the mortality experience for such separate PBT Trusts. Notwithstanding the foregoing, MRB may choose, at its sole discretion, to separate any PBT Trusts established by it from pooling its financial results or mortality experience with other PBT Trusts so long as the number of lives in the remaining pool of PBT Trusts from which it is separating exceeds 25,000 lives in the aggregate after separation, and so long as all BOLI Profits and Losses, Distributable Cash from BOLI Operations, all COLI Profits and Losses, Distributable Cash from COLI Operations, all IOLI Profits and Losses and Distributable Cash from IOLI Operations associated with such separated PBT Trusts are transferred to the Company. If other PBT Trusts wish to separate, priority will be given to those PBT Trusts who provide earlier notice to the Company of their intent to separate.

(b) **Management of COLI and GOLI Transactions.** ILA shall have the exclusive right to manage all of the Company's involvement with COLI and GOLI with respect to any PBT Trust. Notwithstanding the foregoing, the parties acknowledge that MRB and its principals have significant contacts with banks and other institutions and contemplate that so long as any efforts on their part related to such contacts do not have an adverse impact on ILA's ability to enroll lives in a PBT Trust, MRB and its principals will continue to maintain and develop such contacts to further the business of the Company, including the sale or enrollment of COLI and GOLI. Neither MRB nor any of its affiliates, shareholders or principals (including MC) shall enter into any transaction for the creation, sale, or structure of COLI and/or GOLI policies or the enrollment of COLI and/or GOLI policies in a trust, without ILA's prior written consent, which consent shall not be unreasonably withheld. With respect to a COLI, IOLI and/or GOLI policy in respect of which a participant in a PBT Trust is not reasonably likely to pay the related upcoming premium payment if policy values are insufficient to continue the policy in force at prescribed NAR levels, or which is otherwise reasonably likely to lapse, ILA shall have the first right to purchase or arrange for the sale of such COLI, IOLI and/or GOLI policy and shall be entitled to remove the related NAR from any PBT Trust and retain any compensation related to such sale. Furthermore, ILA may establish and administer separate PBT Trusts for COLI, GOLI, and IOLI, and for BOLI of an ILA Strategic Partner enrolled by ILA; provided, that (i) any BOLI of an ILA Strategic Partner enrolled by ILA shall be charged the same pricing charged by MRB with respect to any BOLI enrolled in a PBT Trust, and (ii) it shall administer any such PBT Trust in good faith for the benefit of the Company, which shall include, without limitation, transferring all related BOLI Profits and Losses, COLI Profits and Losses and IOLI Profits and Losses to the Company. The financial results of any such separate PBT Trust, including, without limitation, the death benefits collected by such separate PBT Trust, shall be pooled with other PBT Trusts established by the Company or MRB or contributed to a separate entity whose members, shareholders or partners are other PBT Trusts established by the Company or MRB under Section 6(a), pursuant to a written agreement (including, without limitation, a derivative instrument (*e.g.* a swap) or operating agreement), as agreed to by MRB and ILA. ILA and MRB shall execute any such written agreement in form and substance reasonably acceptable to them to

16 | P a g e

effectuate the pooling of the mortality experience for such separate PBT Trusts. Notwithstanding the foregoing, ILA may choose, at its sole discretion, to separate any PBT Trusts established by it from pooling its financial results or mortality experience with other PBT Trusts so long as the number of lives in the remaining pool of PBT Trusts from which it is separating exceeds 25,000 in the aggregate after separation , and so long as all BOLI Profits and Losses, Distributable Cash from BOLI Operations, all COLI Profits and Losses, Distributable Cash from COLI Operations, all IOLI Profits and Losses and Distributable Cash from IOLI Operations associated with such separated PBT Trusts are transferred to the Company. If other PBT Trusts wish to separate, priority will be given to those PBT Trusts who provide earlier notice to the Company of their intent to separate.

(c) **New Patent Use.** In the event that any Member formulates a use for the patent (the "Formulating Member") that does not involve BOLI, COLI, GOLI or IOLI (a "New Patent Use"), the Formulating Member may present such New Patent Use to the Executive Committee and request that the Executive Committee allow any Member to use the Patent for the New Patent Use. In determining whether to allow approve use of the Patent for the New Patent Use, the Executive Committee shall be subject to the business judgment rule. Distributable Cash From a New Patent Use and New Patent Use Profits and Losses shall be divided among the Members in accordance with their unanimous agreement.

