**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| BALSHE LLC and THE SIMON LAW FIRM, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 08 CV 3256 |
| | ) | |
| v. | ) | Judge James B. Zagel |
| | ) | |
| ALAN J. ROSS and SAVE ASSOCIATES, | ) | Magistrate Judge Susan E. Cox |
| | ) | |
| Defendants | ) | |

**DEFENDANT'S OPPOSITION TO THE PLAINTIFF'S CROSS-MOTION TO
ENFORCE THE SETTLEMENT AGREEMENT AND THEIR SUPPORTING
MEMORANDUM**

Defendants Alan J. Ross and SAVE Associates ( the "Defendants") respectfully submit

this reply to the Plaintiff's Cross-Motion To Enforce The Settlement Agreement And In

Opposition to Defendants' Motion to Compel Compliance With The Settlement

Agreement, their accompanying Memorandum Of Law In Support (the "Plaintiff's Cross-

Motion") and the Affidavit By Declaration Of Nicomedes Sy Herrera (the "Affidavit")[1].

## I. Introduction

The Plaintiff's Cross-Motion underscores the essential purpose of the relief sought

by the Defendant's Motion. As the Plaintiffs point out in their Memorandum, the

Defendants will not possess voting rights in IPB when it is formed. It is for precisely that

reason that the Defendants insist that the final operating agreement strictly adheres to the

terms of the Settlement Agreement. This is the Defendants' primary, if not only,

opportunity as individual Parties, whose approval is required, to make sure that their

---

[1] The Defendants request that their Motion to Compel Compliance With The June 26, 2008 Settlement
Agreement Between The Parties and accompanying Memorandum in Support be incorporated by reference
into this Document.

rights are secured, executed and memorialized for the future as they are expressly defined in the Settlement Agreement. No more and no less is requested.

Incorporated throughout their Memorandum's "Introduction" and "Statement of Facts" the Plaintiffs included self-serving, lengthy and inaccurate hyperbole pertaining to the previous June 2008, action that is irrelevant to the current dispute. Although the Defendants hold equally strong convictions as to the probity of their position in that matter, in *their* Memorandum in Support they resisted (and intend to continue to resist) the temptation to include such commentary, from their point of view; let alone as statements of "fact".

Nevertheless, the Defendants do wish to address what is *currently* applicable, and as such submit this reply to the Plaintiff's Cross-Motion, Memorandum and Affidavit.


## II. Opposition

### A. The Secret Operation Agreement: Three Parties Must Sign, Only Two Executed

1.      The Settlement Agreement specifically requires <u>that all the Parties</u> must participate in the execution of a final Operating Agreement  (see Paragraph 22 of the Settlement Agreement – Defendant's Motion to Compel – Exhibit A).  Since Alan Ross has not signed any Operating Agreement, the so called Operating Agreement submitted by the Plaintiffs and MC is invalid and ineffective

In their Memorandum of Support and Affidavit the Plaintiffs acknowledge that they and Bennett Meyer, of the Meyer-Chatfield Corporation, one of the three parties to the 2008 Settlement entered into what they now maintain is the IPB Operating Agreement[2]

---

[2] During the nearly two year time period in which negotiations have been pursued, the document required in Paragraph 22 that is "necessary to effectuate the terms"  has been referred to by the Parties and their

(Plaintiff's Exhibit C – the "Bilateral Agreement"). This was done in secret as Ross was never made aware that they had actually executed (signed) their version of an Operating Agreement until its existence was exposed in the Plaintiff's filings to the Court on July 6, 2010 (hardcopy *still not received* by the Defendants). Even as communication between the Parties continued, albeit sporadically, and new drafts were circulated and negotiated (11/19; and 12/11/09 – Defendant's Motion to Compel – Exhibit G), the Defendants were still kept in the dark regarding the Plaintiff's and MC's decision to enter into a bilateral arrangement.

In the last paragraph of their Memorandum's "Statement of Facts" (P. 5) the Plaintiffs state that "Balshe and MC were not required to obtain Defendant's agreement to the IPB Operating Agreement to make it effective". Similarly, in the first paragraph of their Argument (P. 5) Plaintiffs state that "the IPB Operating Agreement (is) an agreement that Defendants have absolutely no right to approve or veto". Those self-serving statements (and other similar comments throughout their Memorandum) are unequivocally inaccurate and completely ignore Paragraph 22 of the Settlement Agreement (below):

> 22.    The Parties acknowledge that their respective rights and obligations are intended to be included in future documents to be executed by the Parties, including, without limitation, the documents necessary for the formation and governance of Newco and any documents necessary to effectuate the assignment and recordation of assignment of the Patent with the United States Patent and Trademark Office. The Parties agree to cooperate in good faith to execute any and all necessary documents to effectuate the terms of this Agreement.

---

legal counsel as the "Operating Agreement". The actual draft documents themselves have been entitled "Limited Liability Company Agreement". The terms have been used interchangeably.

In that paragraph the language states that the "*Parties* acknowledge", and later, the "*Parties* agree"..

