FILED
9-16-2010
SEP 1 6 2010
JUDGE JAMES B. ZAGEL
UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BALSHE LLC and the SIMON LAW FIRM )
)   Case No. 08-CV-3256
Plaintiffs )
)   Judge James B. Zagel
v. )
)   Magistrate Judge Susan E. Cox
ALAN J. ROSS and SAVE ASSOCIATES )
)
Defendants )

### DEFENDANTS' MOTION FOR RECONSIDERATION OF THE MEMORANDUM OPINION AND ORDER ENTERED ON SEPTEMBER 2, 2010

Defendants Alan J. Ross and SAVE Associates respectfully hereby move this Motion for Reconsideration of the Memorandum Opinion and Order for the above-captioned Case No. 08 CV 3256 (the "Court's Memorandum"), granting in part and denying in part Defendants Motion to Compel Compliance (the "Motion to Compel") with the Settlement Agreement dated June 26, 2008[1]. As grounds, therefore, Defendants state as follows:

1.  The Defendants respectfully maintain that the Court was in error in line 5 of the "Statement of Facts" section of its Memorandum regarding its statement that........."Balshe and Defendants reached an agreement regarding the purchase of Ross' interest in the Patent". Defendants vehemently contest that

---

[1] The Defendants request that their Motion to Compel Compliance with the Settlement Agreement and supporting Memorandum and the Defendants' Opposition to the Plaintiffs' Cross-Motion (the Opposition Memorandum") be incorporated by reference into this Document.

1

assertion. The question as to whether or not an agreement was actually reached was one of the two main items that were at the center of controversy in the initial litigation in 2008.

It was never resolved by this Court and that case was dismissed with prejudice pursuant to the (now contested) Settlement Agreement. Thus, there is absolutely no legal or, the Defendants strongly contend, factual basis for the inclusion of such a "fact" in the Court's Memorandum, and the Defendants respectfully request that the Court reconsider its inclusion in the Court's Memorandum and that that item be removed from that Memorandum. The issue is material because Defendants have a separate agreement with Bennett Meyer et. al. and the legal firm, Braverman Kaskey which formed the entity now known as MRB LLC ("MRB" – see Motion to Compel, footnote Page 2); which was not at issue in this case. Indeed, Defendants have not had an opportunity to present in this case the evidence to show that the action of Meyer et. al was taken in contravention of its authority under that agreement. Thus, to include such a statement is extremely and unfairly prejudicial to the Defendants.

2.  Defendants agreed to the utilization of the term Institutional Pooled Benefits Trust, but *only* as a "Brand Name". However, Defendants and MRB did not agree to use IPB as the entity to be formed for reasons that will be explained in further commentary below. Accordingly, the Court should reconsider this finding.

3.  In the very first paragraph of the Settlement Agreement the term "Parties" is defined as follows: "Balshe, SAVE (the Defendants) and MC are collectively referenced as the Parties and individually referenced as a Party". Thus there should be no manner of doubt regarding the Defendants' position in that and future documents. They are a Party.

The last sentence in Paragraph 22 of the Settlement Agreement states that: "The *Parties* agree to cooperate in good faith to execute any and all necessary documents to effectuate the terms of this Agreement". The Courts' apparent interpretation of that paragraph is only partially correct but it overlooks that last sentence which specifically states "The Parties agree". Not one Party or two Parties but the Parties which as demonstrated above includes the Defendants. Even the Plaintiffs and MC shared this understanding of the Agreement's requirements. The Defendants request that the Court take note that in his December 30, 2008 correspondence to Alan Ross, Mr. Fleming (acting on behalf of the Plaintiffs and Bennett Meyer) demanded (see Defendants' Motion to compel - Exhibit E) that Ross "execute all documents necessary to effectuate the terms of the Settlement Agreement" or face litigation. Similar demands and threats were lodged against the Defendants by legal counsel for Meyer Chatfield. Their collective demands that the Defendant execute the necessary documents and the accompanying threats together with the plain language of that provision verifies that it was the understanding and intent of all three of the Parties that all three of the Parties were required to *execute* the documents. The Defendants request that the Court reconsider its opinion in regard to the necessity that only two of the Parties were required in order to properly execute the necessary documents as unsupported by the record.

