**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

BALSHE LLC and the SIMON LAW FIRM,

Plaintiffs,

v.

ALAN J. ROSS and SAVE ASSOCIATES,

Defendants.

No. 08 C 3256
Judge James B. Zagel

**MEMORANDUM OPINION AND ORDER**

## I. INTRODUCTION

Defendants[1] come now and ask that I reconsider my prior ruling. Two years ago, Defendants, Plaintiffs, and Meyer-Chatfield Corporation ("MC") entered into a Settlement Agreement to resolve litigation regarding a dispute over the purchase of interest in a patent describing a system of pooling life insurance policies into a trust in order to create a predictable income stream for the trust owners (the "Patent"). Pursuant to the Settlement Agreement, Defendants were required to transfer their interest in the Patent to Institutional Pooled Benefits LLC ("IPB"). To date, Defendants have failed to completely transfer their interest.

This court retained jurisdiction to enforce the terms of the Settlement Agreement and the parties filed cross-motions to compel compliance with the Settlement Agreement. Defendants had refused to transfer their interest in the Patent to IPB alleging that certain provisions contained in the IPB Limited Liability Company Agreement ("Operating Agreement") were inconsistent with

---

[1] Alan J. Ross ("Ross") brings his claims on behalf of himself and SAVE Associates. Though Ross is acting *pro se*, SAVE Associates is represented by Alan R. Lipton. Alan R. Lipton, however, has not signed any of the motions that Ross has brought before the court on behalf of SAVE Associates.

and contrary to the terms and conditions set forth in the Settlement Agreement. I ordered Plaintiffs to strike from the Operating Agreement the provision barring Ross's right to dissuade, and ordered Ross to transfer his remaining interest in the Patent to IPB in compliance with the Settlement Agreement. Defendants come now with a motion to reconsider.

Defendants' motion to reconsider highlights certain facts that were not clear in their original motion. Likewise, they clarify certain arguments. Defendants' motion to reconsider was fully briefed. Additionally, an evidentiary hearing was held on March 11, 2011 in regard to the issue of shared expenses. The parties then filed supplemental briefs following the evidentiary hearing. Each side has had ample opportunity to create a full record. As I noted at the evidentiary hearing, it appears that the "kitchen sink" approach has been adopted by some, if not all, parties. For the following reasons, Defendants' motion to reconsider is granted in part.

## II. PRELIMINARY MATTERS

### A. Motion To Strike

Plaintiffs filed a motion to strike exhibits from Defendants' reply, and Defendants' request for new relief. Specifically, Defendants' reply purports to offer evidence that was not presented to the court during the evidentiary hearing. Exhibits A, B, and C-1 are unauthenticated documents and Exhibit C is a declaration from a witness who was not present to be cross-examined. While I am sympathetic to Plaintiffs' arguments, given the history of the case, I decline to strike these exhibits. In considering their weight, however, I have taken into account the arguments raised in the motion to strike.

Defendants also seek new relief from the court in its reply, asking that the court "overturn" an alleged patent assignment and strike the testimony of the witnesses that Plaintiffs presented at

the hearing. I decline to strike the testimony of the witnesses who testified at the evidentiary hearing. I likewise, decline to offer Defendant any relief outside of, or in addition to, the motion to reconsider my prior order.

B. Motion for Attorneys' Fees

Plaintiffs ask that I award them attorneys' fees given Defendants refusal to honor their obligation to transfer the subject patent under the Settlement Agreement. Given the contentious nature of this dispute, and the myriad of issues that have required resolution, some more meritorious than others, I decline to grant such costs or fees.

## III. FACT STATEMENT

The action underlying the contested Settlement Agreement involved a dispute over the purchase of interest in a patent describing a system of pooling life insurance policies into a trust in order to create a predictable income stream for the trust owners (the "Patent"). In 1997 Ross filed an application for the Patent with the United States Patent and Trademark Office ("USPTO"). Ross assigned a one-half interest in the Patent to an affiliate of the AXA Group, and thereafter, Balshe and Defendants reached an agreement regarding the purchase of Ross's interest in the Patent. The underlying lawsuit was filed when Ross allegedly attempted to sell the Patent to a third party. The contested Settlement Agreement ("Settlement Agreement") was reached on June 26, 2008. The parties to the Settlement were Balshe and The Simon Law Firm (collectively referred to as "Balshe" in the Settlement Agreement), Ross, SAVE, and the Meyer-Chatfield Corporation. This court retained jurisdiction to enforce the terms of the Agreement.