(d) **Joint Covenant Not to Damage Trust.** For the sake of clarity, ILA, MRB, Ross and their respective principals will be permitted to employ any necessary and reasonable actions and/or strategies in order to minimize the lapse of policies whose NARs have been assigned to the Trust. Further, each party to this Agreement covenants with each other party that it will not take any action that will harm, damage or impair the stability, marketability or integrity of any PBT Trust. For the sake of further clarity, the Parties acknowledge that activities contemplated by the Settlement Agreement shall not be construed as harming or causing damage to any PBT Trust.

(e) **Management by Executive Committee.** Except as otherwise provided in subsections (a) and (b), the Company shall be managed by a committee, consisting of a designated member of MRB and a designated member of ILA (the "Executive Committee"). Except as otherwise provided in this Agreement, or any written amendment hereto, all decisions regarding the management of the Company are within the purview of the Executive Committee and shall only be made by unanimous vote of the Executive Committee.

(f) **Delegation of Authority.** Except as otherwise required or specifically limited by any of the terms of this Agreement, or by non-waivable provisions of applicable law, the Executive Committee may delegate its powers to one or more persons. In furtherance of the foregoing, the Executive Committee shall have the right to appoint any officers of the Company and authorize such officers to negotiate and execute agreements, instruments, certificates and any other documents, and to exercise any other powers set forth in such appointment.

**(g) Powers.** Except as otherwise provided in subsections (a) and (b), the Executive Committee will have the following rights and powers, which the Executive Committee may exercise at the cost, expense and risk of the Company:

(1) To carry out and implement any and all of the purposes of the Company;

(2) To engage the services of and consult with counsel, accountants and other consultants to the extent that is mutually deemed necessary, advisable, appropriate or convenient to carry out and implement any and all of the purposes of the Company;

(3) To employ the financial and other resources of the Company in the exercise of any rights or powers possessed by it hereunder or under this Act;

(4) To purchase from or through others contracts of liability, casualty and other insurance which is deemed advisable, appropriate or convenient for the protection of the Company, the Members, the Company's employees and agents, the assets or affairs of the Company, or for any other purpose convenient or beneficial to the Members;

(5) To execute, acknowledge and deliver powers of attorney, consents, waivers and other documents in connection with the business and affairs of the Company, including any proceeding before any court, arbitrator or board of arbitration, administrative board or agency or any governmental authority effecting the Company;

(6) To purchase, sell, transfer, pledge or otherwise exercise or acquire all rights, powers, privileges and other incidents of ownership or possession with respect to securities;

(7) To acquire securities on the basis of investment representations and/or subject to transfer restrictions;

(8) Subject to clause (f) below, to open, maintain and close bank and brokerage accounts, draw checks, or other orders for the payment of money;

(9) To acquire long positions with respect to securities, and make purchases or sales increasing, decreasing or liquidating such positions without any limitation as to the frequency of the fluctuation in such positions;

(10) To act in concert with others to achieve the foregoing objects and purposes;

(11) To execute and file all documents and take any other actions necessary to comply with all federal and state laws regulating securities;

(12) To take any action as is customary in the ordinary course of business of an investment partnership;

(13) To file on behalf of the Company all required local, state and federal tax returns relating to the Company or its assets and to make elections with respect thereto;

(14) To pay any and all fees and expenses incurred in the organization of the Company; and

(15) To cause the Company to borrow money and to obtain extensions of credit that are necessary for the operation of the Company and to do all other things necessary and incidental thereto.

(h) **Bank Accounts.** ILA and MRB shall together have the exclusive right to manage any bank accounts maintained by the Company and to authorize any withdrawals therefrom, including jointly setting the terms and appointing representatives with signing authority over such bank accounts.

(i) **Brokers.** ILA and MRB agree that (a) MRB will not knowingly or intentionally require the disintermediation of brokers with respect to BOLI of any ILA Strategic Partner without the written consent of such ILA Strategic Partner and (b) ILA will not knowingly or intentionally discourage ILA Strategic Partners from replacing its existing brokers in favor of MRB and/or its designee. Nothing herein is intended or should be construed as providing MRB the right to disintermediate brokers with respect to COLI, GOLI or any policies placed in a PBT Trust established by ILA.