In fact, at the end of the very first paragraph of the Settlement Agreement (see Defendant's Motion to Compel Exhibit - A) the term "Parties" is defined as "(Balshe, SAVE and MC are collectively referenced as the "Parties")". Additionally, the last sentence of the above Paragraph 22 states the "*Parties* agree to cooperate in good faith to execute any and all documents necessary to effectuate the terms of the Agreement".

Furthermore, MC was not even empowered to enter into any type of Operating Agreement without the consent of the Executive Committee of MRB Pooled Benefits LLC (which includes Alan Ross), which he did not secure. (see attached Agreement – Section 3 - Exhibit A).

Their action to enter into a secret agreement highlights the Plaintiff's and MC's indifference to the plain language and unambiguous terms of the Settlement. If it was the opinion of the Plaintiff and MC that Ross was incorrect in his interpretation of the Agreement or that he was not cooperating in good faith, they had the right to seek redress in this Court, which they threatened to do on a regular basis, but instead they entered into their previously undisclosed Bilateral Agreement. Likewise, they did not have the right to summarily declare that the term "the Parties" is now defined as only Balshe and MC. Therefore, despite the Plaintiff's and MC's contrived assertion to contrary, Ross' approval is unambiguously required.

**B. The Patent Assignment: Ross Has Not Failed To Perform Since No Entity Has Been Formed To Received The Assignment**

In Section I. (first paragraph) of their Memorandum in Support the Plaintiffs state that Ross promised to assign the Patent to IPB and that "Once again, Ross has failed to do what he agreed to do". That is patently false. The notion (as stated in the first paragraph of their Argument - P.5) that the "Defendants are 'hell-bent' on attempting to thwart the Plaintiffs right to operate IPB", and that "they have refused to assign the Patent to IPB as they are clearly required to do *pursuant to the terms of the Settlement Agreement*[3] (ital. added) is flatly untrue and misleading.

The Plaintiffs state correctly that "the language in Paragraph 2 of the Settlement Agreement could not be more clear". However, they conveniently fail to also concede that the language in Paragraph 1 is equally clear. It begins: "The Parties shall form a new entity ("Newco" -now IPB) for the purpose of exploiting the Patent....The form and jurisdiction in which IPB will be organized/created shall be as mutually agreed to by Balshe and MC".

Paragraph 1, of the Settlement Agreement which was drafted by sophisticated business parties with counsel, uses mandatory language of the Parties future obligations. Since the June 2008 Hearing the Defendants were (and are) aware of a Delaware LLC known as IPB Pooled Benefits LLC whose place of business is 303 E.Wacker Drive, Chicago, Illinois (the Plaintiff's business address). That entity was formed on May 22, 2008 before the June 2008 hearing and *before* the Settlement Agreement was executed. It was and is the assumption and understanding of the Defendants that on September 25, 2008, the date on which the AXA Patent Interest was purchased, this entity was wholly owned by the Plaintiffs (with absolutely no ownership interest accorded to the Defendants and MC (we presumed) as well. Also, the Defendants had received no documentary indication whatsoever that a new

---

[3] Section 2

entity had been formed in which the Defendants were a Party[4]. Thus, the Defendants therefore had and have absolutely no reason to believe that there was actually an entity formed by the Parties (as required in the Settlement Agreement). Consequently, there was no destination to which Defendants could assign their interest in the Patent. The Defendants were not required to assign their Patent interest to just any entity if it did not conform to the requirements of the Settlement Agreement, let alone one that they believe is wholly owned by the Plaintiffs.

As indicated in Paragraph 10 of the Defendant's Motion to Compel, on September 25, 2008 immediately after the AXA Patent Interest was purchased the Defendants assigned one half of it's entire interest in the Patent to the Plaintiff's IPB entity[5]. That assignment conferred to the Plaintiffs the full rights to utilize the Patent (so long as they did so within the terms and conditions of the Settlement Agreement). However, this was intended by the Parties to be a temporary compromise until the execution of a final Operation Agreement, so that an entity could be formed by the Parties as required in the first paragraph of the Settlement Agreement. On September 29th, October 6th and October 20, 2008 the Defendant's legal counsel at that time forwarded emails to the other Parties in an attempt to get everything finalized (see attached Exhibit B1, B2 and B3). Finally after almost one month, on October 24, 2008 the Defendants received the Stroock, Stroock & Lavan revised Draft (see Defendant's Motion to Compel Exhibit - C) that was discussed in the Defendants Motion to Compel, that contained revisions that were dramatically different from their previous Draft (see Defendants Motion to Compel Exhibit - D). That was the start of the breakdown of the negotiation process between the Parties.

---

[4] The Defendants still have not received any documents indicating (such as Form K-1s) that the required entity has been formed
[5] Pursuant to a negotiated assignment document

The Bilateral Agreement - improperly entered into by the Plaintiffs and MC - does not constitute a valid Operating Agreement (for the reasons enumerated above) and does not create an entity formed by the Parties as required by the Settlement Agreement. Even in the Bilateral Agreement, the States in which the MRB LLC and PBT Sponsorship Group LLC are domiciled are delineated (Delaware and Massachusetts respectively). The description of the IPB Pooled Benefits LLC is ambiguous at best and hardly sufficiently definite to support a transfer of the fundamental asset in this matter. It states that IPB LLC is "organized pursuant to the Delaware Limited Liability Act" but, in contrast to the descriptions of the other two Parties, there is no indication as to where (if anywhere) it is domiciled. This fact needs explanation.