4.  Even if Paragraph 22 of the Agreement did not require that all (three) Parties execute the necessary documents (which Defendants adamantly state is not the case), there can be no doubt that at the very least two authorized signatories participation is required in regard to the execution/signature of those documents. At the present time there is only one authorized signatory to the Operating Agreement – the Plaintiffs. MRB LLC ("MRB") has not yet executed the necessary documents. Given the absence of commentary from the Court, in its Memorandum's

3

Statement of Facts or anywhere else, in regard to the MRB Agreement discussed below, and referred to in the footnote to Paragraph 1, page 2 of the Defendants Motion to Compel and the penultimate paragraph in Section II. A of the Defendants Opposition Memorandum, the Defendants believe that it may have been inadvertently overlooked by the Court. The referenced footnote states in part that:

> .......Simultaneous (to) the execution of the Settlement Agreement, Meyer, Ross and the principals of the legal firm known as Braverman-Kaskey, - David Braverman and John Kaskey ("Braverman") - formed an entity (that was later) to be known as the MRB LLC ("MRB"). Meyer placed his forty five percent (45%) voting equity into the newly formed MRB entity. **All MRB management decisions Meyer, Ross and Braverman are required by contractual obligation to be approved unanimously.** Ross continues to maintain his individual ten percent (10%) non-voting equity in the to be formed new entity.........

This was delineated in Section 3(a) of that Agreement (Exhibit A of the Defendants Opposition) which states the following:

### 3. Management of Newco.

(a) Management of Newco (now "MRB LLC") shall initially be governed by a three (3) member executive committee (the "Executive Committee"), comprised of Meyer, Ross and David L. Braverman. Prior to the sale of an equity interest in Newco to a new investor, *all management decisions will require the unanimous vote of the Executive Committee.* Subsequent to the sale of an equity interest in Newco to a new investor, all management decisions for Newco will require the affirmative vote of members holding 65% or more of the membership interests in Newco.

On June 26, 2008 Meyer Chatfield entered into a bona fide Agreement (now known as the MRB Agreement – which was fully disclosed to Plaintiffs during the negotiation of the Settlement Agreement) with the Defendants and Braverman Kaskey P.C.. By doing so they relinquished their unilateral right to execute any Operating Agreement with the Plaintiffs without the Defendants' approval in his capacity as a member of the MRB Executive Committee. The Defendants request the Court to direct its attention to the fact that Bennett Meyer signed the invalid September 2009 so

4

called Operating Agreement for MRB[2]. He was expressly prohibited from doing so without the unanimous vote of the Executive Committee of that entity (which included Braverman Kaskey), which he did not obtain. Therefore any reliance on the part of the Court in its interpretation of the validity of the provisions of the Operating Agreement and its adherence to the Settlement Agreement that is foundationed upon the proposition that "Plaintiffs' and MC's (have) exclusive right to manage" or "Operate" or similar commentary, is misplaced. <u>Meyer Chatfield as a singular entity has absolutely no legal right to manage any part of IPB and Bennett Meyer was not entitled to act as a signatory to that unauthorized IPB Operating Agreement, individually as CEO of MC or as a member of MBR.</u> Further, the Court, in its interpretation of the provisions for which it cites the "Plaintiffs' and <u>MC's</u> exclusive right to manage or operate", is conferring rights and privileges on MC that vanished when Meyer Chatfield entered into the MRB Agreement with the Defendants and Braverman Kaskey. Respectfully, the Court has no authority to confer those rights and privileges upon the Meyer Chatfield organization. Thus, given MC's contractual obligation pertaining to management rights, Defendants also respectfully contend that each provision of the Operating Agreement must adhere to the Settlement Agreement *without any deference to the delegation of IPB management* and that the Court should construe each provision on the basis of the ordinary meaning of the words chosen by the Parties *only* (Matria Healthcare, Inc. v. Coral SR LLC, Memorandum Opinion, Del. Ch. C.A. No.2513-N March 1, 2007 WL 763303 pps.1-2). It is MRB (not MC) - by virtue of the contractually required unanimous approval of its Executive committee, on which Ross serves, that now must agree with the various disputed provisions; and MRB does not.

The Defendants respectfully request that the Court reconsider its ruling based on its interpretation of the "exclusivity to manage or operate with the Plaintiffs' that it asserts is possessed by MC

---

[2] He would be equally prohibited to execute any arrangement or agreement as an individual.

(without deference to its contractual requirement to obtain Defendants' and Braverman Kaskey's approval).