As part of the Settlement Agreement the parties agreed to form a new entity "Newco" for the purpose of commercially exploiting the Patent. Newco is now to be known as "Institutional Pooled Benefits LLC" or "IPB." The Settlement Agreement established the rights and obligations of the parties regarding the ongoing ownership, management, and administration of IPB. The Settlement Agreement stated that the form and jurisdiction in which IPB would be organized/created would be mutually agreed upon by Balshe and MC, and that the ownership and management of IPB would be in accordance with the Settlement Agreement. Ross and SAVE agreed to execute all necessary documents to assign to IPB right, title and interest held in the Patent. The Settlement Agreement also required that IPB use its best efforts to acquire all right, title, and interest in the Patent.

To date, Ross has transferred only a partial interest in the Patent to IPB. The current dispute surrounds the transfer of Ross's remaining interest in the Patent to IPB, and the formation of IPB pursuant to the Settlement Agreement. Because Ross contends that provisions contained in the draft IPB Operating Agreement are inconsistent with terms set forth by the Settlement Agreement, he has refused to transfer his remaining Patent interest to IPB.

## IV. DISCUSSION

### A. Defendants' Objections to Specific Language.

First, Defendants assert that a statement made in the "Statement of Facts" section of the Memorandum Opinion and Order was in error. Specifically, the Order states that "Balshe and Defendants reached an agreement regarding the purchase of Ross' interest in the Patent." Defendants contest that an agreement was ever reached. Plaintiffs do not object to an amendment to the Order stating that: "Plaintiffs allege that Balshe and Defendants reached an agreement

regarding the purchase of Ross' interest in the Patent." Such an amendment should address Defendants' concern.

B. Execution of Documents

Defendants once again argue that pursuant to the terms of the Settlement Agreement, they must sign all documents related to the business of Institutional Pooled Benefits, LLC's ("IPB"), including its final Operating Agreement. They reason that this must be so because paragraph 22 of the Settlement Agreement states that "[t]he Parties agree to cooperate in good faith to execute any and all necessary documents to effectuate the terms of this Agreement." Pursuant to paragraph 1 of the Settlement Agreement, "[t]he form and jurisdiction in which Newco [IPB] will be organized/created shall be as mutually agreed to by Balshe and MC." From my reading of the settlement agreement, I do not see a requirement that Ross or SAVE sign the IPB Operating Agreement. Though the Settlement does state that "the Parties shall form a new entity", the Settlement Agreement specifies that Balshe and MC must agree on the form that IPB should take.

However, the revised Operating Agreement itself states that it is entered into by MRB Pooled Benefits LLC, PBT Sponsorship Group, LLC, and Institutional Longevity Assets LLC. Following the execution of the Settlement Agreement, Bennet Meyer, Meyer-Chatfield Corp., David Braverman and Jonn Kaskey, and Alan J. Ross formed an entity to be known as MRB LLC ("MRB"). Institutional Longevity Assets LLC ("ILA") is an entity formed by Balshe and the Simon Law Firm. PBT Sponsorship Group, LLC ("PBT") is referred to in the Operating Agreement as "Ross," but the formation of this entity is not discussed in any of the briefs. The Operating Agreement has three signature lines, reserved for PBT, MRB, and ILA respectively. The implication, therefore, is that the signature of all three parties is necessary to create a valid

and enforceable Operating Agreement. Nevertheless, there is no signature line for Ross or SAVE explicitly. However, the practical effect of requiring PBT's signature seems to allow Ross (as the presumed representative of PBT) to withhold his signature from the Operating Agreement rendering it unenforceable. Accordingly, though the Settlement Agreement does not itself appear to require Ross's signature to finalize the IPB Operating Agreement, the structure of the IPB Operating Agreement itself does require such a signature. That being said, formation and management rights were assigned to various entities pursuant to the Settlement Agreement. Ross was not granted any management or formation rights to IPB. Specifically, Ross and Save were granted a 10% non-voting equity interest, whereas both Meyer-Chatfield Corporation and Balshe and The Simon Law Firm were granted 45% voting equity interests in IPB. Management duties were delegated between Meyer-Chatfield and Balshe and The Simon Law Firm. Therefore, Ross's signature, as representative of PBT, though necessary, is merely a formality.