## SECTION 7. LIABILITY OF MEMBERS

(a) **Liability of Parties.** The Executive Committee will not be liable to the Company or to any other Member for (i) the performance, or the omission to perform any act or duty on behalf of the Company if, in good faith, such conduct did not constitute fraud, gross negligence or reckless or intentional misconduct and (ii) the performance, or the omission to perform, on behalf of the Company, any act upon good faith reliance on advice of legal counsel, accountants or other professional advisors to the Company.

## SECTION 8. TRANSFERABILITY OF MEMBERSHIP INTERESTS

(a) **Basic Restrictions.** A Member may not Transfer all or part of the Member's Membership Interest to a person or entity (hereinafter sometimes referred to as an "Assignee") unless the Transfer is made in accordance with the provisions of this Section 8.

(b) **Transfers by Members.** During the lifetime of a Member, a Member may only Transfer all or a portion of his or her Membership Interest if (i) the Transfer is to a Permitted Transferee, (ii) the Transfer is approved in writing by the remaining Members, or (iii) the Transfer is from a Bankrupt Member in accordance with Section 8(c) below or (iv) after the

Company and the other Members have been given the right of first refusal as set forth in the remainder of this subsection (b).

(1) <u>Right of First Refusal</u>. If a Member (hereinafter in this Section sometimes referred to as the "Selling Member") receives a bona fide written offer (an "Offer") from an unrelated third party (the "Offeror") to purchase all or any portion of such Member's Membership Interest (the "Offered Interest") and the Selling Member desires to accept such offer, the Selling Member shall first give written notice of the offer (the "Offer Notice") along with a copy of the Offer to the Company and shall offer to sell the Offered Interest to the Company. The offer to the Company shall be at a price and upon terms no less favorable to the Company or more favorable to the Selling Member than those contained in the Offer and may be accepted by the Company within thirty (30) days of the date the Company received the Offer Notice. The Offer Notice shall contain the terms and conditions upon which the Selling Member is willing to sell to the Company or the other Members, as the case may be. If the Company fails to accept the offer made by the Selling Member within thirty (30) days of the receipt of the Offer Notice then ILA and MRB (so long as ILA and MRB are then Members, otherwise the remaining Member of such Members or their successors, if any) other than the Selling Member shall have the opportunity for a further period of fifteen (15) days immediately after the expiration of the Company's thirty (30) day purchase period to accept the offer set forth in the Offer Notice. If more than one Member desires to purchase the Offered Interest, they shall purchase the Offered Interest in proportion to their relative Membership Interests or in such other proportion as they may agree.

(2) <u>Sale to Offeror</u>. If neither the Company nor the other Members accept the Selling Member's offer to purchase the Offered Interest within the time periods described above, the Selling Member may, within ninety (90) days from the expiration of the fifteen-day period the other Members had to accept the offer, sell the Offered Interest to the Offeror at a price not less than the price, and on terms not less favorable to the Selling Member than the terms, at which the Offered Interest was offered to the Company and the other Members, provided that any such sale shall be specifically conditioned upon the Offeror honoring any Tag Along Rights of the other Members. No sale to the Offeror shall be permitted or shall be recognized by the Company unless the Offeror agrees in writing to be bound by, and to hold the Offered Interest subject to, the terms and conditions of this Agreement, including without limitation any Tag Along Rights and the restrictions on Transfer set forth in this <u>Section 8</u>. If the Offered Interest is not so sold to the Offeror within the ninety-day period described in this subsection, the Selling Member shall not thereafter sell all or any portion of his or her Membership Interest unless the Company and the other Members are again given a right of first refusal as proved in this subsection (b).

(3) <u>Sale to Company or Other Members</u>. If the Company or the other Members accept the offer of the Selling Member to sell the Offered Interest, the closing of such sale shall occur at the principal office of the Company no later than ninety (90) days after the acceptance of such offer. The purchase price for the Offered Interest shall be paid on the terms and conditions set forth in the Offer Notice.

(4) Successive Transfers. If a Membership Interest is transferred under this Section 8 to a Permitted Transferee, the only Permitted Transferees of such Assignee (and of any subsequent Assignee of such transferred Membership Interest or any portion thereof) shall be the Permitted Transferees of the original transferor Member.