Finally, perhaps the most illustrative indicator of the defendant's desire to transfer the Patent into an entity that conforms to the Settlement Agreement is the action they have taken by filing their Motion to Compel. With the help of this Court hopefully this deadlock will be broken.

## C. Plaintiff's and MC's Asserted Exclusive Right To Manage IPB Must Conform To The Settlement Agreement's Mandate Of Separate Entities For Plaintiff And MC

Although the Defendants do not have the right to participate in the active management of IPB, the Settlement Agreement unequivocally delegates the management rights to the Plaintiffs and MC as separate entities, not as a joint ruling body. MC has exclusive management rights to manage only the BOLI portfolio and the Plaintiffs have the exclusive right to manage only the COLI, GOLI and IOLI portfolios. There are no cross-management rights conferred. Their rights also allow for the setting of their own management policies (such as forming separate trusts, administrative procedures, administrators, distribution

facilities, actuarial assumptions etc.). However, and most importantly, their right to manage their respective portfolios exclusively must be executed within the directives established in the Settlement Agreement. The fact that IPB's *form* (LLC, Corporation, Trust etc.) is to be as mutually agreed by the Plaintiffs and MC does not obviate their necessity to conform to the substance of the Settlement Agreement.

## D. Shared Expenses[6]:  Plaintiff's Claim Is Entirely Unsupported By The Settlement Agreement

The Plaintiffs jumble Trust expenses with LLC expenses and thus confuse the issue. The Defendants assume, understand and appreciate that the Trust and its third party Administrator will be collecting monies in the form of fees from participating organizations and netting out the expenses associated with the Trust operation (such as Trustee fees, Administrative charges, Actuarial fees etc.) *before* distributing the remainder to the Trust Sponsor - the IPB LLC. Thus, it is *those* distributions of monies - that flow from the Trust to be received (again, net of the Trust's expenses) by IPB LLC and ultimately divided among the Parties  - that are governed by the directives established in the Settlement Agreement.

Again, The Settlement Agreement clearly specifies the methodology by which those distributions from the Trust to IPB are to be divided between the Parties. It specifically exempts Ross from participating in "the cost of acquiring the AXA Patent Interest" and "all expenses incurred after the date of this Agreement, which are necessary to develop the business of Newco (IPB)". The Plaintiffs and MC are directed, in the Settlement Agreement to share in those costs and expenses "equally" and on a 50%/50% basis between Balshe and

---

[6] The Defendants have been excluded from reviewing any of the finalized Trust documents such as the Trust Agreement and the Private Placement Memorandum (assuming they are finalized). Therefore it is impossible for the Defendant to review the division of expenses that are to be assumed by the IPT Trust and those that inure to the IPB LLC.

MC". Contrary to the Plaintiff's assertion, the words "SHARE" and "FRONT"[7] are not synonyms. The Plaintiffs further claim the word "share" *obviously* means "front". . The plain language in the Agreement reads as share (to divide) not front. The Plaintiff's contortion of the word "Front" is nowhere supported by the plain language of the Agreement. To the contrary, maintaining that the word share means to front is simply a fabrication employed to justify a baseless and self-serving position. The Shared Expenses provision does not belong in a final Operating Agreement because it is not contemplated by the Settlement Agreement.

**E. Lapsed Policies Procedures: Plaintiff's Claim Language In Their Claim Is Nowhere To Be Found In**

### The Settlement Agreement

The Defendants do not "admit" (see first sentence, Plaintiff's Memorandum P. 9 - Section C2.), they emphatically <u>state</u> that the Settlement Agreement does not reference any procedures governing policies that are reasonably likely to lapse. It doesn't. To the contrary, the Settlement Agreement is completely silent on the procedures covering lapsed policies. There is no provision in the Settlement Agreement that permits the Plaintiffs and MC to resolve any issues not covered by virtue of entering into a "normal business negotiation"(the negotiations were concluded on June 26, 2008 - the date of the Settlement Agreement). Especially given that Paragraph 19 of the Settlement Agreement plainly states:

> ""This Agreement contains the entire <u>agreement between the Parties</u>
> relating to the rights herein granted and the obligations herein
> assumed…This Agreement can be modified only by a writing signed
> by <u>all of the parties to this agreement</u>".

---

[7] The Defendants assume that the Plaintiff's use of the term "to Front" means to 'advance'.

As stated in their Motion to Compel, the Defendants do not approve of this attempted modification and alteration of the Agreement for the reasons stated above and the reasons stated in their Memorandum in Support. The Plaintiffs and MC cannot ignore the provisions in Paragraph 19 and expect the Defendants to acquiesce when it is against their interest to do so, or deleterious to the integrity of the Trust. Nor do the Defendants have any desire "to come running to this Court" (as the Plaintiffs hysterically and unjustifiably claim in their Memorandum (near the bottom of P. 10). Again, the Plaintiff's claims before this court belie the record and fly in the face of reality. Defendant Alan Ross sent the attached email (see Exhibit C) to David Simon on February 22, 2010 to attempt to avoid this very situation which the Plaintiffs now seek, with sensational language, to use to taint Defendants in the eyes of this court. After almost three months without receiving any response from Simon, Ross had no choice but to file the Defendant's Motion to Compel, otherwise this impasse might continue indefinitely.