5. The Defendants respectfully assert that the Court ruled in error on the "Shared Expenses" Section of the Operating Agreement. The Court states that – "The Settlement Agreement provides that Newco's (IPB) net profits, not gross profits will be divided with 10% of such profits being paid to SAVE". The Defendants respectfully submit that those words - as a whole - do not appear in the Settlement Agreement in fact, form, substance or even intent.

Paragraphs 7 and 9 do not in fact simply state (as the Court states) that "SAVE is entitled to receive a share of (only) "net profits". The only reference in the Settlement Agreement to the specific term "net profits" is made in conjunction with a specific source of revenue -"net profits derived from trust renewal fees". All other references are in fact stated as net fees specifically <u>related to BOLI/COLI or GOLI policies</u>. If the intent was to share all net profits specifically, the plain language of those provisions should have stated so. It failed to do so.

The Court's ruling would engraft on to the Agreement a provision which was not intended and clearly inconsistent with other express language. Where Plaintiffs were represented with sophisticated counsel at a minimum any ambiguity should be held against them. In any case none of the directives in Paragraphs 7 and 9 which speak to profit distributions, obviate the specific requirement in Provision 3 that "Balshe and MC (MRB) <u>share</u> equally the <u>cost</u> of acquiring the AXA Patent Interest. Nor do they obviate the specific requirement in Paragraph 14 that "The Parties agree to <u>share</u> on a 50%/50% basis between Balshe and MC (MRB) all <u>expenses</u> incurred after the date of this Agreement. There is absolutely no ambiguity in those sentences which refer to costs and expenses (Paragraphs 3 and 14) not profit distributions (Paragraphs 7 and 9). At

minimum, if it really was the intent to coordinate Paragraphs 3, 14, 7 and 9 the language in those provisions should have reflected such intent. It did not. If the intent was to "front" those expenses the provision should have utilized the word front or advance. It did not; it says Share. The ordinary meaning of the word share is manifestly different than front or advance.

As was alluded to by paraphrase in the Defendants' Opposition Memorandum in another context – "A plain reading of the policy (Agreement) does not indicate" (that share meant "front" or that Paragraphs 3, 14, 7 and 9 were to be coordinated). If that was their intent to express this, it would have been easy to do so. "They failed to do so, and (their) subjective intent ...is irrelevant" (Security Insurance Company of Hartford v. Schipporeit, 69 F.3d 1377 17 (7th Cir. 1995).

Of equal interest and importance, in terms of ascertaining the *intent* of the Parties as it relates to the probity of including the Shared Expense provision in the Operating Agreement (as it is defined in either the September 2009 or December 2009 Draft versions – which were constructed before the Defendants filed their Motion to Compel), is the fact that the words "The Settlement Agreement provides that (only) IPB's <u>net profits</u> will be divided....." <u>do not appear in the BOLI/COLI/GOLI Profits and Losses or Distributable Cash sections or anywhere in either version</u>. In fact the words "net profits" do not appear as well. The Distributable Cash sections in the Definitions sections of the Operating Agreements specify a number of "net of reasonable sales and distribution-related expenses, none of which appear in the Shared Expense definition. Again, if the intent of the Plaintiffs and MC was to specifically reflect the coordination of paragraphs 3,14,7 and 9, it is not reflected even in their own language.

In further support of its contention, the Defendants request that the Court take notice of the fact that there was no provision resident in the Draft Agreements constructed by legal counsel for MC (distributed on September 9, 2008) or legal counsel for the Plaintiffs (distributed on September 23,

7

2008). On October 23, 2008 after four months from the date of the execution of the Settlement Agreement in the Draft Agreement presented by counsel for the Plaintiffs, a new provision calling for "Shared Expenses" was suddenly included.

The commentary above more than indicates that the Shared Expense item was nothing more than an afterthought that surfaced only after the Plaintiffs contributed their agreed upon share of the cost of the AXA interest in the Patent which then became a reality not just an item in an Agreement. Thus, the Defendants respectfully request that the Court reconsider its ruling as it pertains to "Shared Expenses".

6. The Defendants individually or in their capacity as members of MRB Executive Committee are not required to acquiesce in the obviation of Paragraph 19 of the Settlement Agreement that states in the plainest of language:

> "This Agreement contains the entire agreement between the Parties relating to rights herein granted and the obligations herein assumed.............
> Any oral representation or modification shall be of no force or effect..........
> This Agreement can be modified only by a writing signed by all of the parties to this Agreement".