C. MC's Ability to Sign an Operating Agreement.

Defendants next argue that Bennett Meyer did not have the authority to sign the Operating Agreement on behalf of MRB. Specifically, Defendants state that Meyer did not have the authority to sign the Operating Agreement because pursuant to the MRB Agreement, the management of MRB is governed by the executive committee consisting of Bennet Meyer, Ross and David L. Braverman. Because Ross alleges that he did not agree to the Operating Agreement, Meyer's signature was unauthorized.[2] This argument was raised, though undeveloped in Defendants' motion to compel.

---

[2] No mention has been made of Braverman's perspective on this matter.

It bears repeating that the parties to the Settlement Agreement were: (1) Balshe LLC and the Simon Law Firm; (2) Alan J. Ross and SAVE Associates; and (3) The Meyer-Chatfield Corporation. Pursuant to the Settlement Agreement, the "form and jurisdiction in which Newco will be organized/created" would be mutually agreed to by Balshe and Meyer-Chatfield. The ownership and management of IPB would be in accordance with the Settlement Agreement. Following the execution of the Settlement Agreement, Bennet Meyer, Meyer-Chatfield Corp, David Braverman and Jonn Kaskey, and Alan J. Ross formed an entity to be known as MRB LLC. Meyer-Chatfield transferred its 45% voting equity interest in the Patent Entity (known as IPB) pursuant to the terms of the Settlement Agreement to MRB. Additionally, it was agreed that the management of MRB would be governed by a three-member executive committee comprised of Bennett Meyer, Alan J. Ross, and David L. Braverman. All MRB management decisions must be approved unanimously by the executive committee. Plaintiff contends that Meyer Chatfield relinquished its unilateral right to execute any IPB Operating Agreement with the Plaintiffs without the approval of the MRB Executive Committee.

Assuming that the signing of the IPB Operating Agreement is a management decision as contemplated by the MRB Agreement, which Plaintiffs do not contest, it appears that Bennett Meyer might well have signed the IPB Operating Agreement without authority. Plaintiffs argue, however, that pursuant to Pennsylvania law, the law governing the MRB Operating Agreement, a corporation nor its shareholders may assert the defense of *ultra vires* against a third-party such as Plaintiffs.[3] The relevant Pennsylvania statute provides that:

---

[3] Both Illinois and Delaware have similar statutes. *See* 805 IL. COMP. STAT. 5/3.15; 8 Del. C. § 124.

> A limitation upon the business, purposes or powers of a business corporation, expressed or implied in its articles or bylaws or implied by law, shall not be asserted in order to defend any action at law or in equity between the corporation and a third person, or between a shareholder and a third person, involving any contract to which the corporation is a party.

The statute goes on to state, however, that the defense of *ultra vires* may be asserted:

> [in] an action by a shareholder against the corporation to enjoin the doing of unauthorized acts or the transaction or continuation of unauthorized business. If the unauthorized acts or business sought to be enjoined are being transacted pursuant to any contract to which the corporation is a party, the court may, if all the parties to the contract are parties to the action and if it deems the result to be equitable, set aside and enjoin the performance of the contract.

The meaning of this statute is that "no one may claim a corporation did not have the authority to enter any contract in question, except [] that a shareholder may bring an action to *enjoin* the corporation from doing unauthorized acts." *Copland v. Fischer & Porter Co.*, No. 93-08366-09-5, 1996 WL 932080, at *3 (Pa.Com.Pl. June 13, 1996) (emphasis original). Here, Defendants have not brought a motion to enjoin. Rather, Defendants argue that the MRB signature to the IPB Operating Agreement is invalid and unenforceable because it was unauthorized. Though Defendants have not styled their motion as a motion to enjoin, the spirit of their efforts is to enjoin MRB from action without authorization. The parties to this action, however, are Balshe LLC, the Simon Law Firm, Alan J. Ross, and SAVE Associates. Pursuant to Pennsylvania statute, I may set aside and enjoin the performance of the contract if "all the parties to the contract are parties to the action." The contract at issue here is the IPB Operating Agreement. The parties to that agreement are PBT Sponsorship Group (presumably Ross), MRB Pooled Benefits, and Institutional Longevity Assets (the group formed by Balshe and The Simon Law Firm). Technically speaking, no parties to the contract are parties to this lawsuit. Practically

speaking, however, it is MRB (and its remaining shareholders, Bennett Meyer, Meyer-Chatfield Corp., and Braverman Kaskey PC) who are absent from this action. Because not all parties to the contract are parties to the action, setting aside or enjoining performance on the contract is improper. Furthermore, because MRB is unrepresented in this suit, we only have Ross's representation that Meyer's signature was authorized.