(5) Tag Along Right. If a Selling Member proposes to transfer any portion of its Membership Interest, other than to a Permitted Transferee, then each of the Members other than the Selling Member ("Tag-Along Members") shall have the right ("Tag Along Right") to require the Offeror to purchase from such Tag-Along Member up to that percentage of the Tag-Along Member's Membership Interest calculated by dividing the Membership Interest percentage to be purchased by the Offeror and the product of (i) the total Membership Interest percentage owned by Selling Member and (ii) three. Any Membership Interest purchased from Tag-Along Members pursuant to this Section shall be paid for at the same price per Membership Interest percentage and upon the same terms of payment as such proposed transfer by the Selling Member.

(c) **Bankruptcy of a Member; Involuntary Transfers.** If any Member becomes Bankrupt (such Member, a "Bankrupt Member"), the following shall apply:

(1) The trustee in bankruptcy or other successor in interest of the Bankrupt Member shall be entitled to receive the shares of revenues and other income, receipts, or gain which the Bankrupt Member would have been entitled to receive under the terms of this Agreement (net of the Member's share of the Company costs, expenses and losses) until the time, if any, that the Membership Interest of the Bankrupt Member is purchased as described in subsection (b), but the trustee in bankruptcy or other successor in interest shall not thereby become a Member, nor have any of the other rights herein conferred upon the Bankrupt Member.

(2) At any time after the occurrence of the bankruptcy, (i) if the Bankrupt Member is Ross, the other Members shall each have the right, but not the obligation, to purchase 50% of Ross' Membership Interest for its fair market value, as determined in an independent appraisal performed by a certified public accountant or other qualified appraiser selected by such other Members, (ii) if the Bankrupt Member is ILA, only MRB shall have the right, but not the obligation, to purchase ILA's Membership Interest for its fair market value, as determined in an independent appraisal performed by a certified public accountant or other qualified appraiser selected by MRB and reasonably acceptable to ILA, and (iii) if the Bankrupt Member is MRB, only ILA shall have the right, but not the obligation, to purchase MRB's Membership Interest for its fair market value, as determined in an independent appraisal performed by a certified public accountant or other qualified appraiser selected by ILA and reasonably acceptable to MRB. Unless the Members (other than the Bankrupt Member) currently intend to liquidate the Company, the fair market value of the Bankrupt Member's Interest shall be determined based on the Bankrupt Member's right to receive distributions from the Company, assuming the Company will continue as a going concern, rather than on the basis of a hypothetical liquidation of the

Company. The appraiser shall take all relevant facts and circumstances into account, including, without limitation, minority discounts, lack of liquidity and restrictions on Transfer.

(3) If all or a portion of the Membership Interest held by a Member is transferred involuntarily or by operation of law (including without limitation a Transfer made in connection with divorce proceedings), and if the Company is compelled by law, judicial process or otherwise to recognize such Transfer, then the Member who held such Membership Interest shall be considered a Bankrupt Member, and the provisions of subsections (a) and (b) above shall apply to the Membership Interest (or portion thereof) that was transferred involuntarily or by operation of law.

(d) **Admission of Assignee as Substitute Member.** An Assignee who acquires all or any portion of an existing Member's Membership Interest shall not be admitted to the Company as a substitute Member unless, in addition to meeting the other requirements set forth in this Section 8, the additional requirements set forth in this subsection (d) are satisfied:

(1) the non-assigning Members consent to such substitution, which consent may be given or withheld for any reason which the non-assigning Members deem appropriate or for no reason;

(2) the assigning Member grants the Assignee the right to be admitted as a substitute Member, provided however, that such grant shall not be required in the case of a Transfer which occurs by reason of the death, dissolution or bankruptcy of the assigning Member;

(3) the Assignee shall have accepted and agreed to be bound by the terms and provisions of this Agreement by executing a counterpart thereof and other documents or instruments as the non-assigning Members may require in order to effect the admission of the Assignee as a Member; and

(4) if required by the non-assigning Members, the Assignee pays to the Company a sum that is sufficient to cover all expenses (including legal fees) connected with the admission of the Assignee as a substitute Member pursuant to this Agreement and the Act.