### F. BOLI Policy Purchase Rights: Plaintiff's Claim Is Unsupported Since Any Purchase Rights Are Not Automatically Required, Only Optional

As stated in Paragraph 12 of the Settlement Agreement, the Plaintiffs have a right to approach banks that have decided to assign (prior to enrollment) their Net Amount at Risk to the trust and provide those banks with an *option* to sell their BOLI policies to the Plaintiffs. The Defendants have no interpretive issue in regard to this provision nor do they quarrel with the Plaintiff's right to retain all revenues relating to such purchases. However, there is no provision in the Settlement Agreement that confers upon the Plaintiffs the right to execute direct purchases. The defendants do not consent or agree to this modification.

## G. The Right to Dissuade: The Settlement Agreement Poses No Bar Against Defendant's Right To Help Retain Enrollees

The Plaintiffs want to prohibit BOLI insureds (Age 67 and older) that are part of the enrollment group from joining the Trust. They want to cherry pick their policies and place them with a competitive group through Direct Purchases that are not contemplated in the Settlement Agreement. The Plaintiffs assert "Again, Plaintiffs and MC have the exclusive right to manage the business of IPB", as if making this observation conveys to the Plaintiffs and MC carte blanche to operate IPB in any way they wish. Plaintiff's unsupported reading would twist "the exclusive right to manage" to conceivably mean that without the approval of all three of the Parties, profit allocations could be revised by the Plaintiffs at their whim or that the Defendant's ownership percentage could be reduced or they may utilize the Patent in a manner not specified. Yet, of course, no such rights are guaranteed by the Settlement Agreement. The Settlement Agreement clearly states that none of the terms may be modified without the approval of all three parties, and the terms of the Settlement Agreement must be respected. All of the terms. That includes Paragraph 19 which, again, states that "The Agreement can be modified only by a writing signed by all of the Parties". A "plain reading" review of the provisions of the Settlement Agreement substantiates that there is absolutely no directive precluding the Defendants from attempting to dissuade Banks that decide to assign their death benefits to the Trust from selling their BOLI policy; instead of joining the Trust. Such preclusion may or may not have been the *original intent* of the Plaintiffs and MC; however, to paraphrase an excerpt from the decision in the case, Security Insurance Company of Hartford v. Schipporeit., 69 F.3d 1377 17(7th Cir. 1995):

11

> "it's subjective intent, at this point, is irrelevant. The plain language[8] of
>
> (Section 12 of the Settlement Agreement) does not (preclude the
>
> Defendants from their right to dissuade). Any ambiguity on this point must
>
> be resolved in favor of (the Defendants)."

The addition of such a prohibition would be a modification that would require the approval

of the Defendants, which they do not approve. Additionally, the Plaintiffs assert that " if

Ross were entitled to interfere with the sale of Age policies to Balshe (he is not) it would

undermine (and be a breach of) the very terms of the Settlement Agreement".

Once again, Plaintiff's selective and tortured reading underscores the baselessness of

their claim. The very first words in the Settlement Agreement's provisions in Paragraph 1

state that "The Parties shall form a new entity for the purpose of commercially exploiting the

Patent through the enrollment...of BOLI...COLI...GOLI and... IOLI. policies. The

Plaintiffs wish to engage in activity that would have the effect of convincing BOLI policy

owners *that have already made the decision to enroll in the Trust* to instead refrain from

enrolling and sell their policies to a competing organization owned or affiliated with the

Plaintiffs. Thus, Defendant's assertions are anything but "Nonsense" as the Plaintiffs boldly

state in their Memorandum.


**H. Bankruptcy Provisions: Plaintiff's Attempted Imposition Of Bankruptcy Is Not**

    **Contemplated In The Settlement Agreement**

The Plaintiffs admit that there is nothing in the Settlement Agreement that addresses the

procedures governing the bankruptcy of IPB members. Thus, any language covering

---

[8] MC may not dissuade (absolutely no reference to the Defendants).

bankruptcy is a modification of the Settlement Agreement that requires the approval of all three Parties. The Defendants do not approve of the bankruptcy provisions that are part of the Operation Agreement improperly entered into by the Plaintiffs and MC.

However, that does not mean that the possible bankruptcy of one or more IPB members will not be addressed. To the contrary, the Plaintiffs and MC have decided that IPB, when it is formed, will be a Limited Liability Company pursuant to the Delaware Limited Liability Company Act (the "Act"). Section 18-304 of the Act (see Exhibit D) has numerous provisions that are automatically required to be adopted by those entities that wish to be organized pursuant to the Delaware Limited Liability Act. Those provisions are more than suitable for adoption by the Parties.

## I. New Patent Use

The restrictions prohibiting any modifications to the Settlement Agreement without the agreement (written) by all of the Parties as stated in its Paragraph 19 apply to the Defendants as well. They will discover that the Defendants stated (in Section F of their Memorandum) that:

> "Although Ross contends that there are many potential profit centers outside the (Agreement's) Section 1 purpose that may be exploited, his proposed language is also a modification that requires the approval of all three of the Parties. Until that is accomplished it also must be removed from the final document".