The language above contained in Paragraph 19 of the Settlement Agreement is perhaps the most relevant item as it pertains to the Defendants position in this dispute because they believe that a number of modifications to the Settlement Agreement that have not been approved by all of the Parties have found their way into the final Operating Agreement that the Court has mandated in its ruling. Inclusion of any provision that is not resident in the Settlement Agreement or has not been approved by a writing signed by all of the parties (not just the Plaintiffs) is a modification.

8

As one example, Ross does not "*admit*" (see Section III. B. Line 1. of the Court's Memorandum) - he emphatically *declares* - that lapsed policies[3] were not referenced in the Settlement Agreement. The Plaintiffs nor the Court dispute this fact. However, because the Court seems to rely on the supposition that it states in Section III. B of its Memorandum Opinion that - "Ross' argument, however is without merit. The terms of the Settlement Agreement charge MC and Balshe exclusively with the right to manage Newco's business" - it does not find that such inclusion represents a breach. The Defendants respectfully disagree because the inclusion of *any item not referenced in the Settlement Agreement* is a modification that requires the approval of MBR (not MC); and that has not been granted. Otherwise the Court is essentially extracting the requirements delineated in its Paragraph 19 from the Settlement Agreement. Today and in the future (even as part of a "normal business negotiation") the terms of the Settlement Agreement must be respected. Similarly, Defendants are not aware of any provision that prevents them from purchasing the interest of the Plaintiffs or his Co-Members of MRB (see last sentence of Section E. of the Court's Memorandum). The Defendants respectfully request that the Court reconsider its ruling as it pertains to the inclusion of any provision that is not expressly included in the Settlement Agreement that has not been approved by all of the authorized Parties

7.  During the process of negotiating the Operating Agreement the Defendants proposed (for the benefit of all three Parties) the inclusion of a provision covering possible future uses of the Patent that are outside the purview of Section 1 of the Settlement Agreement. In their Memorandum in Support of their Motion to Compel, the Defendants, recognizing that such a provision is a modification of the Settlement Agreement, stated that "Until that (the approval of all

---

[3] The Defendants also maintain that the Lapse provisions can indeed allow for the gaming of the Trust and have provided an explanation, as an attachment, of how it can be accomplished.

9

Memorandum in Support of their Motion to Compel, the Defendants, recognizing that such a provision is a modification of the Settlement Agreement, stated that "Until that (the approval of all three of the Parties) is accomplished, (the New Patent Use provision) must be removed from the final document". However, the Defendants respectfully assert that, subject to the terms of the Settlement Agreement, the Defendants - individually and as a member of MRB - <u>are</u> allowed to benefit from the Patents use in the exact same manner as the other two Parties. Accordingly, the Court should remove the last sentence from the "New Patent Use" section of its Memorandum.

8. Meyer Chatfield was given an opportunity to dispute any and all of the statements advanced by the Defendants in their various communications with the Court, *and they did not do so.* Their failure to do so evidences their acknowledgement of the Defendants positions.

Respectfully Submitted,

Alan J. Ross and SAVE Associates

By: _____
Alan J. Ross, Pro Se

Alan J. Ross
SAVE Associates
687 Highland Avenue
Needham, Massachusetts 02494
(617) 431-7987

## CERTIFICATE OF SERVICE

I, Alan J. Ross, hereby certify that a copy of the above Defendants' Motion for Reconsideration of the Memorandum Opinion and Order Entered September 2, 2010, was served upon the following individuals by first class mail, postage prepaid:

>P. Andrew Fleming
>Novack and Macey LLP
>100 N. Riverside Plaza
>Chicago, Illinois 60606

>David L. Braverman
>Braverman & Kaskey
>One Liberty Place, 56th Floor
>Philadelphia, Pennsylvania 19103-7334

on this 16th day of September, 2010

_____
Alan J. Ross

# ATTACHMENT A

ATTACHMENT A

EXPLANATORY MEMORANDUM: LAPSED POLICY PROVISIONS

POSSIBLE "GAMING" OF THE TRUST

Despite the commentary in Nicomedes Sy Herrera's Affidavit[4] (see Plaintiffs' Memorandum in Support of their Cross-Motion – Exhibit B) regarding his comments concerning the probity of the lapse procedures anticipated to be incorporated into the administration of the PBT Trust, absent any administrative guidelines instituted by the PBT Trustee and Administrator to prevent participating Trust Policyowners from allowing their policies to lapse, *the Trust most certainly can be gamed.*