Though Meyer's signature on behalf of MRB may have been made without the proper authority, Pennsylvania statute requires that all parties to the contract be parties to the action prior to a court enjoining or invalidating that contract, a situation that does not present itself in this case. Therefore, though the MRB signature may be an *ultra vires* act, it is premature for this court to invalidate the contract.

D. Defendants Argue that "IPB" Is Not "Newco."

Defendants state that they agreed to use the term "Institutional Pooled Benefits Trust" but only as a brand name. They did not, they say, agree to use IPB as the entity to be formed to receive the patent. The Defendants made the same argument before and add nothing new. Having previously considered Defendants' arguments, my prior ruling on this issue will stand.

E. Shared Expenses

Defendants ask that I reconsider my finding that the "Settlement Agreement provides that Newco's (IPB) net profits, not gross profits will be divided with 10% of such profits being paid to SAVE." Specifically, Defendants argue that the Shared Expenses provisions of the Operating Agreement impermissibly alter the Settlement Agreement. Though only now raising the issue of ambiguity, Defendants have clarified their argument in both their supplemental briefing and at oral argument. Even so, I reject their arguments and adhere to my prior ruling.

I begin with the language of the two agreements. The IPB Operating Agreement defines shared expenses as expenses shared by ILA and MRB incurred with (a) the formation and start-up of the Company, (b) the acquisition of the Patent, and (c) all costs and expenses incurred by ILA or MRB in connection with the negotiation, preparation and delivery of the IPB Operating Agreement or pursuant to the Settlement Agreement. Section 5(a)(1) of the IPB Operating Agreement states that prior to making any distributions of "distributable cash," from BOLI[4] Operations, Distributable Cash from COLI Operations, and Distributable Cash from IOLI Operations, up to $1,000,00.00 would be distributed to ILA and MRB on a *pro rata* basis, based on percentages paid by each party in aggregate shared expenses. It is this concept, that Balshe and MC would recoup their fronted expenses *prior* to Ross receiving his share of profits, that Defendants object to.

Paragraph 14 of the Settlement Agreement states:

> The Parties agree to share on a 50%/50% basis between Balshe and MC all expenses incurred after the date of this Agreement, which are necessary to develop the business of Newco, including, without limitation, the procurement of additional patents. (Emphasis added)

Similarly, Paragraph 3 of the Settlement Agreement states that Balshe and MC will share equally in the cost of acquiring the AXA Patent Interest.

Paragraphs 7, 9, and 10 all express similar propositions. Paragraph 7 of the Settlement Agreement states that all of IPB's net profits related to BOLI policies will be divided with 10% to SAVE, 72% to MC and 18% to Balshe. Paragraph 9 states that all of IPB's net profits related to COLI and GOLI policies will be divided with 10% to SAVE, 72% to Balshe, and 18% to MC.

---

[4] BOLI is defined as bank-owned life insurance; IOLI is defined as carrier-owned life insurance; non-BOLI and non-IOLO corporate-owned life insurance is defined as COLI and/or government-owned life insurance ("GOLI").

Likewise, Paragraph 10 of the Settlement Agreement states that net profits related to IOLI policies shall be divided with 10% to SAVE, 45% to Balshe and 45% to MC.

Ross argues that nothing in Paragraphs 7 and 9 of the Settlement Agreement obviate the provision in Paragraph 3 that Balshe and MC share the costs of acquiring the patent interest, or the requirement in Paragraph 14 that Balshe and MC share expenses associated with business development. Moreover, Defendants argue that allowing Plaintiffs and MC the right to recoup expenses before profits are distributed forces Defendants to incur costs in violation of the Settlement Agreement. In opposition, Plaintiffs argue that the word "share" means that Balshe and MC would "front" IPB's expenses.[5] In other words, Defendants would have no obligation to put forth money for expenses up front. In exchange for this benefit, however, Plaintiffs contend that they are entitled to recoup their investment costs and share only 10% of the net profits with Ross.