(e) **Effect of Prohibited Transfer.** Any purported Transfer in violation of the provisions of this Section 8 shall be null and void and any non-transferring Member, in addition to any other remedies available under this Agreement and at law, in equity and otherwise, may seek to enjoin the Transfer and the transferring Member, or the Member's legal representatives, agrees to submit to the jurisdiction of any court of the State of Delaware and to be bound by any order of the court enjoining the purported Transfer. If a Transfer of a Membership Interest occurs (including a Transfer otherwise prohibited hereby that the Company is compelled by law, judicial process or otherwise to recognize), the Assignee shall have only the rights of an assignee who is not admitted as a Member unless the transferee is admitted as a Member pursuant to subsection (e) below. An Assignee shall: (i) only acquire the transferor's rights to distributions

and allocations as provided in this Agreement with respect to the Membership Interest (or part thereof) subject to such Transfer (which, as to distributions, shall be subject to the Company's right of offset to satisfy any debts, obligations or liabilities that the transferor Member or the Assignee may have to the Company); (ii) have no rights to any information or accounting of the affairs of the Company; (iii) not be entitled to inspect the books or records of the Company; (iv) not have any other rights conferred on a Member in this Agreement or by law (including, where applicable, the right to grant or withhold approval on any matter that requires the approval of the Members under this Agreement or by law); and (v) not have any right to receive notice of any act, circumstance, event or proposed event or action of which Members are otherwise entitled to receive notice pursuant to this Agreement, or on which Members are otherwise entitled to act or to express consent or dissent. Nevertheless, in the event any purported Transfer that is not in compliance with this Agreement is enforced by a court or tribunal of competent jurisdiction, the transferee's interest shall be fully subject to the restrictions and other provision of this Agreement, and shall be redeemable at the Company's sole option for a purchase price of One Dollar ($1.00).

## SECTION 9. TERMINATION OF THIS AGREEMENT

This Agreement shall terminate upon the dissolution of the Company, in accordance with Section 12 of this Agreement.

## SECTION 10. BOOKS AND RECORDS; ACCOUNTING AND TAX ELECTIONS

(a) **Maintenance of Records**. The Company will maintain true and correct books and records, in which all transactions of the Company will be entered, and will maintain all other records necessary, convenient or incidental to recording the Company's business and affairs, which will be sufficient to record the allocation of profits and losses and distributions as provided for herein. All decisions as to accounting principles, accounting methods and other accounting matters shall be made by the Executive Committee.

(b) **Reports to Members**. As soon as practicable after the end of each Fiscal Year, the Company (i) will cause to be prepared and sent to each Member a balance sheet and a statement of income and expenses for the Company which may, but need not, be audited by a certified public accountant, and (ii) will cause to be prepared and sent to each Member a report setting forth in sufficient detail all such information and data with respect to the Company for such Fiscal Year as shall enable each Member to prepare his income tax returns in accordance with the laws, rules and regulations then prevailing. The Company will also cause to be prepared and filed all tax returns required of the Company. All balance sheets, statements, reports and tax returns required pursuant to this Section 10(b) shall be prepared at the expense of the Company.

(c) **Tax Election; Determinations Not Provided for in Agreement**. The Executive Committee will be empowered to make or revoke any elections now or hereafter required or permitted to be made by the Code or any state or local tax law, and to decide in a fair and equitable manner any accounting procedures and other matters arising with respect to the

Company or under this Agreement which are not expressly provided for in this Agreement. Notwithstanding the foregoing, neither the Company nor any Member shall make an election for the Company to be excluded from taxation as a partnership under the Code or any state or local law, and no provision of this Agreement will be construed to sanction or approve any such election.

**(d) Tax Matters Member**. MRB is to be the "tax matters partner" of the Company pursuant to the requirements of the Code.

## SECTION 11. REPAYMENT OF LOANS AND ADVANCES

In the event of a dissolution of the Company, all loans, advances, exchanges and accounts of any nature whatsoever between the Company and a Member, whether owing to or by the Company, shall become due and payable on the date on which equitable title to such Membership Interest is transferred.

## SECTION 12. DISSOLUTION AND LIQUIDATION; TERMINATION AND WITHDRAWAL

**(a) Dissolution**. The Company will dissolve and its affairs will be wound up only upon the unanimous vote and written consent of all Members, except Ross.

**(b) Liquidation**.

(i) Upon a dissolution of the Company requiring the winding-up of its affairs, the Company shall wind up its affairs, including, but not limited to, the collection of the Company's accounts receivable. The tangible assets of the Company may be sold to the extent deemed practicable and prudent by the Executive Committee, within a reasonable period of time, to the extent necessary to pay or provide for the payment of all debts and liabilities of the Company.

(ii) The net assets of the Company remaining after satisfaction of all debts and liabilities of the Company and the creation of any reserves, shall be distributed to the Members first in accordance with their positive Capital Account balances as of the date of such distribution, after giving effect to all contributions, distributions and allocations for all periods, including the period during which such liquidation occurs, with the balance, if any to be distributed to the Members in accordance with their Membership Interests. Any property distributed in kind in the liquidation shall be valued at fair market value.