## J. Conclusion

For the reasons stated above, the Defendants respectfully request the Court to (1) Deny the Plaintiff's Cross-Motion in its entirety (2) Grant the Defendant's Motion to Compel Compliance With The June 26, 2008 Settlement Agreement Between The Parties in its entirety.

## CERTIFICATE OF SERVICE

I, Alan J. Ross, hereby certify that a copy of the above Defendant's Opposition To the Plaintiff's Cross-Motion To Enforce The Settlement Agreement And Their Supporting Memorandum was served upon the following individuals by first class mail, postage prepaid:

> P. Andrew Fleming
> Novack and Macey LLP
> 100 N. Riverside Plaza
> Chicago, Illinois 60606

> David L. Braverman
> Braverman & Kaskey
> One Liberty Place, 56th Floor
> Philadelphia, Pennsylvania 19103-7334

on this 4th day of August 2010

_____
Alan J. Ross

# EXHIBIT A

# EXHIBITS
# B1 - B2 – B3

# EXHIBIT C

# EXHIBIT D

# EXHIBIT A

# EXHIBIT A

## AGREEMENT

This Agreement ("Agreement") is made the 26th day of June 2008, by and among Bennett Meyer ("Meyer"), a Pennsylvania resident, with an address at The Pavilion, 261 Old York Road, Suite 614, Jenkintown, PA 19046, Meyer Chatfield, Corp. ("MC"), a Pennsylvania corporation, with a principal place of business at The Pavilion, 261 Old York Road, Suite 614, Jenkintown, PA 19046, Alan J. Ross ("Ross"), a Massachusetts resident, with an address at 687 Highland Avenue, Needham MA 02494, and The Alan J. Ross Insurance Agency, Inc., dba SAVE Associates ("SAVE"), with a principal place of business at 687 Highland Avenue, Needham MA 02494 and Braverman Kaskey PC ("BK"), a Pennsylvania professional corporation with a principal place of business at 1650 Market Street, 56th Floor, Philadelphia, PA 19103.

## W I T N E S S E T H:

WHEREAS, Ross and/or SAVE is/are the owner of a fifty percent (50%) ownership interest in United States Patent No. 5,974,390 (the "Patent");

WHEREAS, Balshe LLC and the Simon Law Firm (the "Plaintiffs") have filed suit against Ross and SAVE in the Circuit Court of Cook County, Illinois, County Department, Chancery Division, contending breach of contract and that the Plaintiffs are the owner of the Ross/SAVE interest in the Patent (the "Litigation");

WHEREAS, Ross and SAVE engaged BK to represent them in the Litigation on a contingency fee basis;

WHEREAS, BK accepted such engagement to represent Ross and SAVE in the Litigation;

WHEREAS, Ross and SAVE require substantial funds in order to commercially exploit the patent;

WHEREAS, Meyer and MC are willing to provide the funding and insurance expertise to commercially exploit the patent;

WHEREAS, Ross, SAVE, Meyer and MC have agreed to a settlement of the Litigation (the "Settlement") which is embodied in that certain written settlement agreement dated June 26, 2008 by and among Balshe LLC, The Simon Law Firm, Ross, SAVE and MC (the "Balshe Settlement Agreement");

WHEREAS, the Settlement will result in the Patent being owned by a newly formed created entity (the "Patent Entity") which will be partially owned by Plaintiffs, SAVE and MC or its designee; and

WHEREAS, as a result of the Settlement and the attendant shift in the economics created thereby, the parties hereto have agreed to the terms of a new arrangement which shall supersede their prior written agreement dated June 5, 2008 (the "June 5 Agreement");

NOW, THEREFORE, in consideration of the mutual covenants and promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

**1.**     **Transfer of Ownership of Patent.**

Ross and SAVE shall transfer all of their right, title and interest in the Patent to the Patent Entity in accordance with the terms of the Balshe Settlement Agreement.

**2.**     **Ownership of Newco and Division of Proceeds/Income.**

(a)     MC shall cause the forty five percent (45%) voting equity interest that it will receive in the Patent Entity pursuant to the terms of the Balshe Settlement Agreement to a limited liability company to be formed by BK ("Newco"). The initial ownership of membership interests in Newco shall be as follows: (a) BK and/or its shareholders shall receive a 22.23% equity ownership interest; (b) Ross shall receive a 25% equity ownership interest; and Meyer shall receive a 52.77% equity ownership interest. MC, Meyer and BK each acknowledge and agree that Ross shall be the sole owner of the of 10% non-voting equity interest that he will receive in the Patent Entity pursuant to the terms of the Balshe Settlement Agreement (the "Ross 10% Interest"), and that MC, Meyer and BK shall not have any right to share in any revenue or sale proceeds Ross receives with respect to the "Ross 10% Interest.

(b)     In the event that after the initial formation of Newco, a new investor is sold an equity interest in Newco or an interest in Newco's cash flow derived from the Patent Entity, the parties will effectuate such sale, and split the sale proceeds, through a pro rata sale of their respective percentage equity ownership interests in Newco.