The Defendants do not require or even request the Court to question Aon Consulting in its judgment of the actuarial fairness of the Patent, as elucidated in its Actuarial Review. The Actuarial fairness of the Patent is not the issue that concerns the Defendants (assuming the inclusion of the proposed lapse procedures). What does concern them is

---

[4] In his affidavit Mr. Herrera does not supply the Court with any items or evidence referencing his professional expertise, experience, recognition or client list (present or past) in the BOLI, COLI, GOLI or IOLI industry. He has never informed the Defendants as to such professional dealings of any sort in those areas and the Defendants assume he has none. The value of the statements in his affidavit is quite dubious.

preventive procedures as they effect an individual policy, not strategies that can easily be employed by Policyowners to game their participation in the Trust pursuant to their <u>entire portfolio of net amount of risk</u> ("NAR") that was enrolled in the Trust from their policies.

In today's BOLI, COLI, GOLI environment, from a practicality standpoint, the underwriting standards and/or the product differentials, offered by the Carriers, are minor. In short the products have become commoditized. Therefore, as it pertains to their actively at work population, policyowners can move their policy portfolio from one carrier to another on a guaranteed issue basis (guaranteeing to issue all policies with equal NAR) and seamlessly purchase a replacement portfolio that is functionally and substantially identical.

Therefore, the Trust can be gamed in at least one or both of the following ways:

1. One or a number of the Policyowner's insureds (with a substantial amount of coverage) develop a serious medical malady and they continue to work after convalescence. This occurs quite frequently. However, in many cases their life expectancy is reduced to 1-5 years (or less). The Policyowner who is the only party aware of the new health situation can then make the business decision to take a maximum policy loan on <u>all of its policies</u> (not just on the policies covering the infirm insureds) and let the policies lapse, usually within 9 but generally no more than 12 months. Then they implement the purchase of the same coverage (outside of the Trust) from another carrier

14

(with the equity that was drawn from the initial coverage via the maximum policy loan), thus obtaining all of the ownership of the death benefit proceeds themselves.

2. In a similar example to the above, a Policyowner may participate in the Trust for a number of years with no or very little mortality experience occurring to its group. Perhaps year after year they have received Trust distributions without contributing any or any significant mortality to the pool from *their* insureds. At a time in the future they also may make a business decision to take on the risk of the longevity of its group (also perhaps based to some extent on their health experience), they then can maximum loan their policies and follow the same course as above.

This undoubtedly creates a very profitable circumstance for the Plaintiffs whereby they are allowed to purchase the remaining net death benefits on policies covering infirm insureds with short life expectancies and receive all of the significant commissions and other possible compensation– <u>without any benefits inuring to the Policyowners that continue to keep their policies in the Trust</u>[5]. The Defendants strongly assert that the Plaintiffs have demanded that such procedures be adopted because it represents a significant and lucrative part of their "business plan" – with no concern for the welfare of the remaining Policyowners. These Policyowners enrolled with the expectation that all of the Trust Participants would execute irrevocable assignments of their NAR – in <u>actuality</u> - not just in name only. It represents a classic bait and switch in that a substantial amount of the initial mortality projections can be significantly reduced. All Trust actions should

---

[5] The Defendants request that the Court note that MRB is required to purchase policies only if such purchase for the benefit of the Trust Policyowner <u>not for their own enrichment</u>.

be taken with the benefit of the Participants as their primary purpose. If there are any profits derived from policy purchases they should be funneled back into the Trust for distribution to the Trust members. Period.

The Defendants also believe that the lapse procedures are a mechanism that negates the purpose and effectiveness of the so called irrevocable assignment. To the contrary, those procedures essentially provide a revolving door that can be utilized by its participating Policyowners to exit the Trust at any time, within a very short period of time as demonstrated above. It is a structural flaw that the advisors of potential clientele will seize upon and will be a significant barrier to successful enrollment into the Trust. The Defendants experienced objections from practitioners in regard to this issue in their previous attempts to market the Trust. As a result, procedures were instituted to prohibit lapses – not make it easier to accomplish. David Covington, the consulting actuary from Aon that provided the actuarial review referenced in this Memorandum, was an employee of The MONY Group which at that time shared ownership of the Patent with Alan Ross. He was part of the team that designed the administrative procedures for the PBT Trust, including those that were intended to prohibit lapses.