Plaintiffs' interpretation is consistent with Paragraphs 7, 9, and 10 of the Settlement Agreement which allocates Defendants 10% of net profits related to BOLI, GOLI, COLI, and IOLI accounts. Though Defendants are correct that the term "shared expenses" does not expressly appear in the Settlement Agreement, because net profits are calculated by subtracting expenses from gross revenues, the concept of "shared expenses" is included in the Settlement Agreement. As I read these two documents, the inclusion of shared expenses in the Operating Agreement is not in conflict with the Settlement Agreement.

Defendants' contention that the Settlement Agreement does not allow Plaintiffs to net out expenses is deficient in two ways. First, nothing precludes the netting out of expenses.

[5] Defendants are correct that on page 5 line one the word "Defendants" should read "Plaintiffs."

Moreover, this interpretation is easily and properly read into Paragraph 14. As conceded by Ross, Balshe and MC do front development expenses. Nothing in the Settlement Agreement even suggests that Balshe and MC must bear such costs without reimbursement. Second, I find that the testimony by John Kaskey, someone with a contrary financial interest, to be credible.[6] At the hearing, Mr. Kaskey testified that all distributions given to Ross were to be net, not gross. In Ross's view, revenue would flow into the entity, Ross would receive his share of the profits, and only then would Balshe and MC recoup their out-of-pocket expenses. This interpretation is dubious because expenses must be fronted on a continuing basis. Moreover, I credit the testimony of others, namely Mr. Kaskey and Sy Herrera, who deny that this view was ever contemplated by the parties during settlement negotiations. Although the agreement does not say that Balshe and MC would 'front' expenses, read as a whole, this is the only reasonable interpretation of the Settlement Agreement.

---

[6] In his supplemental briefing, Ross has alleged that Kaskey's testimony was willfully misleading because it was in direct conflict with meeting summary notes that Bennett Meyer sent to Kaskey on June 20, 2008. These notes were reviewed by Kaskey and then emailed to Ross. These notes record "10% off the top to Alan J. Ross." These documents are unauthenticated, and offer no context. I credit Kaskey's testimony in court, and find that he was clear and unequivocal in his understanding that Ross was to receive a share of gross profits. Ross also contends that Kaskey's testimony was willfully misleading, violated attorney-client confidentiality, and misrepresented Defendants' position. Ross had an opportunity to cross-examine Kaskey under oath, yet chose not to. Accordingly, I find his assertions dubious at best.

Ross also presents the declaration of Stanley A. Twargog, an attorney who advised Ross during settlement negotiations. His declaration states that distributions were to be "net of the operating expenses associated with the generation of the various fee and other revenue inflows into the Trust." Mr. Twargog did not participate at the hearing, nor was he subject to cross-examination. Accordingly, I afford this declaration minimal weight. Moreover, this testimony does not directly contradict the assertion that Ross would be granted his distribution after the reimbursement of *development* costs. Additionally, Twarog states that Kaskey did not discuss the definition of "net" or "net distribution" with him.

One new argument raised by Defendants is that the Settlement Agreement is ambiguous and that because Plaintiffs were represented by "sophisticated counsel" any ambiguity should be construed against them. I do not find that the Settlement Agreement is ambiguous. The Settlement Agreement's discussion of shared expenses is all inclusive, and arguments that the Operating Agreement added something new are untenable. For these reasons, I adhere to my prior ruling that Defendants are entitled to net, not gross profits.

F. Defendants' Right to Veto Procedures Covering Lapse Policies

In Defendants' initial motion to compel enforcement of the settlement, they argued that the references in Section 6 of the IPB Operating Agreement represent an impermissible, substantial modification of the Settlement Agreement. Section 6 of the IPB Operating Agreement is titled "Management of BOLI Transactions" and begins by stating that "MRB shall have the exclusive right to manage all aspects of the Company's involvement with BOLI with respect to any PBT Trust." The paragraph goes on to discuss the management of BOLI transactions, including rights to purchase policies reasonably likely to lapse. Defendants argued that the procedures set forth could potentially allow for the "gaming" of the Trust in ways that would be harmful to its integrity. This, Defendants argue, would violate paragraph 15 of the Settlement Agreement which provides that no party will take action to harm or damage the Trust.