(iii) Distribution to Members, pursuant to this Section 12, shall be made by the end of the taxable year of the liquidation, or, if later, ninety (90) days after the date of such liquidation in accordance with Regulations Section 1.704-1(b)(2)(ii)(q).

(iv) The Executive Committee may withhold from distribution under this Section 12, such reserves which are required by applicable law and such other reserves relating to

pending or anticipated litigation or to Internal Revenue Service examinations. Any such reserves shall be held in a segregated interest-bearing account (which may be commingled with similar accounts). The unused portion of any reserve shall be distributed with interest thereon pursuant to this Section 12 after the Executive Committee shall have determined that the need therefore shall have ceased.

## SECTION 13. GENERAL PROVISIONS

(a) **Notices**. All notices or other communications to any Party to this Agreement, required or authorized under, pursuant to or relating to this Agreement and the transactions provided for herein, shall be in writing addressed to the Party at the address set forth in the introductory paragraph of this Agreement, or to such other address as any Party hereto may specify, in compliance with the requirements of this Section 13(a) for the giving of notice, and may also be given by electronic mail. All of such notices or other communications shall be deemed to have been duly given, made and received, when delivered to a Party, (i) as confirmed by a signed receipt, by United States certified mail or overnight courier service or (ii) if delivered by electronic mail, as confirmed by an acknowledgement by the recipient in writing or by automated electronic response.

(b) **Interpretation**.

(1) Section headings are not to be considered part of this Agreement, are included solely for convenience of reference and are not intended to be full or accurate descriptions of the contents thereof.

(2) Use of the work "including" or a like term shall be construed to mean "including but not limited to."

(3) Schedules and Exhibits to this Agreement are an integral part of this Agreement.

(4) Any reference to a provision of the Code, Regulations or the Act shall be construed to be a reference to any successor provision thereof.

(c) **Governing Law**. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to any conflict-of-laws rule or principle that might refer the governance, construction or interpretation of this Agreement to the laws of another jurisdiction.

(d) **Binding Agreement**. This Agreement shall be binding upon and inure to the benefit of the Members and their respective heirs, executors, administrators, personal representatives and successors and assigns.

(e) **Entire Agreement**. This Agreement (including the Exhibits and Schedules hereto) supersedes any and all other understandings and agreements, either oral or in writing, between the Members with respect to the Membership Interests and constitutes the sole and only agreement between the Members with respect to the Membership Interests. For avoidance of doubt, to the extent not expressly set forth in this Agreement, the agreements of the Parties, their respective principals and/or affiliates contained in the Settlement Agreement shall not be superseded by this Agreement and shall remain in full force and effect.

(f) **Amendment.** The provisions of this Agreement may be altered or amended only by written consent of all Members.

(g) **Further Action**. Each Member shall execute and deliver all papers, documents and instruments and perform all acts that are necessary or appropriate to implement the terms of this Agreement and the intent of the Members.

(h) **Parties Bound.** This Agreement shall be binding upon and shall inure to the benefit of any Person executing this Agreement as a Member or any person subsequently admitted to the Company as a Member, and their respective heirs, personal representatives, successors and assigns; except that no Member may assign or transfer his rights or obligations hereunder except in accordance with this Agreement.

(i) **Severability and Modification.** It is intended that each provision of this Agreement shall be viewed as severable, and if any provision shall be held to be invalid, the remaining provisions shall remain in full force and effect. In the event that any provision of this Agreement is determined by a court of competent jurisdiction to be contrary to any applicable statute, law or rule or for any reason unenforceable as written, such court may modify such provision so as to permit enforcement thereof as modified.

(j) **Counterparts**. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.

(k) **Gender; Number; Computation of Time.** All pronouns used herein shall include all genders and the singular and plural as the context requires. All days, including Saturdays, Sundays and holidays, shall be counted in computing periods defined by number of days.

(l) **No Third-Party Beneficiaries**. This Agreement shall not confer any rights or remedies upon any person other than the parties and their respective successors and permitted assigns.

(m) **Failure to Enforce.** The failure to enforce at any time any of the provisions of this Agreement or to require at any time performance by any other Party of any of the provisions hereof shall in no way be construed to be a waiver of such provisions or to affect either the

validity of this Agreement or any part thereof, or the right of any Party thereafter to enforce each and every provision in accordance with the terms of this Agreement.