(c)     All distributions of BOLI PBT Profits, IOLI PBT Profits, COLI PBT Profits and GOLI PBT Profits that Newco receives from the Patent Entity shall, after the payment of Newco's expenses, be divided and distributed as follows: (i) 17.09% to BK; (ii) 31.67% to Ross; and (iii) 51.24% to Meyer. MC, Meyer and BK each acknowledge and agree that they shall not have any right to share in any distributions of BOLI PBT Profits, IOLI PBT Profits, COLI PBT Profits and GOLI PBT Profits that Ross receives from the Patent Entity with respect to the "Ross 10% Interest and that such distributions shall belong exclusively to Ross.

2

3. **Management of Newco.**

(a)    Management of Newco shall initially be governed by a three (3) member executive committee (the "Executive Committee"), comprised of Meyer, Ross and David L. Braverman. Prior to the sale of an equity interest in Newco to a new investor, all management decisions will require the unanimous vote of the Executive Committee. Subsequent to the sale of an equity interest in Newco to a new investor, all management decisions for Newco will require the affirmative vote of members holding 65% or more of the membership interests in Newco.

(b)    No member of Newco, without the prior consent of the Executive Committee, shall be authorized to pay or obligate Newco to pay any sum in excess of $10,000 on any one item.

4. **Compensation to and Obligations of Ross.**

(a)    Meyer shall cause MC to pay Ross: (i) $13,333 per month for 6 months, the first such payment to be made on August 1, 2008, with each subsequent payment to be made on the 1st day of each succeeding month; and (ii) $6,666 per month for the succeeding 6 months. Notwithstanding anything herein to the contrary, in the event that: (i) after the initial formation of Newco, a new investor is sold an equity interest in Newco or in interest in Newco's cash flow (either through a direct investment in Newco or through a sale of a portion of Ross's, Meyer's and BK's ownership interests in Newco); (ii) after the initial formation of the Patent Entity, a new investor is sold an equity interest in the Patent Entity or an interest in the Patent Entity's cash flow and/or (iii) Ross receives distributions of cash flow from Newco and/or the Patent Entity in an amount equal to or in excess of the payments MC is obligated to pay to Ross under the preceding sentence, Meyer and MC shall not have any obligation to make any of the remaining monthly payments set forth in the preceding sentence.

(b)    Ross agrees that upon the formation of Newco, for a minimum period of two (2) years, he will work exclusively for MC and will not engage in external employment or consultancy work, that he will use his best efforts to sell new BOLI and COLI insurance cases in conjunction with MC's sales representatives.   Ross will execute MC's standard form sales representative agreement and shall be entitled to commissions on sales of BOLI and COLI based upon the same commission schedule MC uses with its other sales representatives. Meyer, will cause MC's staff, located at MC's Jenkintown, Pennsylvania offices, to provide Ross with administrative assistance with respect to Ross's sales efforts. Ross will pay his own expenses when traveling to Jenkintown, PA or anywhere within a 100 mile radius thereof. MC will pay Ross's expenses for any other travel in the course of his duties for MC in accordance with the terms of MC's standard form sales representative agreement.

3

(c)     Notwithstanding the provisions of subsection (b), Ross shall be permitted to enroll policy owners into PBT Trusts created and/or controlled by the Patent Entity and to receive fees regularly paid by the Patent Entity and/or PBT Trusts to other persons with respect to such policy enrollments.

### 5.     **Obligations of Meyer.**

Meyer shall pay all costs associated with setting up of Newco.

### 6.     **Obligations of BK.**

**(a)**     BK will represent Ross, SAVE, Meyer and MC in the settlement of the Litigation, set up Newco and advise Ross, SAVE, Meyer and MC on the best form of entity and the jurisdiction in which the Patent Entity should be formed.

**(b)**     Ross and SAVE each acknowledge and agree that BK currently represents Bennett Meyer and MC in a variety of matters unrelated to the Litigation and that regardless of any dispute that may arise under this Agreement or otherwise, BK shall be free to represent Bennett Meyer and/or MC in such matters. Ross and SAVE each further acknowledge and agree that BK has advised each of them that while the interests of all of the parties to this Agreement are currently aligned with respect to the Litigation and the Settlement, there is a substantial risk that a conflict of interest may arise between their respective interests and that if a conflict of interest does arise among them, BK shall be free to represent it own interests as well as those of Bennett Meyer and/or MC in any dispute with Ross, SAVE, Newco and/or the Patent Entity.