To date, no action has been taken to damage the trust. Furthermore, the Settlement Agreement states that "MC shall have the exclusive right to manage all aspects of Newco's involvement with BOLI with respect to any PBT Trust." The IPB provision regarding lapsing BOLI policies does not violate the Settlement Agreement. MC was charged exclusively with the

management of such policies in the Settlement Agreement, and MRB has taken over this role in the Operating Agreement.[7]

Defendants now contend generally that this modification violates paragraph 19 of the Settlement Agreement which states that "[t]his Agreement contains the entire agreement between the Parties . . . This Agreement can be modified only by a writing signed by all of the parties to this Agreement." I do not find that the lapsing policy provision modifies the Settlement Agreement. This provision is consistent with the Settlement Agreement's grant of exclusive management rights to MC.

G. Bankruptcy Provisions

Defendants seemingly argue, once again, that the Bankruptcy provisions articulated in IPB's Operating Agreement violates the Settlement Agreement because there is nothing in the Settlement Agreement that addresses the procedures governing the bankruptcy of IPB's members. In the event of a bankruptcy of either ILA or MRB, the IPB Operating Agreement affords ILA and MRB exclusively the right to purchase the other's membership interest for its fair market value. This right is not afforded to PBT (Ross).

Defendants are correct that the Settlement Agreement does not explicitly prohibit Ross from purchasing the interest of the Plaintiffs or his co-members of MRB. Plaintiffs however highlight that allowing Ross to purchase an interest in ILA or MRB would morph Ross from a non-voting member into a voting member of IPB, which would be contrary to the Settlement Agreement. This argument is somewhat weakened by the fact that MC transferred its voting rights

[7] I note that Ross himself is a member of the MRB executive committee. As noted by Defendants themselves, the executive committee must unanimously approve all MRB management decisions.

to MRB, and Ross sits as a member of the MRB executive committee. Similarly, the purchase of one entity by the other would likewise shift the voting rights set forth in the Settlement Agreement which would also modify the Settlement Agreement.

Though Defendants may not like the bankruptcy provision, I do not think that it violates or modifies the Settlement Agreement. The Settlement Agreement does not in any way articulate what is to happen in the event of the bankruptcy of a party. Likewise, the bankruptcy provision does not alter any of Defendants' rights as set forth by the Settlement Agreement.

One consideration raised by Defendants, and not previously considered, is the impact any purchase in the event of bankruptcy would have on the Settlement Agreement. The Settlement Agreement sets forth explicitly voting rights and equity interest in Newco, now IPB. The purchase of any one entity's interest would alter these interests, and pursuant to paragraph 19 of the Settlement Agreement any modifications must be made in writing and signed by all parties. In this regard, although the bankruptcy provision does not explicitly violate the Settlement Agreement, any shift in voting rights and equity interest would presumably need to be approved by all members.

H. New Patent Use

Defendants argue that the statement "[i]n accordance with the Settlement Agreement Ross has sold the Patent and no longer is allowed to benefit from its use" should be stricken. Defendants have clarified that Ross had proposed the insertion of additional language to the IPB Operating Agreement under the heading of "New Patent Use." This additional language would cover possible future uses of the Patent that are outside the purview of Section 1 of the Settlement Agreement.

Defendants argue that subject to the terms of the Settlement Agreement – individually and as members of MRB – they are allowed to benefit from the Patents' use in the exact same manner as the two other Parties. Contrary to Defendants' assertions Defendants are not allowed to benefit from the Patent in the same manner as the other two parties. Each party has specified rights delineated by the Settlement Agreement. Furthermore, the contested language, in context, does not prevent Defendants from receiving whatever benefits they are entitled to under the Settlement Agreement.

**V. CONCLUSION**

Defendants' motion for reconsideration is granted in part. Defendants' motion to reconsider specific language in the statement of facts, and the issue of the execution of documents is granted. Defendants' motion to reconsider ruling as to MC's ability to sign, the agreed use of IPB as the entity to be formed pursuant to the Settlement Agreement, Shared Expenses, Defendants' right to veto procedures covering lapse policies, bankruptcy provisions and new patent use is denied. Plaintiffs' motion to strike is denied, as is their request for attorneys' fees.

ENTER:

James B. Zagel

James B. Zagel
United States District Judge

DATE: July 7, 2011