**IN WITNESS WHEREOF**, the undersigned Members, intending to be legally bound hereby, have executed and agreed to the terms of this Agreement effective as of June 27, 2008.

**PBT SPONSORSHIP GROUP, LLC**

By:_____
    Name:
    Title:

**MRB POOLED BENEFITS, LLC**

By:_____
    Name:
    Title:

**INSTITUTIONAL LONGEVITY ASSETS LLC**

By:_____
    Name:
    Title:

## EXHIBIT A

| MEMBERS | Membership Interest | Membership Percentage Interest |
|---|---|---|
| MRB Pooled Benefits, LLC | 45% | 45% |
| PBT Sponsorship Group, LLC | 10% (non-voting membership interest) | 10% |
| Institutional Longevity Assets LLC | 45% | 45% |

4648806

H

# Exhibit H:

**Memorandum in Support of the Defendant's Motion to Compel Compliance with the June 26 Settlement Agreement:**

## I. Introduction

As addressed in the Motion, the revisions that are demanded by Simon and Meyer are modifications to, inconsistent with and contrary to the applicable plain language, terms and conditions in the Settlement Agreement. Paragraph 19 of the Settlement Agreement (which was inserted for inclusion by Simon in the very first draft Agreement distributed to the Parties) states (emphasis added):

> "This Agreement contains the *entire agreement* between the Parties relating to the rights herein granted and the obligations herein assumed......Any oral representation or *modification* concerning this Agreement shall be of no force or effect. <u>This Agreement can be modified only by a writing signed by all the Parties to this Agreement.</u>"

By virtue of the unambiguous language and terms of the above quoted Paragraph 19 and other provisions in the Settlement Agreement, no Party is required to accede to any modification, of any kind, to be included in the final document mandated in Paragraph 22. These provisions are also significantly detrimental to Ross' interests and they are in conflict with the purpose and probity of the Trust.

The following is an explanation of this issue:

## A. Shared Expenses

The concept of "Shared Expenses" is defined in Section 1, and again appears in Sections 4 and 5 of the December 2009 Draft (Exhibit G). It is an invention of Simon and Meyer and does not exist in the Settlement Agreement. Ross does not agree with this new term. Its inclusion represents a modification of the Settlement Agreement that requires the approval of all of the Parties.

Section 5(a)(1) "Initial Distributions" (a term also not resident in the Settlement Agreement) states that prior to making the initial distributions of "Distributable Cash" from various Trust operations, up to $1,000,000 of the distributable cash from net trust profits (cumulative) will be diverted to repay Simon and Meyer for certain "out of pocket costs and expenses", without distributing to Ross his 10% share, thus causing Ross to assume up to $100,000 of costs not anticipated in the Settlement Agreement.

Moreover, the out of pocket costs and expenses delineated in the Simon and Meyer's Shared Expenses definition are specifically required in the Settlement Agreement to be assumed *solely by Simon and Meyer*. Ross is not required to participate in the costs in connection with the formation and start-up of the company (see Paragraph 14 of Exhibit A), the acquisition of the Patent from AXA (see Paragraph 3 of Exhibit A) or expenses incurred by Simon and Meyer in connection with the required LLC Agreement or any post June 26, 2008 expenses regarding the Settlement Agreement (see Paragraph 14 of the Exhibit A Settlement Agreement).

2

As part of the Settlement Agreement Ross agreed to receive a minority equity interest level (10%), *without* voting rights and without any requirement for the assumption of operational expenses of *any* kind. Thus, the retroactive incorporation into the Settlement Agreement of Simon and Meyer's new and additional requirement represents a modification that is unacceptable to Ross and not mandated in any way by the Settlement Agreement.

## B. Procedures Covering Policy Lapses

There are no references whatsoever regarding procedures covering PBT policies in danger of lapsing (the "lapse procedure(s)"). The lapse references in Sections 6 (starting at end of line 14) of the December 2009 Draft represent a further substantial modification of the Settlement Agreement, and in a final document that purports to satisfy the requirements of Paragraph 22 of the Agreement, unless their inclusion is approved by all of the parties. Ross does not approve this modification.