### 7.     **Representations and Warranties of Ross and SAVE.**

Ross and SAVE each represents and warrants to Meyer, MC and BK that:

(a)     he/it has the power to execute, deliver and perform under this Agreement and no consent of any other party and no consent, license, approval or authorization of, or registration or declaration with, any governmental authority, bureau or agency is required in connection with the execution, delivery, performance, validity or enforceability of this Agreement;

(b)     this Agreement, when executed by all parties, will constitute valid obligations of Ross/SAVE, legally binding upon him/it and enforceable in accordance with its terms;

(c)     the execution and delivery of this Agreement and the performance under this Agreement by Ross or SAVE will not violate or contravene any provision of any existing decree of any court, governmental authority, bureau or agency or any other agreement to which Ross or SAVE is a party;

4

(d)     with the exception of the Litigation no actions, suits or proceedings before any court or governmental department or agency are pending or, to his/its knowledge threatened against , which would prevent Ross or SAVE from performing his/its duties under this Agreement;

(e)     Ross or SAVE has no ongoing relationship with any competitor of MC and is free to enter into this Agreement, unencumbered by any contractual or other restrictions;

(f)     Ross and/or SAVE is the owner of a fifty percent (50%) interest in the Patent, that such interest in the Patent is free of any lien or encumbrance and that he/it has the absolute right to assign such interest in the Patent to the Patent Entity;

(g)     SAVE has less than $125,000 of outstanding debt/obligations, that no creditor has any interest in or lien or encumbrance on the Patent and that neither MC, Meyer or BK has any liability for SAVE's outstanding debt/obligations; and

(h)     SAVE and Ross have had the opportunity to be represented by counsel of their own choosing, understand this Agreement and knowingly and voluntarily have entered into this Agreement.

### 9.     __Indemnification.__

SAVE and Ross shall indemnify, defend and hold harmless, Meyer, MC and BK, and their respective shareholders, directors, officers, employees and agents, from and against any damages, losses, costs and expenses (including attorneys' fees) suffered by any such party, as a result of a breach of this Agreement by SAVE and/or Ross or suffered as a result of the enforcement by Meyer, MC and/or BK of this Agreement. If Meyer, MC and/or BK shall prevail in any action at law or in equity to enforce any provision of this Agreement, SAVE and Ross shall pay Meyer's, MC's and/or BK 's costs and expenses, including attorneys' fees, incurred in enforcing this Agreement.

### 10.     __Prior Agreements Superseded.__

Each of the parties to this Agreement acknowledges and agrees that this Agreement supersedes the June 5 Agreement in its entirety.

### 11.     __Governing Law; Forum Selection.__

(a)     This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania without regard to the provisions on conflicts of law.

5

(b)    For the purpose of any suit, action or proceeding arising out of or relating to this Agreement, each of the parties hereby irrevocably consents and submits to the exclusive jurisdiction and venue of any of the Courts of the Commonwealth of Pennsylvania including the Court of Common Pleas of Montgomery County and Philadelphia County and the Federal District Court for the Eastern District of Pennsylvania, and appoints and constitutes the Secretary of State of the Commonwealth of Pennsylvania as his agent to accept and acknowledge on his behalf all service of process in connection with any such matter, copies of which process shall be mailed or delivered to the party being served. Each party irrevocably waives any objection which he or it may now or hereinafter have to the laying of the venue of any suit, action or proceeding brought in such court and any claim that such suit, action or proceeding brought in such a court has been brought in an inconvenient forum and agrees that service of process in accordance with the foregoing sentence shall be deemed in every respect effective and valid personal service of process upon a party hereto.

**12.    Entire Agreement; No Oral Change.**  This Agreement constitutes the entire agreement among the parties hereto with respect to the subject matter hereof and supersedes any and all prior and/or contemporaneous agreements and understandings among the parties hereto, whether oral or written.  This Agreement may be amended only by a written instrument duly executed by all of the parties hereto.

**13.    Waivers.**  A waiver of a party's rights under this Agreement shall be effective only to the extent set forth in a written instrument executed by the waiving party. No waiver by any party of any misrepresentation or breach (whether intentional or not), in any one or more instances and for any period of time, shall be deemed or construed as a waiver of any prior or subsequent misrepresentation or breach of the same or any other provision.  No course of dealing or forbearance, leniency, delay or other omission by a party to assert, exercise or enforce any right or remedy under this Agreement or any other agreement, instrument or document at any one or more times or for any periods of time shall impair or otherwise affect any such right or remedy or any other right or remedy, or be construed to be a waiver or acquiescence; nor shall any single or partial exercise of any right or remedy, or any abandonment or discontinuance of steps to enforce such a right or remedy, preclude any further exercise of the same or any other right or remedy, it being agreed that at all times each party shall have the right to insist upon and enforce strict compliance with each and every provision of this Agreement

**14.    Construction.**  The terms "hereby," "herein," "hereof," "hereto" and "hereunder" mean, respective, by, in, of, to and under this Agreement as a whole, not merely to the provision in which such term is used.  The term "or" shall be construed to be inclusive and have the meaning of "and/or".  The masculine form, wherever used herein, shall be construed to include the feminine and the neuter, and vice versa, where appropriate. The singular form, wherever used herein, shall be construed to include the plural, and vice versa, where appropriate.  The definitions in this Agreement shall apply equally to both the singular and plural of the terms defined.  The term "include" (and correlative terms, such as

6

"includes" and "including") shall not be construed as a term of limitation in any context but shall be construed as if followed by the words "without limitation." All references in this Agreement to an "Exhibit" or "Section" shall be to such exhibit or section of this Agreement, unless otherwise specifically provided. The captions of Sections are for the convenience of reference only; they form no part of this Agreement and shall not limit or otherwise affect the interpretation of any provision herein.

### 15.    Counterparts.

This Agreement may be executed in two or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

### 16.    Severability.  Any provision contained in this Agreement which is

prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the day and year first above written.