In addition, these Procedures, which were not contemplated in the Settlement Agreement, can potentially allow for the "gaming" of the Trust in a number of ways that are harmful to its integrity. For instance, if a number of Trust participants may wish to make policy loans by removing all of their policy cash values as a means to facilitate an accelerated lapse, which would allow for exiting from the Trust. This would reduce the Trust population and potentially negatively affect the actuarial certitude of the Trust. This is also inconsistent with the requirements stated in Paragraph 15 of the Agreement. Ross also contends that a procedural issue of this type is by its very nature a function of

3

negotiation between the Parties and the PBT Trustee and does not belong in this document.

## C. Policy Purchase Rights

In regard to the actual execution of the aforementioned BOLI policy purchases, in Section 6(a) "the Company", which includes Simon, must effect the policy purchase "on behalf of the PBT Trust" within only 20 days, which is well short of the time it will normally take to underwrite and procure financing for such a purchase.

However, after 20 days have elapsed, Simon would be permitted to step out of his position as a member of the Company - which begs the issue of conflict of interest - and assume, *individually*, the exclusive right to purchase such policies (with no facilitation time constraints and no longer exclusively for the benefit of the PBT Trust) and *all compensation related to the sale is retained by him*. The language in Section 6(b) is identical except that Simon does not even have to wait the 20 day time period. Additionally, please note that the first sentence of Paragraph 12 of the Settlement Agreement reads as follows (emphasis added):

> "MC and SAVE acknowledge and agree with Balshe (Simon) that banks or companies that decide to assign the NAR (note - death benefit minus policy cash value = NAR) of any policies held by them into a PBT Trust may be given, prior to enrollment, an option for BOLI and/or option or mandate for COLI and/or GOLI, as appropriate, to sell policies on lives approximately aged 67 or older to an asset management company affiliated with Balshe or other third party investors (an "Age Policy"). "

On line 31 Ross is directed to agree to give Simon the right to arrange for the "direct purchase" of the Age Polices not just the actual provision of an *option* for BOLI as

agreed upon. The application of the agreed upon appropriateness condition, which covers all enrolled policies, including COLI/GOLI, has also been removed. The addition of the Policy Purchase rights addressed above also represent a modification that Ross does not wish to approve.

### D. Ross' Right to Dissuade

In Section 6(a) lines 32/33, Ross is directed to agree to being prohibited from dissuading Trust clients or potential clients from agreeing to allow for a purchase of their policies, by Simon; which may be beneficial to Simon and his business associates, but may be in many situations deleterious to the interests of these clients and may place the integrity of the PBT at risk.

There are absolutely no provisions in the Settlement Agreement prohibiting Ross from attempting to conserve Trust clientele by dissuading them from allowing Simon to make such a purchase nor could one be reasonably implied or intended. Ross would not have executed the Settlement if such a prohibition had been resident in the proposed language.

The first two sentences in Paragraph 12 of the Agreement begin with MC and SAVE but the very next sentence (which is the sentence relevant to this aspect of the discussion) begins with only MC designated:

> "MC agrees that it will not dissuade any banks from selling an Age Policy............".

MC - not MC *and* SAVE - as is the case in the previous two sentences. It should also be noted that this language was incorporated into the Settlement Agreement by *Simon* and

5

continued to remain in all of the succeeding Drafts. Incorporating this new provision in a final agreement is a most significant modification that requires the approval of all of the Parties and Ross does not approve.

### E. Bankruptcy Provisions

Language appears in Section 8(c) that discusses actions to be taken in the event of the bankruptcy of any of the parties. Notwithstanding the fact that there is nothing in the Settlement Agreement covering terms, conditions or requirements in the event of the bankruptcy of any of the Parties and that this provision is not included or required in the applicable Delaware LLC statutes, the language in Section 8(c)(2) accords rights to Simon and Meyer that are not accorded to Ross. This is an example of another modification of the Settlement Agreement that requires the approval of all three of the Parties. Ross does not agree to this modification.

### F. New Patent Use

Ross has developed additional uses for the Patent that are outside of the purview of Section 1 of the Settlement Agreement. He proposed the insertion of additional language under the heading of "New Patent Use" that was meant to create some additional opportunities for development (his and as well as those of Simon and Meyer, if any) regarding use of the Patent, unrelated to the ownership of Policies exclusively by corporations, banks, insurance carriers or governmental entities as delineated in Section

Although Ross contends that there are many potential profit centers outside the Section 1 stated purpose that may be exploited, his proposed language is also a modification that requires the approval of all three of the Parties. Until that is accomplished it also must be removed from the final document.