                               _____

                               BENNETT MEYER

                               Meyer Chatfield, Corp.

                               By:_____

                               ALAN J. ROSS

                               The Alan J. Ross Insurance Agency, Inc.

                               By:_____

                               Braverman Kaskey P.C.

                               By:_____

# EXHIBITS
# B1 - B2 – B3



**Alan Ross <saveassociates@gmail.com>**

---

## FW: MRB/IPB

**EXHIBIT B3**

5 messages

---

**Twarog, Stan <STwarog@mintz.com>**                                    **Mon, Oct 20, 2008 at 11:25 AM**
To: jkaskey@braverlaw.com
Cc: Nicomedes <NH@corridorgroupllc.com>, Alan Ross <saveassociates@gmail.com>, "Sullivan, Henry"
<HSullivan@mintz.com>

John---

An additional TWO weeks have passed. I just checked with Travis Blais and he has not been contacted by
anyone about tax issues. What is causing the holdup?

PLEASE let's get this done. And please respond to this message to let me know what you see as a timetable.

Thanks and regards, Stan

---

**From:** Twarog, Stan
**Sent:** Monday, October 06, 2008 2:31 PM                          **EXHIBIT B2**
**To:** 'jkaskey@braverlaw.com'
**Cc:** 'Nicomedes'; 'Alan Ross'; Sullivan, Henry
**Subject:** FW: MRB/IPB

John---

Another week has passed.

Can you let know when revised drafts will be forthcoming? I think it's in everyone's interest to put this
milestone behind us.

Regards, Stan

---

**From:** Twarog, Stan
**Sent:** Monday, September 29, 2008 5:50 PM                        **EXHIBIT B1**
**To:** 'jkaskey@braverlaw.com'
**Cc:** 'Nicomedes'
**Subject:** MRB/IPB

John---

Following up on last week's festivities, what do you see as a timetable for finishing off the operating
agreements? As you know, Alan is very interested in getting them finished as soon as possible and assigning
the other half interest in the patent to IPB.

You mentioned that it may be worthwhile for you to have a conference call with Travis Blais and Nico or
someone from Strook to iron out whatever allocation issues there may be. I think that's a good idea and
suggest that something be scheduled asap. I am also available to participate in that call as well as to review
and comment, as necessary, on new drafts.

Please provide an update.

---

# EXHIBIT C

**EXHIBIT C**



Alan Ross <saveassociates@gmail.com>

## Memo
1 message

**Alan Ross <saveassociates@gmail.com>**                                          **Mon, Feb 22, 2010 at 10:52 AM**
To: "David (Scooter) Simon" <dsimon@stpcorp.com>
Cc: "Twarog, Stan" <STwarog@mintz.com>, "Sullivan, Henry" <hsullivan@mintz.com>

Memo
To:    David Simon
From: Alan J. Ross
Re:    PBT
Date: February 22, 2010

Scooter:

Based on a recent conversation I had with Stan Twarog in which he summarized your position
concerning our apparent impasse as it pertains to finalizing an operating agreement, it seems that we
are *both* of the opinion that it is time to seek a resolution of our differing points of view with the
assistance of Judge Zagle. There are a number of ways this can be handled:

1. Amicably – Present our arguments in writing and orally before Judge Zagle and leave   it up to
him as to the way this matter needs to be resolved.

2. Same as above but with Lawyers

3. Agree to binding arbitration

4. Another approach that you may have thought of may be implemented (by mutual agreement) other
than the above.

I will be happy to cooperate with you as to the best way to proceed.

As Stan has informed you, Bennett, David Braverman and I must all agree on the final wording of
the operating agreement before MBR as an entity can agree to participate. Thus neither myself, as an
individual participant, and MRB as an entity, can at this time approve the latest draft. However, if
we do wind up seeking resolution under the guidance of Judge Zagle I will of course accede to his
directives (individually and as a participant in the MRB LLC) and assume your group will do the
same.

Please let Stan how you intend to proceed.
Alan

--
Alan J. Ross; President
SAVE Associates

# EXHIBIT D

# EXHIBIT D

**§ 18-304. Events of bankruptcy.**

A person ceases to be a member of a limited liability company upon the happening of any of the following events:

(1) Unless otherwise provided in a limited liability company agreement, or with the written consent of all members, a member:

a. Makes an assignment for the benefit of creditors;

b. Files a voluntary petition in bankruptcy;

c. Is adjudged a bankrupt or insolvent, or has entered against the member an order for relief, in any bankruptcy or insolvency proceeding;

d. Files a petition or answer seeking for the member any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation;

e. Files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the member in any proceeding of this nature;

f. Seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the member or of all or any substantial part of the member's properties; or

(2) Unless otherwise provided in a limited liability company agreement, or with the written consent of all members, 120 days after the commencement of any proceeding against the member seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation, if the proceeding has not been dismissed, or if within 90 days after the appointment without the member's consent or acquiescence of a trustee, receiver or liquidator of the member or of all or any substantial part of the member's properties, the appointment is not vacated or stayed, or within 90 days after the expiration of any such stay, the appointment is not vacated.

68 Del. Laws, c. 434, § 1; 70 Del. Laws, c. 186, § 1.;